## 2023-1218 and 2023-1274

# United States Court of Appeals for the Federal Circuit

SUNOCO PARTNERS MARKETING & TERMINALS L.P.,

*Plaintiff-Appellant,*

– v. –

POWDER SPRINGS LOGISTICS, LLC,
MAGELLAN MIDSTREAM PARTNERS L.P.,

*Defendants-Cross-Appellants.*

*On Appeal from the United States District Court for
the District of Delaware in No. 1:17-cv-01390-RGA,
Honorable Richard G. Andrews, Judge*

## BRIEF FOR PLAINTIFF-APPELLANT

RICHARD L. STANLEY
P.O. Box 7967
Houston, Texas 77270
(832) 656-4277
rstanleylaw@gmail.com

JOHN R. KEVILLE
MICHELLE C. REPLOGLE
MICHAEL C. KRILL
SHEPPARD, MULLIN, RICHTER &
  HAMPTON LLP
700 Louisiana Street, Suite 2750
Houston, Texas 77002
(713) 431-7100
jkeville@sheppardmullin.com
mreplogle@sheppardmullin.com
mkrill@sheppardmullin.com

*Counsel for Plaintiff-Appellant*

MARCH 29, 2023



### U.S. Patent No. 9,207,686

**1**. A method for in-line blending of gasoline and a volatility modifying agent comprising:

  a) providing a continuously flowing gasoline stream that comprises:

  i) a plurality of batches of different gasoline types;

  ii) a gasoline flow rate that varies over time; and

  iii) a plurality of gasoline vapor pressures;

  b) providing an allowable vapor pressure;

  c) providing a stream of said agent that comprises an agent vapor pressure;

  d) periodically determining said gasoline vapor pressure;

  e) periodically determining said gasoline flow rate;

  f) calculating a blend ratio based upon said agent vapor pressure, said gasoline vapor pressure, and said allowable vapor pressure; and

  g) blending said agent stream and said gasoline stream at a blending unit at said blend ratio to provide a blended gasoline stream having a blended vapor pressure less than or equal to said allowable vapor pressure.

**3**. The method of claim **1**, further comprising:

  a) providing a first information processing unit (IPU) on which said calculating is performed;

  b) providing a second IPU which generates pulses of flow rate data;

  c) transmitting said flow rate data to said first IPU; and

  d) calculating a blend rate on said first IPU based upon said flow rate data from said second IPU.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1218, 2023-1274 |
| **Short Case Caption** | Sunoco Partners Marketing & Terminals L.P. v. Powder Springs Logistics, LLC |
| **Filing Party/Entity** | Sunoco Partners Marketing & Terminals L.P. |

> **Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/13/2023

Signature: /s/ John R. Keville

Name: John R. Keville

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Sunoco Partners Marketing & Terminals L.P. | | Energy Transfer L.P. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Winston & Strawn LLP | Eric S. Schlichter | Richard T. McCarty |
| Phillips, McLaughlin & Hall, P.A. | Megan C. Haney | David A. Bilson |
| John C. Phillips , Jr. | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Sunoco Partners Marketing & Terminals L.P. v. U.S. Venture, et al., 1:15-cv-08178 (N.D. Ill. 2015) | | |
| Sunoco Partners Marketing & Terminals L.P. v. U.S. Venture, Inc., No. 22-1899 (Fed. Cir. 2022) | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................i

TABLE OF AUTHORITIES ................................................. vii

GLOSSARY.................................................................xi

STATEMENT OF RELATED CASES ................................xiv

JURISDICTION...........................................................1

INTRODUCTION .........................................................1

STATEMENT OF ISSUES ...............................................2

STATEMENT OF THE CASE.............................................4

    I.    Factual Background.................................................4

        A.    Sunoco's Patents ..........................................4

        B.    The BSA Profit-Sharing Methodology .....................6

        C.    The Patent Rights Were The Sole Reason Other Companies Entered Sunoco BSAs..............................8

        D.    Magellan Refuses A BSA To Keep All Profits For Itself.....................................................10

        E.    Magellan's Infringement On The Colonial Pipeline ...............12

    II.    Procedural History.................................................14

        A.    Pretrial Damages Proceedings .................................14

        B.    The Jury Trial ...........................................15

SUMMARY OF ARGUMENT .............................................17

ARGUMENT ...............................................................20

    I.    Standards Of Review................................................20

    II.    This Case Must Be Remanded For A New Damages Trial ...............21

A.  The District Court Erroneously Treated Sunoco's
    Highly-Comparable BSAs As Multi-Component
    Products That Had To Be Apportioned ....................................21

    1.  The Established BSA Compensation
        Methodology Reflects The Value Of
        Sunoco's Patents.............................................................23

    2.  Sunoco's BSA Methodology Has "Built-In"
        Apportionment.................................................................26

    3.  Sunoco's Actual Negotiations Confirm The
        BSAs Have "Built-In" Apportionment...........................28

B.  The District Court Abused Its Discretion In Striking
    Ugone's Lost Profits Opinions.................................................30

    1.  The District Court Erroneously Disregarded
        Ugone's *Prima Facie* Lost Profits Showing
        Under *Panduit*.................................................................31

    2.  Further Apportionment Of Ugone's Lost Profits
        Opinions Was Not Required Where The *Panduit*
        Factors Are Satisfied ......................................................33

    3.  The District Court Erroneously Rejected
        Sunoco's Evidence Showing The Patent Rights
        Are The Key Driver Of Demand For Sunoco's
        BSAs .................................................................................37

    4.  Apportionment Is Not Required Because Sunoco
        Can Get Lost Profits On The Other BSA
        Services As Convoyed Sales ..........................................40

    5.  Ugone's Supplemental Opinions Addressing
        Apportionment Were Reliable And Should Not
        Have Been Excluded .......................................................44

C.  The District Court Abused Its Discretion In Striking
    Ugone's Reasonable Royalty Opinions ....................................47

D.  The District Court Abused Its Discretion In Excluding
    Ugone's Other Unchallenged Opinions....................................52

    1.  Ugone's "Lost Opportunity Cost" Opinions
        Were Improperly Excluded .............................................52

v

2.    Ugone's "Buckeye License" Rebuttal Opinions
Were Improperly Excluded ..............................................54

E.    Even Without Expert Testimony, The District Court's
Erroneous Rulings Warrant A New Damages Trial ................57

1.    The District Court Erred In Not Instructing
The Jury On Lost Profits ................................................57

2.    The District Court Abused Its Discretion
In Barring Sunoco From Asking The Jury
To Award Royalties Based On Sunoco's
Comparable Licenses......................................................60

III.    The District Court Erred In Granting JMOL Of
Non-Infringement........................................................................63

IV.    The District Court Abused Its Discretion In Not Awarding
Any Enhanced Damages ....................................................................65

CONCLUSION ........................................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ....................................... 24, 45, 46, 47

*Am. Seating Co. v. USSC Group., Inc.*,
  514 F.3d 1262 (Fed. Cir. 2008) ..................................................... 41, 43

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) ........................................ 20, 37, 38, 44

*Apple, Inc. v. Wi-LAN Inc.*,
  25 F.4th 960 (Fed. Cir. 2022) ..................................................... 20, 54

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 476 (1964) .............................................................................1

*Asetek Danmark A/S v. CMI USA Inc.*,
  852 F.3d 1352 (Fed. Cir. 2017) ........................................................52

*Bayer Healthcare LLC v. Baxalta Inc.*,
  989 F.3d 964 (Fed. Cir. 2021) ..........................................................58

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020) ................................................. 27, 48

*Brooktree Corp. v. Advanced Micro Devices*,
  977 F.2d 1555 (Fed. Cir. 1992) ........................................................66

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
  807 F.3d 1283 (Fed. Cir. 2015) ........................................................30

*Centricut, LLC v. Esab Group, Inc.*,
  390 F.3d 1361 (Fed. Cir. 2004) ........................................................62

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015) ....................................... 24, 25, 26, 27

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) ........................................................59

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ........................................................ 20, 35, 37, 56

*Duro-Last, Inc. v. Custom Seal, Inc.*,
  321 F.3d 1098 (Fed. Cir. 2003) ............................................................64

*Elbit Systems Land and C4I Ltd. v. Hughes Network Systems, LLC*,
  927 F.3d 1292 (Fed. Cir. 2019) ...................................................... 24, 27

*Ericsson, Inc. v. D-Link Systems, Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ............................................... 22, 25, 58

*Georgetown Rail Equipment Co. v. Holland L.P.*,
  867 F.3d 1229 (Fed. Cir. 2017) ......................................... 32, 33, 34, 47

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) ....................................... 24, 48, 50

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
  438 F.3d 1354 (Fed. Cir. 2006) ........................................................58, 5

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  579 U.S. 93 (2016) ................................................................... *passim*

*Jamesbury Corp. v. Litton Indus. Products*,
  756 F.2d 1556 (Fed. Cir. 1985) ...................................................... 20, 60

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
  382 F.3d 1367 (Fed. Cir. 2004) ............................................................42

*Jurgens v. CBK, Ltd.*,
  80 F.3d 1566 (Fed. Cir. 1996) .............................................................66

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ......................................................... 23, 26

*Lightning Lube, Inc. v. Witco Corp.*,
  4 F.3d 1153 (3d Cir. 1993) ...................................................................59

*Lord & Taylor, LLC v. White Flint, L.P.*,
  849 F.3d 567 (4th Cir. 2017) ...............................................................59

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ...........................................................29

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
  672 F.3d 1350 (Fed. Cir. 2012) ...........................................................39

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
 851 F.3d 1275 (Fed. Cir. 2017) .................................................... *passim*

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
 870 F.3d 1298 (Fed. Cir. 2017) ....................................................36

*Merritt Hawkins & Assocs., L.L.C. v. Gresham*,
 861 F.3d 143 (5th Cir. 2017) .......................................................59

*Meyer Intellectual Props. Ltd. v. Bodum, Inc.*,
 690 F.3d 1354 (Fed. Cir. 2012) ............................................... 62, 63

*Micro Chem., Inc. v. Lextron, Inc.*,
 318 F.3d 1119 (Fed. Cir. 2003) ...................................................60

*Mississippi Chem. Corp. v. Dresser-Rand Co.*,
 287 F.3d 359 (5th Cir. 2002) .......................................................59

*Mitutoyo Corp. v. Central Purchasing, LLC*,
 499 F.3d 1284 (Fed. Cir. 2007) ...................................................52

*Monsanto Co. v. Ralph*,
 382 F.3d 1374 (Fed. Cir. 2004) ...................................................51

*Nazomi Comms., Inc. v. Nokia Corp.*,
 739 F.3d 1339 (Fed. Cir. 2014) ...................................................42

*O'Brien v. Middle E.F.*,
 57 F.4th 110 (3d Cir. 2023) .........................................................60

*Omega Pats., LLC v. CalAmp Corp.*,
 13 F.4th 1361 (Fed. Cir. 2021) ............................................... 54, 56

*Paper Converting Mach. Co. v. Magna-Graphics Corp.*,
 745 F.2d 11 (Fed. Cir. 1984) .......................................................43

*Pineda v. Ford Motor Co.*,
 520 F.3d 237 (3d Cir. 2008) .........................................................20

*Rite-Hite Corp. v. Kelley Co.*,
 56 F.3d 1538 (Fed. Cir. 1995) ........................................ 20, 31, 41, 60

*Seymour v. McCormick*,
 57 U.S. 480 (1854) .....................................................................65

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  930 F.3d 1295 (Fed. Cir. 2019) (applying Third Circuit law) ..........................65

*Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*,
  2023 WL 1475116 (N.D. Ill. Feb. 2, 2023) ...........................................x

*Tokai Corp. v. Easton Enterprises, Inc.*,
  632 F.3d 1358 (Fed. Cir. 2011) ......................................................20

*Vectura Limited v. GlaxoSmithKline LLC*,
  981 F.3d 1030 (Fed. Cir. 2020) ............................................... *passim*

*Versata Software, Inc. v. SAP America, Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013) ......................................................32

*VirnetX, Inc. v. Cisco Systems, Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ................................................. 46, 47

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010) ......................................................62

## Statutes and Other Authorities:

28 U.S.C. § 1295(a)(1) ....................................................................1

28 U.S.C. § 1338 ...........................................................................1

35 U.S.C. § 101 ..........................................................................16

35 U.S.C. § 284 .................................................................. 1, 58, 67

Fed. R. Civ. P. 50(a) ....................................................................63

Fed. R. Civ. P. 50(b) ....................................................................64

Fed. R. Civ. P. 51(d)(1)(B) ..............................................................57

Fed. R. Evid. 701 ........................................................................59

# GLOSSARY

| | |
|---|---|
| Sunoco | Plaintiff-Appellant Sunoco Partners Marketing & Terminals L.P. |
| Magellan | Defendant-Cross-Appellant Magellan Midstream Partners L.P. |
| PSL | Defendant-Cross-Appellant Powder Springs Logistics, LLC |
| Defendants | Magellan and PSL, collectively |
| '302 Patent | U.S. Patent No. 6,679,302 (Appx163-176) |
| '629 Patent | U.S. Patent No. 7,032,629 (Appx177-190) |
| '686 Patent | U.S. Patent No. 9,207,686 (Appx191-206) |
| '948 Patent | U.S. Patent No. 9,494,948 |
| '548 Patent | U.S. Patent No. 9,606,548 |
| patents-in-suit | The '302 Patent, the '629 Patent, and the '686 Patent, collectively |
| Related Patents | Sunoco's patents that are related to the patents-in-suit, including the parent '302 Patent and all patents claiming priority thereto, including the patents-in-suit |
| Mattingly | Larry Mattingly, one of the named inventors on the Related Patents |
| Vanderbur | Steve Vanderbur, one of the named inventors on the Related Patents |
| inventors | Mattingly and Vanderbur, collectively, the named inventors on the Related Patents |
| Mid-Continent | Mid-Continent Energy, a company founded and owned by inventor Mattingly |

| | |
|---|---|
| Texon | Texon LP is a midstream energy company that was assigned all rights to the Related Patents when they issued |
| MCE | MCE Blending LLC is a company formed by Texon and Mid-Continent, and is the original assignee of the '302 Patent at the time of its prosecution (Sunoco's predecessor-in-interest) |
| BSA | Butane Supply Agreement |
| Kytomaa | Dr. Harri Kytomaa, Sunoco's expert witness on technical issues including validity and infringement |
| Nikolaou | Dr. Michael Nikolaou, Defendants' expert witness on technical issues including validity and infringement |
| Ugone | Dr. Keith Ugone, Sunoco's expert witness on damages issues |
| Maness | Dr. Robert Maness, Defendants' expert witness on damages issues |
| Colella | Joseph Colella, Sunoco's former Vice President for Sunoco's Northeast Operations, including Refined Products and Butane Blending (Appx21931-21932(163:5-164:7)) |
| Maier | Charles Maier, Sunoco's Senior Director of Business Development for Sunoco's Butane Blending Business (Appx22076-22077(308:20-309:23)) |
| Myers | James "Daniel" Myers, Sunoco's former Director of Business Development (Appx22728(960:13-23)) |
| Legge | John Legge, Sunoco's former Senior Director of Special Projects, including Butane Blending (Appx22108-22109(340:12-341:16)) |
| Huff | Nicholas Huff, Magellan's former Quality Control Project Manager (Appx22192-22194(424:24-426:8)) |

| | |
|---|---|
| Moyer | Alan Moyer, Magellan's former Manager of Commodities (Appx22547-22549(779:23-781:13)) |
| Roles | Mark Roles, Magellan's Senior Vice President of Commercial Development for Refined Products (Appx22492(724:14-25)) |
| *Panduit* | *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978) |
| *Georgia-Pacific* | *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) |
| EMV or EMVR | Entire Market Value or Entire Market Value Rule |
| PTO | United States Patent and Trademark Office |
| EPA | U.S. Environmental Protection Agency |
| RVP | Reid Vapor Pressure, a common measure of volatility measured in pounds per square inch ("psi") (Appx169(1:28-64); Appx22290-22292(522:24-524:3)) |
| Appx____ | Page ____ in Joint Appendix |
| Appx____(xx:yy-zz) | Page ____ in Joint Appendix where "xx" represents a column number of a patent or a page in a transcript, "yy" represents the initial line of cited text, and "zz" represents the ending line of cited text |
| | **NOTE: All emphasis in the brief has been added unless otherwise indicated.** |

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5(a), counsel for Sunoco states that this case has not previously been before this Court or any other appellate court. Pursuant to Fed. Cir. R. 47.5(b), counsel for Sunoco states that the following pending cases involve the patent currently at issue before this Court, as well as Related Patents, and therefore may directly affect or be directly affected by this Court's decision in the above pending appeals:

*Sunoco Partners Marketing & Terminals L.P. v. U.S. Venture, Inc., U.S. Oil, and Technics, Inc.*, No. 1:15-cv-08178 (N.D. Ill.) (Chief Judge Rebecca R. Pallmeyer). The Related Patents at issue in that case were the '302 Patent, the '629 Patent, the '948 Patent, and the '548 Patent. After a bench trial, the district court found the four Sunoco patents were valid and willfully infringed, awarded $2 million in damages, and trebled the damages to $6 million for Venture's willful infringement. *Sunoco P'ship* * *Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 436 F. Supp. 3d 1099, 1107 (N.D. Ill. 2020), *aff'd in part, vacated in part, rev'd in part*, *and remanded*, 32 F.4th 1161 (Fed. Cir. 2022) (Judges Prost, Reyna, and Stoll). Following the remand by this Court, and additional briefing, the district court recently issued an opinion resolving the remaining merits issues, including reinstating the treble damages

---

* The caption of the district court's final judgment contains the word "Partnership" instead of the correct word "Partners."

award.  *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 2023 WL 1475116 (N.D. Ill. Feb. 2, 2023).  On February 23, 2023, the district court entered final judgment, and Venture filed its notice of appeal on March 27, 2023.

*Sunoco Partners Marketing & Terminals L.P. v. U.S. Venture, Inc.*, No. 4:19-cv-01145 (S.D. Tex.) (Judge Sim Lake), *appeal pending*, No. 2022-1899 (Fed. Cir.).  That case involves Sunoco's assertions that Venture infringed claims 16 & 17 of the '686 Patent, which are not at issue in the present appeal (although claim 3 of the '686 Patent is at issue).  On May 9, 2022, after resolving summary judgment motions in favor of Venture, the district court entered a final judgment of invalidity under 35 U.S.C. § 101 and of non-infringement, and Sunoco timely appealed.  As of February 17, 2023, the parties completed the appellate briefing in this Court and are currently awaiting an oral argument date.

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1338. Sunoco's appeal from the final judgment entered October 24, 2022 was timely filed on November 23, 2022. Appx23649-23650. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

35 U.S.C. § 284 requires "damages adequate to compensate for the infringement," which asks "had the Infringer not infringed, what would [patentee] have made?" *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964). Here, Sunoco lost what it would have made under a comparable BSA, where the parties share the profits from selling the extra gasoline created using Sunoco's patented butane blending technology. Not only is the BSA methodology the only way that Sunoco licenses its patents, but the BSAs are indisputably comparable licenses which are always used in determining infringement damages.

The district court misapplied this Court's apportionment principles to strike Sunoco's expert's damages opinions and to prohibit Sunoco from arguing based on Sunoco's highly-comparable licenses. The errors caused a one-sided damages trial in which Sunoco was barred from seeking lost profits and was limited to a $0.02/gallon royalty that Defendants' expert excised from the 2010 agreement selling the patents to Sunoco. The jury could award only $12+ million in damages

1

(which the court failed to enhance) even though Sunoco's licensees would pay—and Sunoco would have made—at least $150 million for blending the same volumes under a comparable BSA.

This damages award is even worse than the "heads-I-win, tails-you-lose" scenario decried under *Panduit* that enabled infringers to impose compulsory licenses after losing at trial—it compels Defendants to pay less than 8% of what licensees would pay!  Having reaped undeserved profits of over $400 million by intentionally infringing Sunoco's patents, it is little wonder that only the willful infringers celebrated after the jury's damages verdict, lauding the case as "4 years of litigation over a mere $12 million dollars."

## STATEMENT OF ISSUES

1.    Whether Sunoco is entitled to a new damages trial because the district court abused its discretion by excluding Sunoco's expert's opinions utilizing Sunoco's highly-comparable BSA licenses to the same patents and technology?

2.    Whether the court abused its discretion in excluding Sunoco's expert's opinions where Sunoco's BSAs had "built-in apportionment" allowing him to utilize their profit-sharing methodology without further apportionment and without proving the licensed patent rights created the entire market value of the BSAs?

3.    Whether the court abused its discretion in excluding Sunoco's lost profits opinions where a reasonable jury could find that obtaining rights under

2

Sunoco's patents was the sole reason that Sunoco's licensees entered BSAs, where the licensees could provide all other BSA services?

4.    Whether the court abused its discretion in excluding Sunoco's lost profits opinions for not apportioning the value of the other BSA services that are functionally related to Sunoco's patented system for which Sunoco can recover lost profits as convoyed sales?

5.    Whether the court abused its discretion in excluding Sunoco's reasonable royalty opinions for not apportioning the value of the other BSA services where any such value was already apportioned because the opinions used Magellan's actual profit margins and blending volumes?

6.    Whether the court erred by not instructing the jury on lost profits damages and by prohibiting Sunoco from asking the jury for a royalty measured by Sunoco's highly-comparable BSAs and Buckeye License?

7.    Whether the court erred by granting JMOL of non-infringement on grounds not raised in Defendants' pre-verdict Rule 50(a) motion?

8.    Whether the court abused its discretion by not awarding any enhanced damages for Defendants' willful infringement?

## STATEMENT OF THE CASE

### I.    Factual Background

Blending butane into gasoline raises volatility, which is important to engine performance.  Appx169(1:29-49).  Blending butane is also profitable because butane is typically cheaper than gasoline, and each gallon of butane blended creates an extra gallon of gasoline for sale at the gasoline market price.  Appx169(1:49-51); Appx21934-21936(166:18-168:1).

The EPA regulates gasoline volatility by limiting Reid Vapor Pressure ("RVP"), so blending too much butane can result in severe penalties. Appx169(1:52-64); Appx21941(173:3-10).  Because EPA limits vary by region and season, gasoline downstream of the refinery typically has an RVP below the limit, leaving a "blend opportunity."  Appx22079-22081(311:23-313:7); Appx22290-22295(522:24-527:16).

### A.    Sunoco's Patents

Sunoco's patents cover automated blending systems and methods for capturing the maximum blend opportunity.  Appx170(3:14-67); Appx22296-22300(528:15-532:4);  Appx22900-22903(1132:8-1135:3)  (showing  Sunoco's systems practice the asserted claims).  The application leading to the patents-in-suit was filed in February 2001.  Appx163.  It was assigned to MCE, Appx21939(171:6-18), but Texon held all patent rights.  Appx23138-23139(1370:20-1371:3).

4

In 2010, Sunoco acquired Texon's blending business for $140 million, primarily "for the patents" and "the ability to license the patents." Appx21951-21952(183:14-184:20); Appx24045-24058; Appx7456-7460(¶¶45-46). By then, Texon had licensed Sunoco, Kinder Morgan, Shell/Motiva, and Buckeye at 14 different terminals. Appx25341; Appx21961-21963(193:19-195:14); Appx22110-22112(342:14-344:4). Since 2010, Sunoco has licensed 16 companies at over 70 terminals, and installed its patented systems at 18 Sunoco terminals. Appx25480-25483; Appx25379-25381; Appx7477-7480(¶¶77-78).



Appx25517; Appx21962-21964(194:9-196:3). The gray line above is the Colonial Pipeline. *Id*.

### B.    The BSA Profit-Sharing Methodology

Texon licensed the patents under BSAs, under which Texon would construct and operate its patented system at the licensee's terminal, supply the butane needed for the system, and grant a limited license in exchange for sharing the licensee's profits from selling the extra gasoline created using the patented inventions. Appx21946-21948(178:14-180:15); Appx7477-7479(¶77).  Sunoco's BSAs utilize the same legacy name, Appx21979(211:17-24), and the same compensation methodology of sharing the profits on the extra gasoline created.

Sunoco's BSAs grant a limited "license to practice and use the Technology"[1] solely for "testing, verifying, starting up or shutting down a Blending System or (in an emergency situation) operating a Blending System," but not the right to "make" the patented invention.  *E.g.*, Appx25141-25173(¶13.1).  Sunoco also performs services functionally related to making and using the patented invention, such as "construction of the … systems, the supplying and delivery of butane, [and] operating and maintaining the Blending Systems."  Appx25142-25143.

Each BSA is separately negotiated, but generally the parties share the resulting profits 40/60 or 50/50.  Appx21972-21979(204:8-211:24); Appx25150-

---

[1] "Technology" is typically defined as "Technical Information" and "the Invention," where "Technical Information" is information "that relates to the Invention and/or the Blending Systems," and the "Invention" encompasses Sunoco's "Blending Systems" and Sunoco's patents.  Appx25142-25147; Appx24985-24989.

25151(¶5.1(b)); Appx25170; *see* Appx7498-7505(¶¶104-108). As illustrated below, blending 400 butane gallons into 10,000 gasoline gallons yields 10,400 gasoline gallons. If gasoline sells for $2.00/gallon and butane costs are $1.20/gallon, the owner/licensee earns $0.80/gallon on the newly-created 400 gallons ($320 total profits).



Appx25514-25516;    Appx21934-21937(166:20-169:11).    Under    the    BSA methodology, Sunoco is compensated solely by sharing the $320 profit on the 400 gasoline gallons created, not on the sale of all 10,400 gallons blended with the patented technology and not for supplying butane.

Sunoco only grants rights to its patents under the BSA methodology, with one historical exception. Appx7626(162:12-23). When Sunoco acquired the patents in 2010, Buckeye wanted to continue its BSA with Texon rather than Sunoco (its

competitor), so as part of the acquisition transaction, Sunoco agreed to allow Texon to continue to use the patented inventions only for Buckeye BSAs.  Appx21952-21955(184:9-187:9); Appx24566-24602; Appx7402-7404(¶46).

Under the so-called "Buckeye License," Texon paid Sunoco $0.02/gallon for patented blending at all Buckeye terminals (up to $1 million/year) for ten years, ***plus*** 60% of Texon's profits from patented blending at any future Buckeye terminals (*i.e.*, post-2010) through patent expiration.  Appx21954-21957(186:11-189:20); Appx24056-24058.  Buckeye and Texon still shared profits 50/50, so Sunoco's 60% share of Texon's share equals 30% of total profits from the patented invention. Appx12305-12308; Appx21957-21958(189:21-190:7).

## C.    The Patent Rights Were The Sole Reason Other Companies Entered Sunoco BSAs

Colella explained "without the patent, you wouldn't be at the table with these clients," and licensees "would gladly do this business without us," but "our patents drove them to align with us."  Appx7626(163:5-164:2); Appx10406(52:13-53:17). Colella testified that the patents are "absolutely critical to our success in growing and managing this business," noting that "[d]ead-on competitors such as Kinder Morgan have signed up," which "speaks volumes to the strength of the patents." Appx14470; Appx21971-21972(203:21-204:7); *see* Appx8984-8985(¶¶18-19).

Before acquiring the patents, Sunoco (and Colella) negotiated for Texon BSAs at six Sunoco terminals. Appx7623(118:11-121:14); Appx22110-22112(342:14-344:4); Appx7479-7480(¶78). From that perspective as a licensee, Colella confirmed "[t]he first instinct … is for the prospective blend partner … to ask the question and investigate can they do it on their own." Appx7626(162:24-164:2); Appx21943-21945(175:14-177:16).

As Colella understood, Sunoco's licensees "could provide all of these services themselves. … The reason they're with us is because of the patents. … They don't need you unless you have the patents." Appx22016(248:9-23). Phillips 66 had installed its own automated system in Denver, but informed Sunoco of infringement concerns. Appx7626(164:6-16). Sunoco's personnel visited the terminal, "observed the system," and thought "it was infringing." Appx15379-15380(233:11-234:10); *see* Appx19532-19539. As Colella testified, Phillips' BSA resulted from "the strength of the patent." Appx7626(164:6-16); *see* Appx8980-8982(¶¶13-14).

In 2012, Perimeter entered a Sunoco BSA under a 50/50 profit split. Appx23192-23196(1424:23-1428:2); Appx24981-25009(¶5.1). When Magellan purchased Perimeter's terminal in 2015, Magellan could either cancel or assume that BSA. Appx9428-9432. Although Magellan was infringing elsewhere, it assumed Perimeter's BSA on terms more favorable to Sunoco. Appx21983-21987(215:16-

219:24);    Appx22512-22513(744:4-745:9);    Appx25232-25238;    Appx8977-
8980(¶¶9-11).

Under the BSAs, Sunoco has earned over $470 million in profits since 2010
from patented blending at third-party terminals.    Appx7477-7480(¶¶77-78);
Appx25328-25335;  Appx25480-25483;  *see*  Appx21989-21990(221:10-222:12);
Appx25518-25529; Appx25533-25548.  Sunoco earned another $261 million using
the patented systems at its own terminals.  *Id*.

### D.    Magellan Refuses A BSA To Keep All Profits For Itself

In  2003,  Texon  approached  Magellan  about  licensing  Texon's  "Patent
Pending Automated Butane Blending System."  Appx23861-23880; Appx22513-
22514(745:23-746:19).  In 2004 and 2006, they again discussed licensing the now-
patented  technology.    Appx23881-23898;  Appx25503-25512;  Appx22514-
22517(746:20-749:25).    Each time, Texon  offered  a 50/50 BSA.    Appx22530-
22531(762:8-763:15);    Appx23901-23904;    Appx7490-7492(¶93).        Those
negotiations always used the BSA methodology, even though Magellan could build
systems, supply butane, and perform maintenance.  Appx22496-22502(728:13-
734:12).

After Texon's 2006 presentation, Magellan's Roles recognized "value in
Texon's 'Turnkey' system," but suggested "there [was] more value for Magellan
keeping everything internal."  Appx25500-25502.  Roles knew it was not "ethical

for us to drag [Texon] down the road and leach information, and then decide to go with Moyer's [Magellan] group in the end." Appx25500.  Nevertheless, Magellan dragged enough information from Texon to conclude that "the same project" would "take 6-12 months to develop."  Appx23901; Appx24883-24886; Appx22523-22528(755:20-760:7).  By mid-2007, Magellan decided to "do it internally" because Magellan "could make more $$ using Magellan assets/management."  Appx23901-23904; *see* Appx7490-7492(¶93).

By 2008, Magellan installed three infringing systems.  Appx22195(427:15-22); Appx7471-7472(¶67).  In November 2010, Magellan filed an application on its system.    Appx22199-22203(431:11-435:1);  Appx23923-23939.    In  2011-2012, Magellan installed more systems.  Appx23247(1479:2-5).  By 2012, Magellan was well aware of the infringement risks, Appx22262-22264(494:2-496:16), which were confirmed in 2014, when the PTO rejected Magellan's claims as anticipated by Sunoco's    patents.    Appx22249-22253(481:3-485:13);    Appx24939-24952. Nevertheless, Magellan did not modify its systems to avoid Sunoco's patents. Appx22258-22261(490:1-493:21).

Since 2012, Magellan's infringing systems blended over 600 million gallons yielding over $300 million in profits.  Appx25629-25632; Appx21617-21619.

E.  **Magellan's Infringement On The Colonial Pipeline**

The Colonial Pipeline is "the largest refined products pipeline system in the world" and serves "the major markets from the southeastern U.S. to the northeastern U.S." Appx24717. Because of its large size and flow rates (2.2 million gallons/hour), Appx24717-24718, manual blending methods were not "feasible" for that pipeline. Appx22112-22114(344:14-346:19); Appx21994-21995(226:13-227:23).

In 2013, Colonial sought an automated blending system for the Colonial Pipeline. Appx1486-1487; Appx23961-23966. Sunoco proposed its "patented in-line blending technology," Appx24837-24838; Appx23969, with a 50/50 profit-share under its established BSA methodology. Appx24845-24847; Appx7535-7536(¶152(c)). Sunoco subsequently learned that Colonial chose Magellan, that they jointly formed PSL, and that PSL began blending in 2017. Appx21994-21995(226:13-227:23); Appx22095-22097(327:20-329:4).

Magellan knew its only competition for the Colonial project was Sunoco. Appx22038(270:8-18); Appx22275(507:20-23); Appx23135-23137(1367:23-1369:3). Magellan's proposal was nearly identical to Sunoco's BSAs previously offered to Colonial and Magellan, *i.e.*, Magellan would construct, operate, and maintain the system, and supply butane and other services, in exchange for sharing

12

profits 50/50.   Appx25484-25497.   Magellan later offered a 40/60 split, which

Colonial accepted.   Appx22264-22265(496:24-497:14).



Appx25590-25591; Appx22314-22316(546:14-548:10).

Sunoco operates patented systems at 25 terminals on the Colonial Pipeline

downstream of PSL.   Appx22127-22128(359:18-360:9).   Those terminals suffered

diminished blending once PSL started blending.   Appx22096(328:5-24).   As Colella

explained, "they're depriving us of blend opportunity by injecting butane before the

gasoline gets to us."   Appx21995(227:10-23).

Since 2018, PSL's infringing blending of over 300 million gallons generated

over $100 million in profits.   Appx24043-24044; Appx25400-25408.

## II.     Procedural History

Sunoco filed this case in October 2017.  Appx297-335.  Two days later, Sunoco sought a preliminary injunction against PSL, Appx1126-1127, which was denied.  Appx2671.  In August 2018, Sunoco added Magellan's other infringing systems.  Appx483-484.

### A.     Pretrial Damages Proceedings

The opinions of Sunoco's damages expert, Dr. Keith Ugone, utilized Sunoco's BSA profit-sharing methodology because that is how Sunoco licenses its patents.  Appx7430-7575; Appx7362-7407.  Defendants challenged his opinions—not for failing to apportion Magellan's infringing system—but for not apportioning Sunoco's BSAs.  Appx5049-5050.  Misapplying apportionment principles and ignoring the direct comparability of the BSAs, the magistrate struck Ugone's opinions, but granted leave to supplement.  Appx8697-8714.

Ugone's supplement identified the evidence showing the licensed patent rights were the key driver for third parties to enter Sunoco BSAs, and also gave opinions on which and how other BSA services could be apportioned.  Appx8966-9001.  Disregarding the cited evidence and dismissing Ugone's opinions, Judge Stark struck Ugone's supplement without revisiting the exclusion of Ugone's original report.  Appx22-25.  On reconsideration, Appx10864-10868, Defendants agreed Ugone disclosed the BSAs "were comparable" but insisted "he didn't

14

apportion those licenses." Appx14489-14490(17:11-18:4). Sunoco explained "apportionment is built into the BSAs," Appx14490-14491(21:24-22:7), but the court denied Sunoco's motion. Appx14483.

Defendants then moved for summary judgment that Sunoco could not prove damages without an expert. Appx10837. Sunoco's opposition identified the evidence from which the jury could still decide damages, including Sunoco witnesses, Sunoco's BSAs, the Buckeye License, and Defendants' expert's opinions. Appx11142-11149. The court denied Defendants' motion. Appx14507-14508(86:20-90:7).

Judge Stark then ordered liability tried before damages (with the same jury). Appx14536. He ruled that the BSAs and the Buckeye License would be admitted, but the jury would be instructed that Sunoco is "not permitted to attribute all the value of the BSAs" or "the full value of the Buckeye license" to the patents. Appx15978(33:4-16), Appx16013(68:5-22).

## B.    The Jury Trial

The jury trial began on November 29, 2021, the same day the case was reassigned to Judge Andrews. Appx284(#735). The asserted claims were '302 Patent claims 3 and 16-17, '629 Patent claims 18, 22, and 31-32, and '686 Patent claim 3. Appx20853-20861. After a five-day trial, the jury found all asserted claims valid and willfully infringed. *Id.*

15

Before the damages phase, the court deleted Sunoco's proposed lost profits instructions. Appx96-100; Appx82-86. After trial but before closings, Judge Andrews precluded Sunoco from arguing for damages based on "some value that's intermediate" to the "full value" of the 40-50% rates in the BSAs or the 30% rate in the Buckeye License. Appx23229-23231(1461:5-1463:15); Appx23232-23238. The only royalty Sunoco could seek was the $0.02/gallon rate that Maness lifted from the Buckeye License, which the jury awarded exactly ($9,364,242.32 for Magellan and $2,836,716.12 for PSL). Appx23254-23257(1486:9-1489:4); Appx21091-21093.

Within two weeks, Defendants were describing this case as "4 years of litigation over a mere $12 million dollars." Appx21258. Eight months later, the post-trial rulings denied JMOL of invalidity under 35 U.S.C. §101, Appx117-133; granted JMOL of non-infringement for '302 Patent claims 16-17 and '629 Patent claims 18 & 22, but denied JMOL on the other infringed claims, Appx134-143; denied JMOL of no willful infringement, Appx143-149; denied enhanced damages, Appx152-156, awarded supplemental damages at $0.02/gallon for Defendants' infringement not covered by the jury's verdict, Appx156-159, and awarded pre- and post-judgment interest. Appx159-160. The final judgment awarded the jury's verdict and the supplemental damages, plus interest. Appx1-5.

16

## SUMMARY OF ARGUMENT

The district court abused its discretion in striking Sunoco's expert for not adequately apportioning Sunoco's highly-comparable BSAs granting rights to the same patents under identical economic circumstances as when Defendants' infringement began.  Because Ugone properly utilized the BSA profit-sharing methodology, which reflects the patented technology's value in the marketplace, his opinions were reliable and admissible.

Under its BSAs, Sunoco makes and uses its patented butane blending systems at its licensees' facilities, and is compensated by sharing the profits on only the extra gasoline created using the patented inventions.  That is the only way that Sunoco grants rights to its patents.  Comparable licenses are the most effective way of determining a patent's value, and Ugone properly accounted for the differences between the BSAs and the present circumstances.  Nothing more should have been required.  Comparability issues concern the weight of the evidence, not its admissibility.

A damages theory may have "built-in apportionment" where, as here, negotiators "settled on a royalty rate and royalty base combination embodying the value of the asserted patent."  Sunoco's 70+ BSAs reflecting the same profit-sharing methodology were negotiated in arms-length transactions by companies in identical circumstances to Defendants.  Because Sunoco's BSAs contain "built-in

17

apportionment," the court abused its discretion in requiring Ugone to further apportion the highly-comparable BSAs.

The court separately abused its discretion (1) by ignoring that Ugone's opinions constituted an unrebutted *prima facie* showing of lost profits under *Panduit*, (2) in disregarding this Court's precedent holding that satisfying *Panduit* satisfies apportionment for lost profits, and (3) in rejecting Ugone's opinions showing that the licensed patent rights created the entire demand and market value for Sunoco's BSAs. Moreover, Sunoco's blending algorithm and "other" BSA services comprise a "single assembly" comprising Sunoco's patented system and constitute a functional unit with Sunoco's licensed patent rights. None have independent value apart from Sunoco's patented systems, but Sunoco could recover any profits lost on those services as "convoyed sales."

Ugone's royalty opinions utilized Defendants' actual blend volumes which apportioned any increased blending profits achieved by Sunoco's other services. Furthermore, any disputes on such issues, or disagreements with Ugone's apportionment opinions, should have been resolved by the jury, not by exclusion under *Daubert*.

Based on the erroneous *Daubert* ruling, the court barred Ugone's separate opinions based solely on PSL's upstream blending, and his rebuttal opinions on the Buckeye License despite neither being challenged or based on the BSAs. The court

18

struck Sunoco's lost profits instructions even though neither the patent statute, the evidence rules, nor precedent require expert testimony to prove lost profits. The court then prohibited Sunoco from seeking any royalty based on Sunoco's comparable licenses, thus forcing Sunoco to use only Defendant's expert's $0.02/gallon number. A more unfairly one-sided damages trial cannot be imagined.

Independent of the woefully-inadequate damages, the court abused its discretion by failing to enhance damages for Defendants' willful infringement because its analysis improperly contradicted the jury's willfulness findings and failed to punish Defendants' intentional misconduct or deter others. A new damages trial and reconsideration of enhanced damages are required.

19

# ARGUMENT

## I.    Standards Of Review

This Court applies regional circuit law to evidentiary rulings.  *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1364 (Fed. Cir. 2011).  The Third Circuit uses an abuse-of-discretion standard, reversing decisions resting "upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

A trial judge acts as a "gatekeeper" to ensure that expert testimony is not only relevant but reliable.  *Id.*  "A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility."  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014).  "[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts …, the gatekeeping role of the court is satisfied."  *Apple, Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022); *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595-96 (1993) (focus "must be solely on principles and methodology, not on the conclusions").

The standard of review for challenged jury instructions is prejudicial legal error.  *Jamesbury Corp. v. Litton Indus. Products*, 756 F.2d 1556, 1558 (Fed. Cir. 1985).  Whether lost profits are available is a legal question reviewed *de novo*.  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1544 (Fed. Cir. 1995).

Decisions on enhancing damages are reviewed for abuse of discretion. *Halo Elecs., Inc. v. Pulse Elecs., Inc.,* 579 U.S. 93, 107-08 (2016).

## II.    This Case Must Be Remanded For A New Damages Trial

### A.    The District Court Erroneously Treated Sunoco's Highly-Comparable BSAs As Multi-Component Products That Had To Be Apportioned

Sunoco's claims cover Magellan's entire blending system, so there is no multi-component accused product to be apportioned in determining damages. Seeking to devise a way to avoid paying infringement damages consistent with what Sunoco's BSA licensees pay for rights to Sunoco's patents, Defendants argued that Ugone's opinions were unreliable because he did not apportion Sunoco's BSAs. Appx5049-5050; Appx5057. Defendants conceded they were applying this Court's precedent backwards:

> **The facts here are slightly different from typical apportionment cases, where the accused product contains patented and unpatented features**. … Here, Defendants do not sell a "product"; they build and operate butane blending systems, which Sunoco says are covered by the patents-in-suit. It is Sunoco who offers a "product"—the Turn-Key Butane Blending Operation that indisputably contains more than just the patents—and Dr. Ugone relies on that product to calculate lost profits and a royalty rate. **It is thus the patentee's product that needs to be evaluated for apportionment, as opposed to the accused product**.

Appx5057 n.5. Defendants also distorted the facts by labeling Sunoco's BSA as the "product" offered by Sunoco. As they know, neither party "sells" blending systems; instead, they "build and operate butane blending systems" for themselves and their

licensees, as shown by Magellan's direct competition with Sunoco to blend on the Colonial Pipeline using Sunoco's patented technology and the same methodology as Sunoco's BSAs.

Misled by Defendants' legal and factual sleights-of-hand, the magistrate struck Ugone's opinions for not apportioning "(a) the value attributable to the patent license rights from (b) the value attributable to the additional 'basket of services' provided by the [BSAs]" or not showing "why the entire market value rule-*equivalent* applies here in the rate context." Appx8709-8711. Neither requirement applies to comparable licenses.

Damages experts relying on comparable licenses cannot be required as a condition of admissibility to identify a discrete value for everything mentioned in those licenses other than the patent rights at issue, and then subtract each value from the comparable royalty rate. No precedent requires that. Indeed, patent licenses often contain things like cross-licensing terms, foreign rights, or forum-selection, non-compete, and arbitration provisions that arguably could affect the degree of comparability. As explained in *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014), prior licenses "are almost never perfectly analogous" and "the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility."

Likewise, a requirement to show an "entire market value-equivalent" applies before admitting expert opinions relying on comparable licenses is nowhere in this Court's precedent. That false premise was concocted by Defendants to transform a court's gatekeeping role over an expert's royalty base for multi-component products into grounds for usurping the jury's factfinding role when evaluating comparable licenses to decide infringement damages. Rather than apportioning the value of non-patented components of multi-component devices, the district court and Defendants have incorrectly demanded that Ugone apportion features and services that are fundamentally related to the patented invention that the BSAs already accounted for and that have no value apart from the patented invention.

It was fundamental error to adopt Defendants' distortion of this Court's apportionment principles as grounds for striking Ugone's opinions utilizing the established methodologies of Sunoco's highly-comparable BSAs. Because those opinions were both reliable and admissible, their exclusion under *Daubert* should be reversed and the case remanded for a new damages trial.

### 1. The Established BSA Compensation Methodology Reflects The Value Of Sunoco's Patents

Sunoco's BSAs are the epitome of the "comparable" licenses used to determine damages. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) (actual licenses "most clearly reflect the economic value of the patented technology in the marketplace"). Defendants' expert agreed:

23

Q. [I]t's your opinion that those rates that are provided in the [BSA] would be evidence of what the established royalty rate is?

A. Yes.  There are licenses covering the very technology at issue; yes. That would be evidence of what the royalties would be in a reasonable royalty calculation.

Appx23194(1426:18-23).  Even if disputed, "[t]he degree of comparability of the … license agreements as well as any failure on the part of [Sunoco's] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion."  *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).

Use of past licenses in determining damages has never required identity of circumstances.  *Elbit Systems Land and C4I Ltd. v. Hughes Network Systems, LLC*, 927 F.3d 1292, 1299-1300 (Fed. Cir. 2019) (and cases cited).  Comparable license valuations "may be the most effective method of estimating the asserted patent's value."  *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303-04 (Fed. Cir. 2015).  "Such a model begins with rates from comparable licenses and then 'account[s] for differences in the technologies and economic circumstances of the contracting parties."  *Id.* at 1303.

> Where the licenses employed are sufficiently comparable, this method is typically reliable because the parties are constrained by the market's actual valuation of the patent.  *See Georgia-Pacific*, 318 F.Supp. at 1120 (declaring the first factor relevant to damages calculations to be "[t]he royalties received by the patentee for licensing the patent-in-suit, proving or tending to prove an established royalty").

24

809 F.3d at 1303 (footnote omitted). Here, Sunoco's BSAs establish the market's recognition that the value of Sunoco's patents is appropriately measured by the profits from only the extra gasoline created using the patented system, and that the relevant negotiation involves dividing only those profits between Sunoco and the licensee.

In *Commonwealth*, the parties had discussed Cisco taking a license around the time of the hypothetical negotiation. *Id.* at 1302-03. As this Court explained, "[b]ecause the parties' discussions centered on a license rate for the [patent-in-suit], this starting point for the district court's analysis already ***built in apportionment***. Put differently, the parties negotiated over the value of the asserted patent, 'and no more.'" *Id.* at 1303 (quoting *Ericsson,* 773 F.3d at 1226).

Here, the parties negotiated over licensing Sunoco's patents before Defendants' infringement began, *i.e.*, as of the hypothetical negotiation, but could not agree on terms. Appx7490-7492(¶93); Appx23901-23904. But as with every Sunoco BSA, those negotiations utilized the same methodology under which the parties share the profits on the extra gasoline created using Sunoco's patented technology. By doing so, those parties were negotiating over the value of Sunoco's patent rights and no more.

*Commonwealth* held that it did not violate apportionment principles to employ a damages model that took into account the parties' negotiations over the end product.

809 F.3d at 1304. As in *Commonwealth* and its progeny, Ugone did not violate any apportionment principles by using the BSA methodology as his damages model because it tracked actual marketplace negotiations, including those with Magellan, over sharing the profits from Sunoco's patented inventions.

Because that is how Sunoco licenses its patents, measuring Sunoco's damages another way is unsupported and unreliable. *See LaserDynamics,* 694 F.3d at 79-80 (actual licenses are probative of the proper royalty form). By itself, excluding Ugone's opinions for working from Sunoco's established BSA profit-sharing methodology was an abuse of discretion.

### 2. Sunoco's BSA Methodology Has "Built-In" Apportionment

The error in excluding Ugone's opinions is conclusively demonstrated by *Vectura Limited v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1039-42 (Fed. Cir. 2020), where this Court held that prior licenses can have sufficient "built-in apportionment" to meet this Court's requirements. Although this Court characterized *Vectura* as "a rather unusual circumstance," *id*. at 1040, this case involves even clearer circumstances establishing that Sunoco's prior BSAs and negotiations contain exactly the "built-in apportionment" that establishes Ugone's damages opinions as reliable and thus admissible.

Vectura's expert relied on a 2010 license between the same parties involving 400+ patents and a three-tiered royalty structure, where the centerpiece patent

26

covered coating lactose excipients with material such as magnesium stearate. *Id*. at 1039-40. The 2010 license included a non-assert clause for other patents, including the application that became the patent-in-suit. *Id*. at 1040. Treating the 2010 license as comparable, Vectura's expert adopted its first-tier 3% rate as her flat royalty rate and its royalty base of total sales of licensed products as her royalty base. *Id*.

On appeal, GSK argued Vectura's expert failed to show that the patented mixtures drove demand for the accused inhalers, and failed to apportion her royalty base to account for non-infringing inhaler components. *Id*. This Court disagreed, reiterating that "when a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required." *Id*. (citing *Bio-Rad*, *Elbit*, and *Commonwealth*). "That is because a damages theory that is dependent on a comparable license (or a comparable negotiation) may in some cases have 'built-in apportionment.'" *Id*. (citing *Commonwealth*). Like *Vectura*, this is one of those cases.

"Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent." *Id*. at 1041. Hence, the offering party "can adopt the comparable license's royalty rate and royalty base without further apportionment and without proving that the infringing feature was responsible for the entire market value of the accused product." *Id*. Here, negotiators for Sunoco's

comparable BSAs recognized the only thing that prospective licensees needed was rights to Sunoco's patents, and settled upon on a royalty rate and base combination that embodied the market's value of Sunoco's patents.

In *Vectura*, GSK's expert conceded the 2010 license was "comparable, much closer than you ever find in a patent case." *Id*. at 1040. Yet, that license was nowhere close a comparable as Sunoco's BSAs are here. Because Sunoco's BSAs are indisputably "sufficiently comparable," Ugone's opinions could properly adopt the BSA royalty rate and royalty base (*i.e.*, a 40/60 to 50/50 profit-split on the extra gasoline created) without further apportionment and without proving that the granted patent rights were responsible for the entire BSA market value (even though they were). Under *Vectura*, neither inquiry was necessary or even relevant, and it was reversible error to have required them.

### 3. Sunoco's Actual Negotiations Confirm The BSAs Have "Built-In" Apportionment

As explained in *Vectura*, a damages theory dependent upon a comparable negotiation may also have "built-in apportionment." 981 F.3d at 1040. Vectura's expert explained "the circumstances of the 2010 license and the hypothetical negotiation in 2016 were highly comparable and that principles of apportionment were effectively baked into the 2010 license." *Id*. at 1041. As Ugone also explained, the circumstances of Sunoco's BSAs compared to the hypothetical negotiation

confirm that apportionment principles had already been negotiated into the BSA methodology.  Appx7503-7506(¶¶107-109); Appx7535-7537(¶¶152-154).

A "hypothetical negotiation" determines the royalty for the infringer's use of the patented technology that the parties would have negotiated as willing licensor/licensee before infringement began, where both parties assume the patents are valid and infringed.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009).  Those are the circumstances under which Sunoco's 70+ BSAs were actually negotiated, *i.e.*, arms-length transactions with sophisticated companies willing and wanting to license Sunoco's patents and knowing they were valid and infringed.

Like Defendants, Sunoco's licensees could build and operate their own versions of Sunoco's patented systems, and surely would have done so absent Sunoco's patents.  Phillips 66 had its own automated blending system in Denver, but after recognizing infringement issues, Phillips negotiated a Sunoco BSA.  Appx8980-8982(¶¶13-14).  Phillips would not have done that without concluding Sunoco's patents were valid and infringed.  Appx7588(220:20-221:2).  Indeed, Sunoco reached the same conclusion when it licensed the patents before acquiring them.  Appx7626(162:24-164:2).  As Colella explained, Sunoco's partnership with Phillips was "a result of the strength of the patent."  Appx7626(164:6-16).

The only thing that Sunoco's licensees could not provide by themselves was rights to Sunoco's patents. That came only under a Sunoco BSA. *See Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 807 F.3d 1283, 1305 (Fed. Cir. 2015) (as of hypothetical negotiation, defendant had no alternative to patentee's technology, which "is so significant that it is used industry-wide"). Hence, like the actual BSA negotiations, the only thing to be decided in a hypothetical negotiation was how to share the resulting profits.

The negotiations for Sunoco's most-comparable BSAs typically generated a 40/60 profit-split when the licensee provided the construction capital, and a 50/50 profit-split when Sunoco did. Appx7503-7506(¶¶107-109); Appx21975-21976(207:1-208:9). Under *Vectura*, that again confirms that BSA negotiators had collectively "settled on a royalty rate and royalty base combination embodying the value of the asserted patent." 981 F.3d at 1041. By using the BSA methodology that reflects how the market actually valued Sunoco's patents, Ugone's opinions were reliable and thus admissible. Hence, this Court should order a new damages trial in which Ugone can testify on all his opinions.

### B.     The District Court Abused Its Discretion In Striking Ugone's Lost Profits Opinions

Even if Sunoco's BSAs did not have "built-in apportionment," the district court abused its discretion by ignoring Ugone's unrebutted *prima facie* showing of

lost profits under *Panduit*, in not understanding that satisfying *Panduit* satisfies apportionment for lost profits, and in rejecting Ugone's opinions—based on ample supporting evidence—that the patent rights created the entire demand and market value for Sunoco's BSAs.

### 1. The District Court Erroneously Disregarded Ugone's *Prima Facie* Lost Profits Showing Under *Panduit*

Under *Panduit*, a patentee proves lost profit damages by establishing: "(1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017). Such showing establishes a "*prima facie* case [of] 'but for' causation." *Rite-Hite*, 56 F.3d at 1545.

Ugone explained why the *Panduit* factors were met such that Sunoco could recover lost profits for Magellan's infringement.[2] Appx7476-7514(¶¶75-116). To calculate what Sunoco would have made, Ugone determined that Sunoco receives a 40% profit-share when the licensee pays the capital costs or a 50% share if Sunoco does. Appx7503-7506(¶¶107-109). Ugone calculated Sunoco's average per-gallon profitability ranged from $0.25/gallon (40% share) to $0.28/gallon (50% share), resulting in lost profits of $150.3 to $166.7 million for Magellan's infringing

---

[2] Sunoco sought only reasonable royalty damages for PSL's infringement. Appx7475(¶72).

volumes.  Appx7506-7514(¶¶110-115).  Nothing about Ugone's damages principles, methodologies, or analyses warranted exclusion under *Daubert*.

Ugone's opinions established a *prima facie* case of "but for" causation for lost profits.  In *Versata Software, Inc. v. SAP America, Inc.*, 717 F.3d 1255, 1266-67 (Fed. Cir. 2013), Versata's expert used comparable contracts to calculate "the base value of each lost sale" and "accounted for the additional revenue streams that would follow … through maintenance and consulting agreements."  This Court held the opinion "was based on sound economic proof confirmed by the historical record," was "a *prima facie* showing of lost profits," and constituted substantial evidence for the jury's lost profits award.  *Id.* at 1267.

In *Georgetown Rail Equipment Co. v. Holland L.P.*, 867 F.3d 1229, 1241-42 (Fed. Cir. 2017), Georgetown's patented system "for inspecting railroad tracks" had "generated millions in revenue and was contracted out to four U.S. railroad companies" under which Georgetown used its system to inspect their tracks.  When Georgetown sued after Holland used its infringing system to secure a Union Pacific contract, Georgetown's expert used the comparable contracts to estimate contract length, per-mile rates, miles of track, and deductible costs to support his lost profits opinion.  *Id.* at 1242.  Citing *Versata*, this Court held that was a *prima facie* showing that shifted the burden to the infringer, who did not show a different rate or award was more reasonable.  *Id.* at 1243.

Ugone's opinions were also based on sound economic and factual predicates drawn from Sunoco's most-comparable BSAs. As in *Georgetown*, Ugone's analysis paralleled the terms of the Sunoco-Magellan negotiations in 2006-2007, which Magellan itself now uses with PSL. Appx7505-7506(¶109). As in *Georgetown* and *Versata*, Magellan never attempted to show another rate or award would be more reasonable. Appx14296-14299(¶¶11-17); Appx7370-7372(¶8). But instead of recognizing that Ugone's unrebutted lost profits opinions constituted a *prima facie* case sufficient to reach the jury, the district court struck them as unreliable. Appx8706-8714. That was reversible error.

### 2. Further Apportionment Of Ugone's Lost Profits Opinions Was Not Required Where The *Panduit* Factors Are Satisfied

Under *Mentor*, proving the first two *Panduit* factors can satisfy apportionment principles for lost profits. 851 F.3d at 1285. "Together, requiring patentees to prove demand for the product as a whole and the absence of non-infringing alternatives ties lost profit damages to specific claim limitations and ensures that damages are commensurate with the value of the patented features." *Id*. That analysis from *Mentor* is directly applicable here.

In *Mentor*, the accused emulator systems contained thousands of features, but only two infringed. *Id*. at 1286-87. The relevant market contained only Mentor and Synopsys. *Id*. Intel would not have purchased the infringing system without the two patented features and there were no non-infringing alternatives, so but for Synopsys'

infringement, Mentor lost the profits that it would have made selling its emulators to Intel. *Id*. at 1287.

Here, Magellan's entire system infringed Sunoco's claims rather than only two features. The relevant market contained only Sunoco and infringers (*e.g.*, Defendants). *See Georgetown*, 867 F.3d at 1242 (in two-supplier market where both parties bid on same contract, patentee's expert properly assumed infringer's business would go to patentee). Magellan could not provide its butane blending without rights to Sunoco's patents and there were no suitable non-infringing alternatives, so only Sunoco could provide such blending. And Sunoco would have done so "but for" Magellan's infringement, so Sunoco lost the profits it would have made under its BSA methodology. Appx7490-7493(¶¶93-94); *supra* section I.B.

In *Mentor*, Synopsys urged a two-step process for calculating lost profits. First, the patentee would calculate the profits lost using the *Panduit* factors. 851 F.3d at 1287. Second, the patentee would further apportion those profits to cover only the patentee's inventive contribution. *Id*. As this Court recognized, under Synopsys' approach, the damages are not "the profits the patentee lost … but rather only the amount of profit properly attributable to its patented features." *Id*. This Court rejected Synopsys' second post-*Panduit* step, explaining that "apportionment was properly incorporated into the lost profits analysis and in particular through the

*Panduit* factors" and holding that "satisfaction of the *Panduit* factors satisfies principles of apportionment." *Id*. at 1288.

By establishing the *Panduit* factors, Ugone determined what Sunoco would have made but for the infringement. Appx7476-7514(¶¶75-116). By holding that Ugone had to further apportion his lost profits opinions, the magistrate erroneously invoked the two-step approach rejected in *Mentor*. Appx8710-8711. Under *Mentor*, this Court should reverse the exclusion of Ugone's lost profits opinions, which were properly tied to the value of Sunoco's patents through the *Panduit* factors. 851 F.3d at 1288. Particularly for *Daubert* purposes, there was nothing unreliable about Ugone's methodology or *Panduit* analysis. *See* 509 U.S. at 594-95.

The magistrate dismissed *Mentor* because Sunoco was seeking lost profits associated with its BSAs. Appx8711. However, that illusory distinction does not avoid this Court's holding in *Mentor*. Ugone established the demand for Sunoco's patented systems under *Panduit*. Appx7476-7489(¶¶75-91). That demand is the same demand for the rights to Sunoco's patents provided under the BSAs. One cannot get either without the other because Sunoco granted access to its patents only under its BSAs.

In *Mentor*, Intel would not purchase emulators lacking the claimed features. 851 F.3d at 1289-90. While other features may have been important, only Mentor could sell an emulator with all the features that Intel required. *Id*. The magistrate

35

cited only the opinion in *Mentor* concurring in denial of rehearing *en banc*, Appx8710-8711, which further explained:

> Mentor proved that the patented features were what imbued the combined features that made up the emulator with marketable value. Under these circumstances, further apportionment is unnecessary. … Whether one views this in terms of what imbues value to the ultimate combination of features or what is a driver of demand for those combined features, the result is the same: the apportionment [requirement] is satisfied.

*Mentor Graphics Corp. v. EVE-USA, Inc.*, 870 F.3d 1298, 1300 (Fed. Cir. 2017) (Stoll, J., concurring). Here, Sunoco's patents cover the entire patented system and methods, so only Sunoco can meet the market demand, whether viewed as demand for the patented system or for the rights granted under the BSAs.

This Court in *Mentor* concluded that "the district court did not err in refusing to further apportion lost profits after the jury returned its verdict applying the *Panduit* factors. … [W]hen the *Panduit* factors are met, they incorporate into their very analysis the value properly attributed to the patented feature." 851 F.3d at 1290. On these facts, there was no supportable basis for striking Ugone's lost profits opinions as unreliable for not apportioning Sunoco's BSAs. Under *Mentor*, no further apportionment was or could be required.

### 3. The District Court Erroneously Rejected Sunoco's Evidence Showing The Patent Rights Are The Key Driver Of Demand For Sunoco's BSAs

In striking Ugone's original opinions, the magistrate stated that if Ugone had demonstrated "the patent licenses provided in these [BSAs] were the key driver motivating third parties to enter into these [BSAs]—i.e., if he were to demonstrate why the entire market value-*equivalent* applies here in the rate context—then there would not be a need to apportion." Appx8711. Ugone had opined that the parties would accept that "the patented technology is the principal driver of demand for Sunoco's [BSAs]," Appx9332, but the magistrate declared "this conclusory statement, without more, does nothing to ***persuasively demonstrate*** that the patents indeed drove demand for the [BSAs]." Appx8712 n.9.

To establish reliability or admissibility, an expert need not "persuasively demonstrate" that her conclusions and opinions are "indeed" correct. That is not the standard under *Daubert*. Instead, the underlying evidentiary bases for Ugone's conclusions, or the validity of his opinion that "the patents indeed drove demand," are matters for cross-examination before the jury, not pre-trial exclusion. *See Apple*, 757 F.3d at 1314-15.

Ugone's supplemental report explained the evidence supporting his conclusion that the granted patent rights were the key driver for the BSAs. Appx8976-8985(¶¶7-19). Disregarding Ugone's explanations and evidence, the

district court struck his supplemental opinions, declaring that Ugone had not identified "reliable evidence" to show that the patented feature was the "sole driver" of demand for Sunoco's BSAs. Appx22. The court also pronounced that Sunoco had not shown that the "patented features" (apparently, the licensed patent rights) were what "substantially created the value of the component parts" (apparently, everything provided under the BSAs). Appx23-24. While those statements are two versions of the same conclusion, both are wrong for multiple reasons.

First, the district court overstepped its gatekeeping role, wrongly weighed the evidence, and prejudged Ugone's conclusions. *See Apple*, 757 F.3d at 1314. For example, Ugone cited Myers' testimony that "I don't think we have a business without those patents," and that "a hundred percent of our income, in my opinion, probably is related to those patents." Appx8984(¶18(a)); Appx7585-7586(113:3-114:21). Sunoco's evidence relied on by Ugone establishes that the "sole" thing that Defendants could not obtain themselves was rights to Sunoco's patents. Appx8984-8985(¶¶18(b)-(e)); *see supra* section I.C. Such evidence was more than sufficient at the *Daubert* stage.

Second, the district court wrongly declared that "Ugone *simply speculates* that … Sunoco's patents led Magellan and Philips 66 to become Sunoco customers." Appx22. Ugone did not speculate. Appx8977-8982(¶¶9-15). Ugone cited Legge's testimony that Sunoco engineers visited the Phillips facility, "observed the system,"

and "thought it was infringing."  Appx15379-15380(233:11-234:10); Appx8981

n.38.  Ugone cited the evidence showing that Phillips entered a Sunoco BSA "to

ensure that they weren't infringing on our patents."  Appx7588(220:20-221:2);

*supra* page 9.

As to Magellan, Ugone cited the evidence that Magellan assumed Perimeter's

pre-existing BSA on terms more favorable to Sunoco.  Appx8978-8979(¶9(b)-(c));

*supra* pages 9-10.  As Ugone explained, "the only service that Magellan was not

capable of providing was a license to Sunoco's patents."  Appx8979(¶11).  Ugone

also cited Colella's testimony that "Kinder Morgan's license with Sunoco 'really

reflects the strength of the patents.'"  Appx8984-8985(¶18(c)-(f)); Appx7626(163:5-

164:16).  Far from "simply" speculating, ample evidence supported Ugone's opinion

that the patents were the key driver motivating Sunoco's licensees, including

Magellan, to enter BSAs.

Third, whether Ugone's opinions and Sunoco's evidence "reliably show" that

the licensed patent rights were the "sole" driver of BSA demand is a jury question.

*See Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1360 (Fed. Cir.

2012).  Because a reasonable jury could find that the patent rights exclusively drove

demand for the BSAs and that any EMV-equivalent rule was satisfied, it was error

to exclude Ugone's lost profits opinions.

Finally, the rights to use Sunoco's patented technology is what "substantially created the value of the component parts" of the BSA. Appx23-24. No one has ever sought Sunoco's "non-patented" services outside of a BSA. Appx8983(¶¶16-17). However, others have sought a Sunoco patent license without any services, showing the patent rights drive demand. Appx7497(¶103); Appx11167(¶¶11-12). In addition to above evidence, Ugone cited Colella's testimony that "without the patent, you wouldn't be at the table with these clients." Appx7626(163:5-18). While the court cited allegedly "undisputed evidence that Sunoco's services are valued for their non-patented features, such as their expertise and algorithm" (Appx23-24), the court was both improperly prejudging the evidence and ignoring the unrebutted evidence that Sunoco's algorithm and services had no value apart from their use in and with the patented invention. Appx21939-21940(171:19-172:6); Appx22102-22103(334:19-335:14); Appx22356(588:10-19).

### 4.    Apportionment Is Not Required Because Sunoco Can Get Lost Profits On The Other BSA Services As Convoyed Sales

The district court rejected Ugone's supplemental opinions as "unreliable" primarily for not apportioning Sunoco's blending algorithm, believing it was described as the "selling point" for Sunoco's BSA "products." Appx24-25. That misconstrued Myers' testimony, which stated that the algorithm determines "how much butane can be blended" but that "[t]he *results of the blending*, because of those algorithms, I think was the selling point." Appx5343(139:13-141:2). In any event,

40

it was error to hold that apportionment of Sunoco's blending algorithm and "other non-patented features" was even required. Appx24.

As Ugone opined, "these [BSA] services would represent, at a minimum, convoyed sales (and thus would appropriately be considered when evaluating lost profits damages)." Appx8972(¶5(b)); Appx8986(¶20).

> A patentee may recover lost profits on unpatented components sold with a patented item, a convoyed sale, if both the patented and unpatented products "together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit."

*Am. Seating Co. v. USSC Group., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (quoting *Rite-Hite*, 56 F.3d at 1550). Sunoco's algorithm and other services together constitute a "functional unit" with Sunoco's commercial embodiment, so Sunoco could recover lost profits on any independent value as a "convoyed sale" with the patent rights granted to use Sunoco's patented system.

The district court rejected Sunoco's explanation that its algorithm "is part of the patented system" (Appx24-25) as contradicted by Ugone's testimony "that the algorithm is 'proprietary and a Sunoco trade secret' (that is, not disclosed in a patent)." Appx8973(¶5(b)(ii)). However, the court misunderstood that Sunoco's algorithm could be part of Sunoco's commercial embodiment without being disclosed or claimed in Sunoco's patents. As the court itself noted (Appx25 n.5), Sunoco did not have to prove Defendants use Sunoco's algorithm to prove

infringement. Appx20853-20856. Because Sunoco's algorithm did not need to be claimed or disclosed in its patents, it could remain "proprietary and a trade secret" despite being part of Sunoco's embodiment.

The asserted claims recite "process control unit," "processing unit," "programmable logic controller," and "information processing unit," which are hardware devices that use software. *See Nazomi Comms., Inc. v. Nokia Corp.*, 739 F.3d 1339, 1340 (Fed. Cir. 2014). Sunoco could not license rights to its patented system, as operated at its licensees' facilities, without providing the algorithm and software necessary for that system to use the patented methods to blend butane. Appx22102-22103(334:19-335:14); Appx21939-21940(171:19-172:6). As such, Sunoco's algorithms and software are indisputably part of the "single assembly" that is Sunoco's embodiment of the patented system, and constitute a functional unit with the patent rights granted under the BSAs.

Similarly, Ugone did not need to apportion any value for Sunoco's butane services. In *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1372 (Fed. Cir. 2004), this Court held it was error to have barred Juicy Whip from seeking lost profits on unpatented syrup sold with its patented dispenser. As in *Juicy-Whip*, Sunoco's patented system and butane are "analogous to parts of a single assembly" because a butane blending system cannot function without butane and the butane is "mixed" using the patented methods. *Id*. Even though butane has other uses, the

42

patented system and butane "together constitute[] a functional unit." *Am. Seating*, 514 F.3d at 1268.  Just as it was error to exclude Juicy Whip's lost profits theory from the jury, it was error to exclude Ugone's lost profits opinions here.

Sunoco's construction services constitute "making" the patented system at the licensees' facilities, which is functionally related to using that system under a BSA. Because Sunoco operates its blending systems for its licensees, its "services" such as 24/7 monitoring, engineering support, and maintenance are functionally related to the "use" rights granted in the BSAs.  No customer wants or demands those services apart from Sunoco's patented system.  Whether viewed as having no independent value or as functionally related to the patent rights, the district court erred in striking Ugone's opinions for not apportioning Sunoco's other services.

Because Defendants perform the same "other" services while infringing, Sunoco can recover as "convoyed sales" any profits lost from not providing those services under its BSAs.  *See Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22-23 (Fed. Cir. 1984) (affirming lost profits on patentee's "entire rewinder line" including "auxiliary units" used with patented unit, where patentee normally anticipated selling the unpatented components).  Hence, Ugone's reliance on Sunoco's BSA methodology without apportioning the value of the other services is fully consistent with this Court's apportionment principles.

43

### 5.   Ugone's Supplemental Opinions Addressing Apportionment Were Reliable And Should Not Have Been Excluded

As required by the magistrate, Ugone's supplement provided opinions on the value of the other BSA services that could be apportioned, including why some had little or no independent value.   Appx8986-9000(¶¶20-33).   The district court's unexplained disagreements with Ugone's valuations go to their weight, not their admissibility. *See Apple*, 757 F.3d at 1320 ("court resolved admissibility based upon its own view on the correct estimate of value for the '949 patent," which "should have been reserved for the jury").

Citing evidence to support his conclusions, Ugone determined the "value" of Sunoco's hedging services was $0.02/gallon, Appx8991-8993(¶26(d)-(e)), and the "value" of its butane supply/certification services was $0.01/gallon.   Appx8987-8988(¶¶22-24).   Ugone explained there was no demand for Sunoco's blending algorithm and software "separate and apart" from using Sunoco's patented systems so there was "limited value associated with these services in isolation."   Appx8989-8991(¶26(a)-(b)).

For Sunoco's construction services, Ugone explained that his opinions based on the 40/60 and 50/50 profit splits already accounted for who provided the construction capital, and that those services otherwise had "limited value in isolation of the patented system."   Appx8991(¶26(c)).   Ugone also explained that services such as regulatory compliance and customer service (*e.g.*, maintenance) protected

Sunoco from "significant reputational harm," but he conservatively did not increase his opinions for those risks. Appx8993-8994(¶26(f)-(g)); *see* Appx22508-22509(740:2-741:7).

Overall, Ugone apportioned his original $0.25-$0.28/gallon lost profits opinion by $0.03/gallon (10-12%). Appx8994-8995(¶27). Because Ugone's original reasonable royalty opinions had not incorporated hedging, Appx8992-8993(¶26(d)(ii)), he reduced his $0.16-$0.25/gallon royalty opinions by $0.01/gallon for butane supply/certification. Appx8994-8995(¶27).

Nevertheless, the district court struck Ugone's supplemental opinions because "he did not analyze the value of other non-patented features of the BSAs, including Sunoco's blending algorithm." Appx24-25. That is simply false. As shown, Ugone did analyze the apportionment "value" of the "other" BSA features, including Sunoco's algorithm. Appx8972-8976(¶5(b)); Appx8989-8990(¶26(a)). Moreover, the court's unstated rationale assumes that Sunoco's system yields higher blend volumes than Defendants' system, Appx8989-8990(¶26(a)), but Ugone's opinions were based on Defendants' actual blend volumes, so any "value" added by Sunoco's algorithm and other services had already been apportioned.

In *ActiveVideo*, Verizon argued that ActiveVideo's expert should have been excluded because he relied on two prior licenses, where one did not involve the patents-in-suit and the other "covered ActiveVideo's patents ***and software services***

45

yet the entire license fee was attributed to the asserted patents without any attempt to 'disaggregate the value of the patent license from the value of the services.'" 694 F.3d at 1333.

> Verizon's disagreements are with the conclusions reached by ActiveVideo's expert and the factual assumptions and considerations underlying those conclusions, not his methodology. These disagreements go to the weight to be afforded the testimony and not its admissibility.

*Id*. Hence, *ActiveVideo* conclusively refutes any requirement for Ugone to apportion ("disaggregate") the value of Sunoco's patent rights from the value of Sunoco's software and other services.

Similarly, in *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1329-30 (Fed. Cir. 2014), Cisco argued that VirnetX's expert's testimony should have been excluded because he relied on six licenses, where one "contained a software license in addition to a license for various patent applications" and another "covered sixty-eight VirnetX patents." Citing *ActiveVideo*, this Court explained that four licenses "relate[d] to the actual patents-in-suit, while the others were drawn to related technology," and "the other differences that [infringer] complains of were presented to the jury, allowing the jury to fully evaluate the relevance of the licenses. No more is required in these circumstances." *Id*. at 1330-31. No more should have been required for admissibility here.

In striking Ugone's supplemental opinions, the district court never identified other services that he omitted or how his valuations violated some unstated sufficiency threshold.  Defendants have merely insisted that Ugone did not apportion enough without offering their own evidence or valuations of what allegedly had to be apportioned.  *See Georgetown*, 867 F.3d at 1243 (burden should shift to infringer to show another rate would be more reasonable).  The result was a one-sided exercise forcing Sunoco to "bid against itself" to undercut its established BSA methodology. If the expert testimony in *ActiveVideo* and *VirnetX* was sufficient to sustain a jury's damages verdict, Ugone's supplemental opinions were sufficiently reliable to reach the jury, even if further apportionment were required.

## C.    The District Court Abused Its Discretion In Striking Ugone's Reasonable Royalty Opinions

Ugone's royalty opinions were stricken using a "similar" analysis to that used for his lost profits opinions.  *See* Appx8711.  But as held in *Vectura*, "a party relying on a sufficiently comparable license can adopt the comparable license's royalty rate and royalty base without further apportionment and without proving that the infringing feature was responsible for the entire market value of the accused product." 981 F.3d at 1041.  As that similarly applies to Ugone's royalty opinions, their erroneous exclusion should be reversed for the reasons already stated.

47

According to the magistrate, Ugone had to apportion "the value attributable to the additional 'basket of services' provided by the [BSAs]." Appx8709. Because Defendants "would negotiate for a bare license to the patents (and not for the additional services provided by the [BSAs])," the magistrate rejected Ugone's opinion that Defendants would willingly pay the same royalty as Sunoco's BSA customers. Appx8706. Not only was that a jury question, but the magistrate misunderstood this Court's precedents, Sunoco's BSAs, and Ugone's opinions.

Even before *Vectura*, "there is no blanket rule of *quantitative* apportionment in every comparable license case." *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1376 (Fed. Cir. 2020). Bio-Rad's expert applied the *Georgia-Pacific* factors and adopted a 15% reasonable royalty rate from three comparable licenses in similar technologies. *Id*. He explained that his royalty rate was already apportioned in the comparable licenses, and that no further quantitative adjustment was required. *Id*. at 1377. Because his methodology "was similar to the hypothetical negotiation," this Court agreed that "no adjustment of the 15% royalty rate in the comparable licenses was required. His analysis could reasonably be found to incorporate the required apportionment. Our case law does not require more." *Id*.

As in *Bio-Rad* and *Vectura*, Ugone's analysis paralleled the hypothetical negotiation so no further apportionment was required. He identified Sunoco's BSAs with 40/60 profit-sharing as most comparable. Appx7528-7529(¶141). Because

Defendants built the infringing systems, Ugone used the 40% share as "the relevant indicator of value." Appx7564-7565(¶187). That coincided with Sunoco's negotiations with Magellan and Colonial, Magellan's ultimate agreement with Colonial, Appx7535-7536(¶152); Appx7540-7541(¶162(a)); Appx7553-7558(¶176), and Sunoco's other BSAs "negotiated under similar business and economic circumstances." Appx7570-7571(¶195).

From such evidence, Ugone determined the reasonable royalty would be between $0.16/gallon to $0.25/gallon. Appx7571-7573(¶¶197-200). The magistrate faulted Ugone for stating that Sunoco would not accept less than its 40/60 BSA profit-share. Appx8705-8706. However, that mischaracterizes Ugone's analysis and opinions. First, his royalty opinion used "a per-gallon royalty rate (as opposed to a percentage of net margin)." Appx7563(¶184). While he compared a 40% profit-share, Ugone used Magellan's lowest anticipated margin ($0.40/gallon), and highest anticipated margin ($0.83/gallon), to determine a "fixed-fee royalty" range of $0.16/gallon to $0.33/gallon. Appx7571-7572(¶197(b)); *see* Appx7566-7569. However, because Sunoco's 40/60 profit margin corresponded to $0.25/gallon, Appx7513-7514(¶115), Ugone capped his royalty range at $0.25/gallon. Appx7572(¶197(c)).

The minimum of Ugone's reasonable royalty range reflected a 36% discount from the maximum $0.25/gallon rate. Appx7571-7572(¶¶197-198). Ugone applied

that range to Defendants' infringing volumes to get the total royalty damages for both Magellan and PSL. Appx7574(¶202). As Sunoco correctly told the magistrate, Ugone satisfied any apportionment requirement "in connection with his analyses of the *Panduit* … and *Georgia-Pacific* [factors]." Appx8710. Never looking beyond Ugone's perceived failure to apportion, neither the magistrate nor the district court ever discerned why that was true.

Ugone acknowledged that the hypothetical negotiation would be for a "bare" patent license. Appx7521(¶128(f)); Appx7546(¶166); Appx7560(¶179). By infringing, Defendants did the other services themselves, but therefore also did not achieve any extra profits from the "value" allegedly added by Sunoco's other BSA services. Appx7566-7569(¶¶189-190); Appx7571-7573(¶¶196-199).

The magistrate held Sunoco's "'basket of services' beyond those licenses" was what would "lead to increased total profits earned from butane blending." Appx8706. If Sunoco's other services do not create any higher profits, then the court's rationale for striking Ugone's opinions disappears. But because Ugone calculated his per-gallon royalty opinions **using Defendants' expected profit margins and actual blend volumes**, his analysis had already apportioned any value added by Sunoco's other services. Any value resulting from Sunoco's blending algorithm and other services would be reflected only in Sunoco's higher blend

volumes and profit margins, which Ugone's opinions did not use. Hence, there was nothing further to apportion.

Moreover, the district court overlooked a big difference between Sunoco's BSAs and the bare license Defendants needed. Under its BSAs, Sunoco grants rights only to "use" the patented inventions and only in limited circumstances. *E.g.*, Appx25160(¶13.1). Because Magellan built the infringing systems, Magellan's bare license would have to include the right to "make" Sunoco's patented system, which is beyond the "use" rights granted in the BSAs. Appx7519-7521(¶128(c)-(f)); Appx8998-9000(¶¶32-33). Hence, the royalty determined from a hypothetical negotiation for the rights that Defendants infringed could be higher than what Sunoco receives under its BSAs for a limited license merely to "use" its patented systems. *See Monsanto Co. v. Ralph*, 382 F.3d 1374, 1378 (Fed. Cir. 2004) (affirming royalty award above patentee's established rate where infringer's use of patented invention far exceeded the previously-granted rights).

Even so, Ugone decided that Sunoco seeking a 40/60 split in the hypothetical negotiation remained appropriate. Appx7527-7534(¶¶137-151); Appx7565-7566(¶188). He also reasoned that Sunoco would not accept a royalty "so low as to negatively influence future negotiations with terminal operators," Appx7529(¶142), and would seek one "commensurate with" its BSA profitability. Appx7535-7536(¶¶152-153). As the evidence showed, granting a bare license to both make

51

and use its patented inventions would undercut Sunoco's entire business model. Appx21964(196:2-11).

In *Mitutoyo Corp. v. Central Purchasing, LLC*, 499 F.3d 1284, 1292 (Fed. Cir. 2007), this Court affirmed a 29.2% royalty which equaled patentee's usual profit margin where the patentee was "unlikely" to be interested in a lower rate. In *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362-63 (Fed. Cir. 2017), this Court affirmed a 14.5% royalty based on patentee's "per-unit profit margin" under another license, recognizing that patentee would "unlikely" accept a lower rate. Consistent with *Asetek* and *Mitutoyo*, Ugone's reasonable royalty opinions were reliable and admissible. At bottom, the district court merely disagreed with his conclusions, which does not justify striking his opinions and excluding his testimony.

### D. The District Court Abused Its Discretion In Excluding Ugone's Other Unchallenged Opinions

#### 1. Ugone's "Lost Opportunity Cost" Opinions Were Improperly Excluded

Sunoco's complaint alleged that PSL's infringing blending into the Colonial Pipeline diminished the blend opportunity at Sunoco-operated terminals downstream of PSL's system. Appx302-303; *see* Appx7537-7539(¶¶155-159). Sunoco sought a preliminary injunction (Appx1126), but Judge Stark accepted Defendants' argument that Sunoco could be adequately compensated by damages. Appx2577-2578(242:14-243:6); Appx2833-2836(¶7); Appx2681-2703.

To estimate the impact of PSL's upstream blending, Ugone determined the weighted average change in blend volumes at Sunoco terminals supplied solely by the Colonial Pipeline. Appx7537-7538(¶156(a)). Using Sunoco terminals not on that pipeline as a benchmark, he estimated that PSL's infringing blending caused a 12% decline in 2017, and a 42% decline in 2018, for a lost blend volume of 33.9 million gallons. Appx7537-7538(¶156(a)).

Ugone calculated that each gallon blended by PSL's infringing system reduced the blending opportunity by 0.27 gallons at downstream Sunoco terminals. Appx7538(¶157). Using $0.34/gallon, Magellan's lowest projected profit for PSL's blending (Appx7569(¶191)), Ugone opined Sunoco's downstream losses were "at least $0.09 per gallon," which would be "a definitive lower bound on the royalty Sunoco would accept" for PSL's infringement. Appx7573(¶199(c)); Appx7569-7570(¶¶191-192).

Notably, Ugone's opinion was not based on Sunoco's BSA methodology; it related solely to the negative impact of PSL's upstream blending. Defendants' first *Daubert* motion did not mention that opinion. Appx5049-5050; Appx7345 n.1; Appx8713. In opposing Defendants' motion to strike Ugone's supplement, Sunoco noted the opinion remained unchallenged. Appx9278-9279. Defendants' reply merely argued that Sunoco "never raised" that opinion, Appx9520, which confirms that Defendants never challenged it.

53

Nevertheless, adopting Defendants' new reply argument, Appx9520, the district court struck Ugone's lost opportunity cost opinion as "unreliable" because he "failed to apportion the value lost due to non-infringing manual blending." Appx25. By itself, that was an abuse of discretion. *See Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1375 (Fed. Cir. 2021) (abuse of discretion to exclude opinions "never addressed (or challenged) on the merits").

Moreover, consistent with Colonial seeking only automated blending for PSL's facility (Appx1486-1487; Appx23961-23966), Ugone understood that "manual blending would not be feasible into large and active pipelines" like Colonial, Appx7469(¶61); Appx7558-7559(¶177), so there was no manual blending to apportion. Ugone accounted for "harm caused by blending generally," Appx9520, by estimating Sunoco's lost volumes after considering volume changes at Sunoco terminals unaffected by PSL's blending. Appx7537-7538(¶156(a)); Appx7405-7406(¶48(b)). Finally, the court's belated rationale improperly evaluated Ugone's conclusions, not his methodology. *See Wi-LAN*, 25 F.4th at 971. On that separate basis, a new damages trial on PSL's infringement is required.

## 2. Ugone's "Buckeye License" Rebuttal Opinions Were Improperly Excluded

When Sunoco acquired Texon's blending business in 2010, Sunoco agreed to allow Texon to keep using the patented technology only for Buckeye. *See supra* section I.B. For future Buckeye terminals, the Buckeye License required Texon to

pay Sunoco (1) $0.02/gallon up to $1 million/year for 10 years,[3] *plus* (2) 60% of Texon's 50/50 profit-share from Buckeye's blending under the patents (30% of total profits) through patent expiration. Appx24570(¶3.1); Appx24595(¶4(c)): Appx24598(¶13). Notably, these provisions did not alter Buckeye's 50/50 profit-sharing obligation under its Texon BSA.

Maness repeatedly described the Buckeye License as "a bare license to the patents." Appx15869-15876(¶¶20, 118, 130-34). He deemed the Buckeye License as "comparable" because Magellan did not need "other services covered by Sunoco's [BSAs]." Appx15877(¶137). However, Maness' analysis utilized only the $0.02/gallon rate, while opining the 30% of profits rate was "not relevant." Appx15875(¶133).

Ugone's rebuttal report explained why that was incorrect. Appx7402-7405(¶¶46-47). First, a payment to "the former patent holder would not be a relevant value indicator for Defendants." Appx7404-7405(¶47). Second, "[t]he more comparable royalty rate … is the 60% of Texon's gross profits rate Texon pays Sunoco for butane blending at any new Buckeye sites" because a royalty anticipating future sites is more similar to the hypothetical negotiation, which occurs *before* infringement begins. Appx7403-7404(¶46(b)).

---

[3] Colella explained that Texon and Sunoco were $10 million apart during the patent-acquisition negotiations, so the $0.02/gallon payment for 10 years up to $1 million/year was devised to bridge that gap. Appx23140(1372:1-14).

Ugone's Buckeye License opinions were never challenged.  *See* Appx5049-5050; Appx8949-8951.   Sunoco argued that the *Daubert* rulings related only to Ugone's BSA opinions and not the Buckeye License, "a different agreement" arising under "different circumstances."   Appx15959(14:18-22).   However, the court precluded Sunoco "from arguing that … the full value of the Buckeye license is attributable solely to the patents," as "consistent with the *Daubert* ruling." Appx15978(33:4-13).   According to the court, it "did not make any exceptions" when striking Ugone's opinions.  Appx16462.

During the damages trial, Maness testified that the $0.02/gallon rate was a relevant indicator but the 30% rate was "not at all" relevant.   Appx23174-23176(1406:21-1408:14); Appx23179-23187(1411:15-1419:22).  However, Sunoco could not call Ugone to testify in rebuttal that, if the $0.02/gallon rate related to a bare license, so did the "30% of profits" rate.  Appx7402-7405(¶¶46-47).  Because Ugone's Buckeye License opinions were never challenged, the court abused its discretion in excluding those opinions as encompassed by the *Daubert* rulings.  *See Omega*, 13 F.4th at 1375 (abuse of discretion to exclude expert's unchallenged rebuttal opinions, despite other opinions being stricken).

**E.    Even Without Expert Testimony, The District Court's Erroneous Rulings Warrant A New Damages Trial**

Even if Ugone's exclusion is affirmed, a new damages trial is still required because the district court erred (1) by failing to instruct the jury on lost profits, and (2) by limiting Sunoco to seeking reasonable royalty damages using only the $0.02/gallon provision in the Buckeye License.

**1.    The District Court Erred In Not Instructing The Jury On Lost Profits**

Under Fed. R. Civ. P. 51(d)(1)(B), "[a] party may assign as error … a failure to give an instruction, if that party properly requested it and … also properly objected."  Sunoco proposed lost profits instructions, including on each *Panduit* factor.  Appx36-44.  Defendants objected to each instruction "because lost profits require apportionment, and Sunoco has no expert through which it can apportion lost profits."  Appx36-44.  The court's final instructions omitted all lost profits instructions.  Appx96-116; Appx66-79.  Sunoco properly objected, Appx82-83, but the court gave no reasons for deleting those instructions.  Appx85-86.

Even if this Court can assume that the court implicitly accepted Defendants' objections, they do not justify taking lost profits from the jury.  First, Sunoco's instructions specifically addressed the *Panduit* factors.  As explained in *Mentor*, satisfaction of the *Panduit* factors satisfies the principles of apportionment for lost profits.  851 F.3d at 1288.  Second, Defendants' assertion that "lost profits require

apportionment" ignores those principles also apply to reasonable royalties. *See*

*Ericsson*, 773 F.3d at 1226. Even with no Sunoco expert, the jury was still instructed

on apportionment for its royalty determination. Appx23245-23249(1477:6-1481:2).

Finally, even if further apportionment were required, the trial evidence allowed

making any such determinations. Appx21947-21948(179:12-180:15); Appx23143-

23145(1375:2-1377:5); Appx23186-23187(1418:16-1419:11).

As Sunoco objected, § 284 states that "[t]he court *may* receive expert

testimony as an aid to the determination of damages or of what royalty would be

reasonable under the circumstances," not that it *must* receive expert testimony.

Appx36 n.6, Appx82-84. This Court agrees "[a] party need not present expert

testimony on damages" because § 284 "is clear that expert testimony is not necessary

to the award of damages." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 985

(Fed. Cir. 2021). While proving lost profits without an expert might be more

difficult or less persuasive, it is error to bar the patentee from doing so based on the

evidence merely for not having expert testimony.

This Court has affirmed lost profits where, as here, the patentee had no expert

testimony. In *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1370-

72 (Fed. Cir. 2006), the patentee used testimony from party employees, and a third-

party retailer, to prove all *Panduit* factors, a two-player market, and that patentee

would have lost the sale of the entire patented assembly, plus other unpatented

accessories. In *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1355-57 (Fed. Cir. 2001), this Court found sufficient evidence for awarding lost profits, including defendant's expert's testimony, despite patentee's expert having been rejected post-trial as "incompetent" and "unreliable."

Other courts allow lost profits testimony from lay witnesses having direct knowledge of the underlying bases.[4] As the Fed. R. Evid. 701 practice note explains:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Here, as in *Golden Blount*, Sunoco introduced direct evidence from witnesses (*e.g.*, Colella, Maier) with particularized knowledge of Sunoco's butane blending business, including the history, terms, and methodologies of Sunoco's BSAs and Buckeye License. Appx21931-21934(163:15-166:10); Appx21943-21958(175:14-190:22);

---

[4] *See, e.g.*, *Merritt Hawkins & Assocs., L.L.C. v. Gresham*, 861 F.3d 143, 153 (5th Cir. 2017) (affirming jury's lost profits award based on company officer's testimony); *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 574-76 (4th Cir. 2017) (affirming jury's lost profits award based on executive's testimony); *Mississippi Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373-74 (5th Cir. 2002) (affirming lost profits award based on director's testimony).

Appx21969-21979(201:15-211:24);   Appx22076-22091(308:20-323:6).   Sunoco

also elicited favorable testimony from Maness during cross-examination.

Appx23190-23202(1422:18-1434:21).

By striking lost profits before trial, the district court essentially ruled as a

matter of law that Sunoco could not recover lost profits without the procedures and

safeguards applicable to summary judgment or JMOL motions.  Defendants' "no

damages" summary judgment had already been denied, and nothing had changed in

the interim.  Moreover, before a court can grant JMOL under Rule 50(a), the non-

movant is allowed to introduce more evidence, but deficiencies in Sunoco's trial

evidence was not the issue—it was entirely Sunoco's lack of expert testimony.

Whether reviewed *de novo*, *e.g.*, *Rite-Hite*, 56 F.3d at 1544, as akin to a

summary judgment denying lost profits, *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d

1119, 1121-22 (Fed. Cir. 2003), or only for abuse of discretion, *e.g.*, *O'Brien v.

Middle E.F.*, 57 F.4th 110, 117 (3d Cir. 2023), the failure to instruct on lost profits

was prejudicial legal error, *Jamesbury*, 756 F.2d at 1558, which independently

requires a new damages trial.

> **2.    The District Court Abused Its Discretion In Barring Sunoco
> From Asking The Jury To Award Royalties Based On
> Sunoco's Comparable Licenses**

As explained, Judge Stark ruled the jury would be instructed that Sunoco

could not "attribute all the value of the BSAs" or "the full value of the Buckeye

license" to the patents.    Appx15978-15979(33:4-34:12);  Appx16013(68:13-22).

Even after Sunoco's lost profits case was stricken, the jury would have been able

under those instructions to determine a reasonable royalty by evaluating the

comparability of Sunoco's prior licenses and negotiations.

The jury heard evidence explaining (1) Sunoco's 50/50 profit-sharing BSA

with Magellan, Appx23195-23196(1427:8-1428:2); (2) Sunoco's other BSAs where

competitors accepted 40-50% profit-sharing, Appx21975-21976(207:1-208:23);

(3) the $0.02/gallon and "30% of profits" rates in the Buckeye License, and

(4) possible  apportionment.    Appx21945-21958(177:17-190:22);  Appx21964-

21969(196:22-201:14);    Appx23139(1371:4-25);    Appx23143-23144(1375:22-

1376:13).  However, the jury never got the chance to make findings on such evidence.

After the close of evidence, Judge Andrews barred Sunoco's comparable

license evidence and royalty theories from being argued to the jury.  Minutes before

closings, he told Sunoco that "just because you can't argue the full value doesn't

mean you have a basis to argue some value that's intermediate," and "even if you

say here's a little piece and here's a little piece and they're worth this … that's not

apportionment." Appx23229-23231(1461:2-1463:15).  He declared "the 30 percent

is out and the 50 percent is out, as that's the import of Judge Stark's rule."

Appx23236-23237(1468:16-1469:4).  He declared "that's the price for losing your

expert," Appx23235(1467:18-19), which confirms his conclusion that Sunoco could not prove any damages theory without an expert.[5]

Judge Andrews still instructed the jury that the "full value" of the BSAs and the Buckeye License is "not attributable solely to the patents." Appx23246(1478:4-10). But after his post-trial ruling, that instruction was meaningless. Sunoco could not argue that *any* percentage of the profit-sharing in the BSAs (40-50%) or Buckeye License (30%) was attributable to the patents. Instead, because Maness had advanced the $0.02/gallon rate as his benchmark, Appx23174-23175(1406:21-1407:15), Sunoco was limited to asking the jury to award a royalty based on Defendants' rate, which the jury did. Appx21091-21093; Appx23254-23257(1486:9-1489:3).

In *Meyer Intellectual Props. Ltd. v. Bodum, Inc*., 690 F.3d 1354, 1375-76 (Fed. Cir. 2012), the district court excluded defendant's invalidity expert, and the prior art he relied on, and then barred defendant from using lay witnesses to introduce other prior art to "back-door" the exclusion orders. Reversing both rulings, this Court

---

[5] The court acknowledged there are "Federal Circuit cases saying you don't need an expert" but distinguished them as arising "usually in relatively simple situations." Appx23236(1468:16-25). Actually, such cases allow juries to decide even substantive patent issues without an expert in simple technologies. *See Wyers v. Master Lock Co*., 616 F.3d 1231, 1242 (Fed. Cir. 2010) (prior art/obviousness), *Centricut, LLC v. Esab Group, Inc*., 390 F.3d 1361, 1369 (Fed. Cir. 2004) (infringement). In contrast, damages calculations "usually" involve "relatively simple situations" of subtracting costs from sales (lost profits) or multiplying the number of infringing units by the determined rate (reasonable royalty).

recognized that defendant was not using a lay witness (its CEO of 36 years) to give invalidity opinions, but merely to testify about facts within his personal knowledge. *Id*. at 1377.  Because the exclusion errors prevented defendant from presenting its obviousness defense and resulted in "a one-sided trial," the errors were not harmless and warranted a new trial.  *Id*. at 1377-78.

Here, the rulings striking Sunoco's lost profits instructions and barring use of Sunoco's comparable-license evidence resulted in a one-sided damages trial where only Defendants' $0.02/gallon rate could be argued to the jury.  As in *Meyer*, a new damages trial is required here.

## III.    The District Court Erred In Granting JMOL Of Non-Infringement

The jury found Magellan infringed all eight asserted claims.  Appx20854-20856.  Five of those ('302 claims 16-17, '629 claims 18 & 22, and '686 claim 3) recite calculating a blend ratio based on a "butane [or agent] vapor pressure." Appx175(14:41-43); Appx189(14:44-45); Appx205(16:7-9).  Defendants argued the term required actually *measuring* the vapor pressure, but the district court held that it merely "requires knowing … the vapor pressure of the … butane 'to be blended.'" Appx10742; *see* Appx22329-22334(561:8-566:10) (showing Defendants' equation used butane's inherent vapor pressure).

Defendants moved for JMOL under Rule 50(a) on those five claims, arguing Sunoco's only evidence "suggests that the RVP of the butane is baked into our

equation, but the claim limitation [as construed] requires knowledge of the RVP." Appx22440-22441(672:16-673:15).  Defendants' renewed JMOL similarly asserted "[t]he only evidence … is Dr. Kytomaa's testimony that this knowledge is baked into Magellan's formula" which did not satisfy the court's construction. Appx22906-22908(1138:13-1140:1).  However, the court ruled that "substantial evidence support[ed] the jury's finding that Defendants had knowledge of an inherent or assumed butane vapor pressure."  Appx137-140.

Defendants' post-verdict JMOL under Rule 50(b) raised a new claim construction argument applicable to only '302 claims 16-17 and '629 claims 18 & 22.  Because those four claims recite "transmitting" or "receiving" a butane vapor pressure before "calculating," Defendants argued those terms require moving the vapor pressure "from A to B."  Appx23596-23597(8:12-9:8).  Despite not being raised in the pre-verdict JMOLs (Appx23401-23405), the court granted post-trial JMOL on Defendants' new ground.  Appx140-141.

It is "constitutionally impermissible for the district court to re-examine the jury's verdict and to enter JMOL on grounds not raised in the pre-verdict JMOL." *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1107 (Fed. Cir. 2003).  Without more, the post-trial JMOL of non-infringement should be reversed.

Moreover, the only evidence addressing these limitations came from Sunoco's infringement expert, who explained Defendants' systems performed the step by

"programming in or inputting into the equation the vapor pressure of the butane." Appx22347-22348(579:16-580:5); Appx22358-22360(590:25-592:8). Defendants did not cross-examine Kytomaa on this issue or present any contrary evidence. Appx23404-23405. Because his unrebutted testimony is substantial evidence for the infringement verdict, JMOL on those four claims can also be reversed on that basis. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019) (applying Third Circuit law).

## IV.   The District Court Abused Its Discretion In Not Awarding Any Enhanced Damages

Enhanced damages are "a 'punitive' or 'vindictive' sanction for egregious infringement behavior" variously described as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo*, 579 U.S. at 103-04. Here, Defendants exemplify "the 'wanton and malicious pirate' who intentionally infringes another's patent … for no purpose other than to steal the patentee's business." *Id*. at 104 (citing *Seymour v. McCormick*, 57 U.S. 480, 488-89 (1854)).

Magellan knew it needed a license, but decided to intentionally infringe and not share any profits by "keeping everything internal." Appx25500. Magellan later procured the Colonial contract over Sunoco by infringing Sunoco's patented technology and using the same terms and methodologies as Sunoco's BSAs.

Appx25484-25497.  A clearer case of intentionally "stealing the patentee's business" can hardly be imagined.

In *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir. 1996), the district court abused its discretion where its enhancement analysis contradicted the jury's willfulness findings.  A court "does not have discretion to reweigh this evidence once the matter has been decided by the jury and the court finds evidence sufficient to support the jury determination." *Id*. at 1572-73.  Having already upheld the willfulness verdict, Appx143-149, the court here abused its discretion by reweighing the evidence and making its own findings that contradicted the jury's findings and were clearly erroneous.

The court's enhancement analysis used the *Read* factors.  Appx152-156. While the court found five factors weighed against enhancement, it did so by improperly accepting Defendants' view of the facts, which the jury necessarily rejected.[6]

On factor one, the jury had substantial evidence that Magellan copied Texon's systems using information Magellan solicited from Texon.  Appx21577-21578; *supra* section I.D.  Ignoring the jury's presumed findings, the court accepted

---

[6] Defendants' closing asserted that "if you believe that we are infringers and willful infringers, ***you have to accept that we have been lying to you*** throughout this case." Appx23030(1262:15-18).  It must be presumed that the jury agreed. *See Brooktree Corp. v. Advanced Micro Devices*, 977 F.2d 1555, 1569 (Fed. Cir. 1992) ("Issues of credibility of witnesses are for the jury, and are not amenable to appellate review.").

Magellan's assertion that it had automated blending since 2001, and that Roles wanted more information about Texon's system not to copy but merely to choose between them.    Appx153; Appx22595(827:12-23); Appx22498-22509(730:1-741:10).  Both assertions were rejected by the jury and are unsupported by the record.

First, Magellan *alleged* that it had an automated system in 2001 (OKC-Reno), which the jury rejected as prior art.  Appx20858.  Magellan had no supporting documentation and never cited that system when seeking its own patent. Appx22248-22260(480:9-492:8);  Appx22612-22613(844:7-845:15);  Appx22621-22624(853:20-856:17).  Second, in upholding the willfulness verdict, the district court rejected Defendants' argument—citing the same testimony—that Magellan only sought data that Texon's systems "could reliably and consistently blend." Appx144-145; Appx21548-21550.  Hence, the court's finding is contrary to the jury's implicit findings, as upheld by the court.

On factors three and five, the court believed "Defendants acted reasonably and in good faith in pursuing their defenses," and that the case "was relatively close." Appx153-154.  Under *Halo*, both findings are irrelevant absent proof Defendants knew of and acted on their trial defenses before infringing.  579 U.S. at 105.  To avoid allowing one "who plunders a patent … [to] escape any comeuppance under § 284 solely on the strength of his attorney's ingenuity," the Court held in *Halo* that "culpability is generally measured against the knowledge of the actor at the time of

the challenged conduct," and nothing "suggests that we should look to facts that the defendant neither know nor had reason to know at the time he acted." *Id*. at 105-06. Lacking any such showing, neither factor can weigh against enhancement.

On factor seven (remedial measures), the court cited Magellan's switch "from feedforward to feedback" systems allegedly to avoid infringement. Appx155; Appx22260-22263(492:9-495:5). But the court denied JMOL because "Defendants had no reasonable basis to believe that their [feedback] systems did not infringe." Appx146-147. Moreover, Magellan's application on "Huff's feedback system" was rejected as anticipated by Sunoco's patents in 2014, but "Magellan did not change their physical systems," *i.e.*, took ***no*** remedial measures. Appx145-146; Appx22259-22260(491:21-492:8). Because Defendants knew the feedback system did not avoid Sunoco's claims, Defendants' ***lack*** of remedial measures should have heavily favored enhancement.

On factor eight (motivation for harm), the court excused Magellan winning the Colonial project as "ordinary competition driven by a profit motive." Appx155. Because Magellan prevailed only by using Sunoco's patented technology, which Colonial specifically required, Appx7553-7559(¶¶175-177), it was clear error not to find that the harm to Sunoco resulted from Magellan's extraordinary misconduct driven by its improper motive to keep all the profits, *i.e.*, "for no purpose other than to steal the patentee's business." *Halo*, 579 U.S. at 104. Moreover, the finding that

"Colonial went with Magellan because it had more experience blending on large pipelines," Appx155, is another of Defendants' stories that the jury rejected in finding willfulness. Appx20857.

On factor nine (concealment), the court inexplicably found that "Mattingly knew Magellan had automated blending systems [when] he pitched the Texon systems to Magellan" while citing Mattingly's testimony that he did not know "how their system was working." Appx155; Appx22177-22178(409:16-410:21). Hence, the court's "no concealment" finding is itself clearly erroneous.

Because no *Read* factor supports the court's failure to enhance damages, Appx151-156, its ruling should be reversed. Notably, despite finding factor four favored enhancement, the court viewed it as not "particularly relevant that the jury's damages award amounts to only 2% of Defendants' profits." Appx153-154. Not only should that gross disparity have been highly relevant, but that statement reflects such a serious error in judgment that the corresponding failure to enhance damages could only be an abuse of discretion.

The remedy of enhancement should punish the willful infringer so its intentional decision to infringe becomes less economically beneficial than properly respecting another's patent rights. Admittedly, absent a new damages trial, even trebling the total damages here would reward Defendants with an undeserved $100+ million windfall relative to both Sunoco and its BSA licensees. However, regardless

69

of whether the damages were adequate to compensate Sunoco for the infringement, the separate failure to enhance those damages completely failed to fulfill the statutory purposes to punish "the 'wanton and malicious pirate'" and to deter others from embarking upon a similar path of egregious misconduct and culpable behavior. *See Halo*, 579 U.S. at 103-04.

## CONCLUSION

This case should be remanded for a new damages trial and reconsideration of enhanced damages.

Dated: March 29, 2023        Respectfully submitted,

/s/ John R. Keville
John R. Keville
SHEPPARD, MULLIN,
RICHTER & HAMPTON, LLP
700 Louisiana Street, Suite 2750
Houston, Texas 77002-2791
(713) 431-7100

*Counsel for Plaintiff-Appellant*
*Sunoco Partners Marketing &*
*Terminals L.P.*

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

| Docket No. | Description | Pages |
|---|---|---|
| 774 | Judgment on the Jury Verdict, dated 12/15/2021 | Appx1 |
| 863 | Final Judgment, dated 10/24/2022 | Appx3 |
| 547 | Memorandum Order re all outstanding motions, entered on 06/09/2020 | Appx12 |
| 745[1] | Proposed Jury Instructions (Phase 2), dated 12/04/2021 | Appx29 |
| 767 | Final Jury Instructions (Damages Phase), entered on 12/13/2021 | Appx66 |
| 787 | Sunoco Letter to Judge Andrews re docketing of email communications (with Exhibits), dated 01/04/2022 | Appx80 |
| 852 | Memorandum Opinion entered on 08/31/2022 | Appx134 |
| 853 | Order regarding Defendants' Renewed Motion for Judgment As a Matter of Law of No Infringement of Certain Asserted Claims and No Willful Infringement (D.I. 795 ) is granted-in-part and denied-in-part entered on 08/31/2022 | Appx150 |
| 854 | Memorandum Opinion granting-in-part and denying-in-part Defendant's Renewed Motion for Judgment as a Matter of Law of No Infringement of Certain Asserted Claims and No Willful Infringement (D.I. 795), entered on 08/31/2022 | Appx151 |
| 855 | Order: Sunoco's Post-Trial Motion for Enhanced Damages, Supplemental Damages, Pre-Judgment and Post-Judgment Interest, and Ongoing Royalties (D.I. 797 ) is granted with respect to supplemental damages, pre-judgment interest, and post judgment interest, and denied with respect to enhanced damages and ongoing royalties entered on 08/31/2022 | Appx162 |

---

[1] Docket Nos. 745, 767, and 787 are included in the addendum because these documents reflect the district court's decision to preclude Sunoco from arguing that it was entitled to lost profits at trial, which Sunoco is directly appealing. The district court did not issue a separate order or document reflecting its decision.

| Docket No. | Description | Pages |
|---|---|---|
| | U.S. Patent No. 6,679,302 (PTX001) | Appx163 |
| | U.S. Patent No. 7,032,629 (PTX002) | Appx177 |
| | U.S. Patent No. 9,207,686 (PTX003) | Appx191 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SUNOCO PARTNERS MARKETING & TERMINALS L.P., | § § § | |
| Plaintiff, | § § | Civil Action No. 17-1390-RGA |
| v. | § § | |
| POWDER SPRINGS LOGISTICS, LLC, AND MAGELLAN MIDSTREAM PARTNERS, L.P., | § § § § | |
| Defendants. | § | |

**JUDGMENT ON THE JURY VERDICT**

This ___15___ day of December 2021, the Court having held a jury trial, and the jury having

rendered a verdict, pursuant to Fed. R. Civ. P. 58(b)(2), IT IS HEREBY ORDERED that:

Judgment of infringement is entered for Plaintiff Sunoco Partners Marketing & Terminals

L.P. and against Defendants Powder Springs Logistics, LLC and Magellan Midstream Partners, L.P.

on Count III of the Second Amended Complaint, with respect to claim 3 of U.S. Patent No. 9,207,686,

in the amount of $2,836,716.12, and Defendants Powder Springs Logistics, LLC and Magellan

Midstream Partners, L.P. were further found to willfully infringe claim 3 of U.S. Patent No.

9,207,686. (D.I. 149.)

Judgment of infringement is entered for Plaintiff Sunoco Partners Marketing & Terminals

L.P. and against Defendant Magellan Midstream Partners, L.P. on Count IV of the Second Amended

Complaint, with respect to claims 3, 16, and 17 of U.S. Patent No. 6,679,302, and Count V of the

Second Amended Complaint, with respect to claims 18, 22, 31, and 32 of U.S. Patent No. 7,032,629,

in the amount of $9,364,242.32, and Defendants Powder Springs Logistics, LLC and Magellan

Midstream Partners, L.P. were further found to willfully infringe claims 3, 16, and 17 of U.S. Patent

1

Appx1

No. 6,679,302 and claims 18, 22, 31, and 32 of U.S. Patent No. 7,032,629. (D.I. 149.)

Judgment is further entered for Plaintiff Sunoco Partners Marketing & Terminals L.P. and against Defendant Magellan Midstream Partners, L.P. on Counterclaims III (noninfringement) and VIII (invalidity) of Defendant Magellan Midstream Partners. L.P.'s Answer and Counterclaims to Plaintiff's Second Amended Complaint ("Magellan's Answer and Counterclaims"), with respect to claim 3 of U.S. Patent No. 9,207,686; Counterclaims IV (noninfringement) and IX (invalidity) of Magellan's Answer and Counterclaims, with respect to claims 3, 16, and 17 of U.S. Patent No. 6,679,302; and Counterclaims V (noninfringement) and X (invalidity) of Magellan's Answer and Counterclaims, with respect to claims 18, 22, 31, and 32 of U.S. Patent No. 7,032,629. (D.I. 271.)

Judgment is further entered for Plaintiff Sunoco Partners Marketing & Terminals L.P. and against Defendant Powder Springs Logistics, LLC on Counterclaims III (noninfringement) and VII (invalidity) of Defendant Powder Springs Logistics, LLC's Answer and Counterclaims to Plaintiff's Second Amended Complaint ("Powder Springs Logistics' Answer and Counterclaims"), with respect to claim 3 of U.S. Patent No. 9,207,686 and Counterclaim VIII (invalidity) of Powder Springs Logistics' Answer and Counterclaims, with respect to claims 3, 16, and 17 of U.S. Patent No. 6,679,302. (D.I. 280.)

This Judgment is subject to modification following the Court's consideration of the parties' post-trial motions.

/s/ Richard G. Andrews
_____
UNITED STATES DISTRICT JUDGE

Appx2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SUNOCO PARTNERS MARKETING & | § | |
| TERMINALS L.P., | § | |
| | § | Civil Action No. 17-1390-RGA |
| Plaintiff, | § | |
| | § | |
| v. | § | JURY TRIAL REQUESTED |
| | § | |
| POWDER SPRINGS LOGISTICS, LLC, | § | |
| AND MAGELLAN MIDSTREAM | § | |
| PARTNERS, L.P., | § | |
| | § | |
| Defendants. | § | |

## <u>FINAL JUDGMENT</u>

This action was tried before a jury beginning on November 29, 2021, with the Honorable Richard G. Andrews presiding. The jury returned a verdict on liability on December 3, 2021 and on damages on December 6, 2021. The verdict was accompanied by a verdict form, which was signed by the foreperson and all jurors as a unanimous verdict, and was accepted by the Court and filed in redacted form by the Clerk (D.I. 744; D.I. 753). On December 15, 2021, the Court entered a non-final judgment on the jury verdict. D.I. 774.

Following briefing and oral argument, the Court issued Memorandum Opinions (D.I. 850; D.I. 852; D.I. 854) and Orders (D.I. 851; D.I. 853; D.I. 855) on the parties' post-trial motions on August 31, 2022. In accordance with the jury's verdict, the Court's pre- and post-trial opinions and orders, and pursuant to Federal Rule of Civil Procedure 58, final judgment in this action is hereby entered as follows:

Appx3

1.      Judgment is entered in favor of Plaintiff Sunoco Partners Marketing & Terminals L.P. ("Sunoco") and against Defendants Powder Springs Logistics, LLC ("Powder Springs") and Magellan Midstream Partners, L.P. ("Magellan") with respect to infringement of claim 3 of U.S. Patent No. 9,207,686.

2.      Judgment is entered in favor of Plaintiff Sunoco and against Defendant Powder Springs with respect to willful infringement of claim 3 of U.S. Patent No. 9,207,686.

3.      Judgment is entered in favor of Plaintiff Sunoco and against Defendant Powder Springs for damages for infringement of claim 3 of U.S. Patent No. 9,207,686 in the amount of $7,138,733; plus prejudgment interest in the amount of $607,677; plus post-judgment interest in the amount of $27,189; plus $467.05 in interest for each day after October 21, 2022 until entry of final judgment; plus $433.10 in interest for each day after final judgment.

4.      Judgment is entered in favor of Plaintiff Sunoco and against Defendant Magellan with respect to infringement of claim 3 of U.S. Patent No. 6,679,302; claims 31 and 32 of U.S. Patent No. 7,032,629; and claim 3 of U.S. Patent No. 9,207,686.

5.      Judgment is entered in favor of Plaintiff Sunoco and against Defendant Magellan with respect to willful infringement of claim 3 of U.S. Patent No. 6,679,302; claims 31 and 32 of U.S. Patent No. 7,032,629; and claim 3 of U.S. Patent No. 9,207,686.

6.      Judgment is entered in favor of Plaintiff Sunoco and against Defendant Magellan for damages with respect to infringement of claim 3 of U.S. Patent No. 6,679,302; claims 31 and 32 of U.S. Patent No. 7,032,629; and claim 3 of U.S. Patent No. 9,207,686 in the amount of $12,810,336; plus prejudgment interest in the amount of $2,534,258; plus post-judgment interest in the amount of $41,520; plus $407.72 in interest for each day after October 21, 2022 until entry of final judgment; plus $381.68 in interest for each day after final judgment.

Appx4

7.      Judgment is entered in favor of Defendant Magellan and against Plaintiff Sunoco with respect to Defendant Magellan's counterclaims of non-infringement of claims 16 and 17 of U.S. Patent No. 6,679,302, and claims 18 and 22 of U.S. Patent No. 7,032,629.

8.      Judgment is entered in favor of Defendants Powder Springs and Magellan and against Plaintiff Sunoco with respect to Defendants Magellan and Powder Springs' counterclaims of invalidity under 35 U.S.C. § 101 of claims 23, 24, and 30 of U.S. Patent No. 6,679,302.

9.      Judgment is entered in favor of Plaintiff Sunoco and against Defendants Powder Springs and Magellan with respect to Defendants Powder Springs and Magellan's remaining counterclaims.

10.     All remaining claims and counterclaims are hereby dismissed.

**IT IS SO ORDERED.**

Dated this <u>24th</u> day of <u>October</u>, 2022.

                                        /s/ Richard G. Andrews
                                        _____
                                        HON. RICHARD G. ANDREWS
                                        UNITED STATES DISTRICT JUDGE

Appx5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUNOCO PARTNERS MARKETING & TERMINALS L.P., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 17-1390-LPS-CJB |
| | : | |
| POWDER SPRINGS LOGISTICS, LLC, and MAGELLAN MIDSTREAM PARTNERS, L.P., | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM ORDER

WHEREAS, on January 16, 2020, Magistrate Judge Burke issued a Report and Recommendation ("January Report" or "Jan. Rep.") (D.I. 447), recommending that the Court grant-in-part and deny-in-part Plaintiff Sunoco Partners Marketing & Terminals L.P.'s ("Sunoco") motion for partial summary judgment (D.I. 372);

WHEREAS, on January 28, 2020, Sunoco filed objections to the January Report ("Sunoco January Objections") (D.I. 461), specifically objecting that Judge Burke erred in recommending denying summary judgment that Defendants Powder Stream Logistics, LLC ("Powder Stream") and Magellan Midstream Partners, L.P.'s ("Magellan" and, together with Powder Stream, "Defendants") accused systems infringe claims 3 and 8 of United States Patent No. 9,606,548 (the "'548 patent");

WHEREAS, on February 10, 2020, Defendants filed a response to Sunoco's January Objections ("Defendants January Response") ("D.I. 484");

1

WHEREAS, on January 28, 2020, Magellan filed objections to the Jan. 16 Report ("Magellan January Objections") (D.I. 460), specifically objecting that Judge Burke erred in recommending granting Sunoco's motion for partial summary judgment that accused Magellan systems infringe claim 3 of United States Patent No. 6,679,302 (the "'302 patent");

WHEREAS, on February 10, 2020, Sunoco filed a response to Magellan's January Objections ("Sunoco January Response");

WHEREAS, on February 6, 2020, Judge Burke issued a Report & Recommendation ("February Report" or "Feb. Rep.") (D.I. 477), recommending that the Court grant-in-part and deny-in-part Sunoco's motion for summary judgment that certain references do not qualify as prior art (D.I. 377);

WHEREAS, on February 20, 2020, Defendants filed objections to the February Report ("Defendants February Objections") (D.I. 499), specifically objecting that a fact dispute existed as to whether the TransMontaigne system ("TransMontaigne") was publicly accessible;

WHEREAS, on March 5, 2020, Sunoco filed a response to Defendants February Objections ("Sunoco February Response") (D.I. 511);

WHEREAS, on February 20, 2020, Sunoco filed objections to the February Report ("Sunoco February Objections") (D.I. 500), specifically objecting that there was no evidence that Williams took steps to make the automated system publicly known;

WHEREAS, on March 5, 2020, Defendants filed a response to Sunoco's February Objections ("Defendants February Response") (D.I. 510);

2

WHEREAS, on February 19, 2020, Judge Burke issued a Report and Recommendation ("February Report II" or "Feb. Rep. II") (D.I. 495), recommending that the Court deny Defendants' motion for summary judgment of noninfringement (D.I. 381);

WHEREAS, on March 4, 2020, Defendants filed objections to February Report II ("Defendants Objections to February Report II") (D.I. 509), specifically objecting that that Defendants' systems could not infringe the asserted claims as a matter of law;

WHEREAS, on March 18, 2020, Sunoco filed a response to Defendants Objections to February Report II ("Sunoco Response to February Report II Objections") (D.I. 518);

WHEREAS, on February 27, 2020, Judge Burke issued a Report and Recommendation ("February Report III" or "Feb. Rep. III") (D.I. 506), recommending that the Court deny Defendants' motion for summary judgment (D.I. 381) that certain patent claims asserted by Sunoco are invalid as anticipated and/or obvious;

WHEREAS, on March 12, 2020, Defendants filed objections to February Report III ("Defendants Objections to February Report III") (D.I. 516), specifically objecting that certain of Judge Burke's conclusions were incorrect under the proper construction of certain claim terms;

WHEREAS, on March 26, 2020, Sunoco filed a response to Defendants Objections to February Report III ("Sunoco Response to February Report III Objections") (D.I. 521);

WHEREAS, on March 13, 2020, Judge Burke issued a Report and Recommendation ("March Report" or "Mar. Rep.") (D.I. 517), recommending that the

Court deny Defendants' motion for summary judgment that certain Sunoco patents are not entitled to the priority date of the '302 patent (D.I. 381);

WHEREAS, on March 27, 2020, Defendants filed objections to the March Report ("Defendants March Objections") (D.I. 522), specifically objecting that Judge Burke applied the wrong legal test and ignored the '302 patent's disclosures;

WHEREAS, on April 10, 2020, Sunoco filed a response to Defendants March Objections ("Sunoco March Response") (D.I. 527);

WHEREAS, on January 3, 2020, Judge Burke issued a memorandum order granting Defendants' motion to exclude the damages opinions of Dr. Keith R. Ugone with leave to file a supplemental report (D.I. 442) ("January Ugone Order" or "Jan Ord.");

WHEREAS, on January 17, 2020, Sunoco filed objections to the January Ugone Order ("Sunoco Ugone Objections") (D.I. 448), specifically objecting that Judge Burke applied the wrong legal standard;

WHEREAS, on January 30, 2020, Defendants filed a response to Sunoco's Ugone Objections ("Defendants Ugone Response") (D.I. 465);

WHEREAS, on January 17, 2020, Defendants filed objections to the January Ugone Order ("Defendants Ugone Objections") (D.I. 449), specifically objecting that Judge Burke erred in granting Sunoco leave to file a supplemental report;

WHEREAS, on January 30, 2020, Sunoco filed a response to Defendants Ugone Objections ("Sunoco Ugone Response");

WHEREAS, on January 27, 2020, Defendants filed a motion to exclude Dr. Ugone's supplemental damages report ("Motion to Exclude") (D.I. 459), which has been fully briefed (*see, e.g.*, D.I. 459 Ex. 2; D.I. 476; D.I. 478);

WHEREAS, on January 24, 2020, Sunoco filed a motion to strike certain of Defendants' pretrial disclosures ("Motion to Strike") (D.I. 457), which has been fully briefed (*see, e.g.*, D.I. 458, 464, 471);

WHEREAS, on April 17, 2020, Defendants filed a motion to stay the litigation with respect to U.S. Patent Nos. 9,494,948 (the "'948 patent") and 9,606,548 (the "'548 patent") ("Motion to Stay") (D.I. 530), which has been fully briefed (*see, e.g.*, D.I. 531, 534, 540);

WHEREAS, on May 13, 2020, the Court held a hearing by teleconference to hear oral argument on the many motions and matters addressed in this Memorandum Order (*see* Transcript ("Tr.") (D.I. 545));

WHEREAS, the Court has reviewed *de novo* the portions of Judge Burke's Reports addressing dispositive issues,[1] *see Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3);

WHEREAS, the Court has reviewed Judge Burke's January Ugone Order, which resolves a nondispositive issue, under a "clearly erroneous and contrary to law" standard of review, *see* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a); *see also Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, 61 F. Supp. 3d 437, 441 (D. Del. 2014);

---

[1] January Report, February Report, February Report II, February Report III, and March Report. The Court adopts by reference the legal standards applicable to summary judgment motions articulated in *Wasica Fin. GmbH v. Schrader Int'l, Inc.*, 2020 WL 1150135, at *1 n.1 (D. Del. Jan. 14, 2020).

Appx16

WHEREAS, expert testimony is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case," Fed. R. Evid. 702(b)-(d);[2]

NOW, THEREFORE, IT IS HEREBY ORDERED that, as more fully described below, (i) the January Report (D.I. 447) is ADOPTED in part and REJECTED in part; (ii) the February Report (D.I. 477) is ADOPTED in part and REJECTED in part; (iii) February Report II (D.I. 495) is ADOPTED; (iv) February Report III (D.I. 506) is ADOPTED; (v) the March Report (D.I. 517) is ADOPTED; (vi) Sunoco's motion for summary judgment of patent infringement (D.I. 372) IS DENIED; (vii) Sunoco's motion for summary judgment regarding certain prior art (D.I. 377) is DENIED; (viii) Magellan's motion for summary judgment of non-infringement and invalidity (D.I. 381) is DENIED; (ix) Defendants' original motion to exclude Dr. Ugone (D.I. 375) remains GRANTED, as does leave to Sunoco to have filed a supplemental report – the Sunoco Ugone Objections and Defendants Ugone Objections are DISMISSED AS MOOT; (x) Defendants' Motion to Exclude (D.I. 459) is GRANTED and Dr. Ugone's supplemental report is STRICKEN; (xi) Defendants' Motion to Strike (D.I. 457) is DENIED; and (xii) Defendants' Motion to Stay (D.I. 530) is DENIED.

**January Report**

The Sunoco January Objections are OVERRULED.

---

[2] The Court adopts by reference the legal standards applicable to motions to exclude expert testimony articulated in *Wasica*, 2020 WL 1150135, at *1 n.2.

Sunoco argues there is no genuine dispute of fact that Defendants' accused systems practice the "processor" limitation of the '548 patent, as the accused systems use "PLCs" that perform every limitation of the claimed "processor."  (D.I. 461 at 2) Like Judge Burke, however, the Court concludes that a reasonable juror could find that the accused systems' PLCs do not practice at least one of these limitations: "output[ting] a signal representative of the adjustment to the injection device."  '548 pat. at 17:19-28, 48-56.  Sunoco's expert, Dr. Kytomaa, stated multiple opinions that a reasonable jury could find to be inconsistent and noncredible, resulting in a record that does not justify a grant of summary judgment of infringement.  (*See* D.I. 400 at 12; D.I. 447 at 16; *see also* Jan. Rep. at 17 (citing D.I. 401 Ex. 3 at ¶¶ 765, 770, 779))  Also, Defendants' expert, Dr. Nikolaou, provided opinions a jury could credit and, from them, find noninfringement.  (*See, e.g.*, D.I. 402 Ex. A at ¶¶ 224, 248-49)  Thus, the Court denies Sunoco's motion for summary judgment that the accused systems infringe claims 3 and 8 of the '548 patent.

The Magellan January Objections are SUSTAINED.

Defendants' expert, Dr. Nikolaou, did not improperly reconstrue the claim term "fluid connection."  Instead, he permissibly applied the Court's construction of this term.  There is a genuine dispute of material fact as to whether the accused systems practice the "dispensing unit . . . in fluid connection with blending unit" and "rack" limitations of claim 3 of the '302 patent, given the existence of a tank between the blending system and the rack.  (*See* D.I. 460 at 2-4; *see also* D.I. 402 Ex. A at ¶¶ 38-43)  Thus, the Court denies Sunoco's motion for summary judgment that the accused systems infringe claim 3 of the '302 patent.

Appx18

**February Report**

Defendants February Objections are SUSTAINED.

The opinions of Defendants' experts Dr. Nikolaou – that a person of ordinary skill in the art ("POSA") who viewed the publicly-accessible TransMontaigne equipment would "have understood how the blending system operated at the level required by the claims of the asserted patents" – and Dr. Mongold – that "most people in the industry would be able to tell" how the system worked – are sufficient, if credited by the jury (as it will be free reasonably to do), to create a genuine dispute of material fact.  (*See* D.I. 499 at 4-6 (citing D.I. 399 Ex. B at ¶ 106; D.I. 398 Ex. 36 at 250); *see also Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) ("[A] reference can anticipate a claim even if it d[oes] not expressly spell out all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would at once envisage the claimed arrangement or combination.") (internal quotation marks omitted))  Thus, the Court denies Sunoco's motion for summary judgment that TransMontaigne is not prior art.

Sunoco's February Objections are OVERRULED.

The record reveals a genuine dispute of material fact as to whether Defendants suppressed or concealed the OKC-Reno system.  A reasonable juror could find that the inventors of OKC-Reno did not intentionally suppress or conceal OKC-Reno, based on evidence including that (1) the inventor of the Sunoco patents sent his contractor to visit the Tulsa system, that was similar in all material respects to OKC-Reno; (2) Magellan's predecessor allowed the contractor to tour the Tulsa facility; and (3) the contractor's visit led to the creation of Sunoco's rack system.  (D.I. 510 at 3-4) (citing D.I. 397 at 22; D.I. 398 Ex. 28 at 136-42, 144-45, 150-52; D.I. 398 Ex. 26 at 429-30; D.I. 398 Ex. 29 at 47-48)  Viewed in the light most favorable to

8

Appx19

Defendants, a reasonable juror could find from this evidence that Magellan's predecessor did not conceal the Tulsa system's blending system and, therefore, likewise did not conceal the materially-similar OKC-Reno blending system.  This same evidence, viewed in the same most favorable light to Defendants, could likewise lead a reasonable juror to find that Magellan's predecessor made the OKC-Reno blending system publicly accessible.  Thus, the Court denies Sunoco's motion for summary judgment that OKC-Reno is not prior art.

**February Report II**

Defendants Objections to February Report II are OVERRULED.

Defendants argue their systems are configured in either a "non-blending" or "blending" mode and that neither mode practices all of the asserted claim limitations.  (D.I. 509 at 7)  But a reasonable juror, taking the evidence in the light most favorable to Sunoco, could find there is only one configuration for Defendants' accused systems: a "normal operation mode" that practices all the limitations of the asserted claims.  (D.I. 518 at 2-3) (citing D.I. 382 at 8-9)  Further, while Defendants fault February Report II for "constru[ing] the claim language to determine the claim scope" (D.I. 509 at 9), they do not identify any claim terms that Judge Burke purportedly construed (nor persuade the Court that he did so incorrectly).  Thus, the Court denies Defendants' motion for summary judgment of noninfringement.

**February Report III**

Defendants Objections to February Report III are OVERRULED.

The record reveals a genuine dispute of material fact as to whether Haas anticipates claims 3 and 8 of the '548 patent under the construction of "gasoline" adopted by the Court. (*See* D.I. 539 at 7-8)  The Court agrees with Judge Burke's explanation as to how a reasonable juror, taking the evidence in the light most favorable to Sunoco, could fail to agree with

9

Appx20

Defendants that Haas satisfies the claim limitation "a volatility measurement device in communication with the gasoline stream." (Feb. Rep. III at 8)  Defendants' expert, Dr. Nikolaou, opined (in the context of a related patent) that (1) the term "gasoline stream" referred to "unblended gasoline" and (2) Haas's "vapor-liquid analyzer . . . does not receive or use a measurement of the vapor pressure of the ***gasoline to be blended***." (D.I. 406 Ex. B at ¶ 617) (emphasis added)  While Defendants argue these opinions do not apply to the '548 patent claims, the law permits the type of reasoning proffered by Sunoco, because "where multiple patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents." *Trustees of Columbia Univ. in City of New York v. Symantec Corp.,* 811 F.3d 1359, 1369 (Fed. Cir. 2016).  Moreover, Defendants' obviousness contentions regarding claims 3 and 7 of the '948 patent and claim 3 of the '302 patent depend on a construction of "vapor pressure" which the Court has rejected.  (*See* D.I. 539 at 6-7)  Thus, the Court denies Defendants' motion for summary judgment of invalidity.

**March Report**

Defendants March Objections are OVERRULED.

Defendants contend that Judge Burke applied the "wrong test" for determining the priority date of the continuation-in-part patents ("CIP patents") by "focus[ing] on whether the '302 patent ***excludes*** pipeline blending." (D.I. 522 at 5)  The Court disagrees.  Judge Burke cited sections of the '302 patent specification from which a reasonable juror could find that the '302 patent explicitly discloses pipeline blending.  (Mar. Rep. at 5) (citing '302 pat. at 2:10-12, 5:35-38)  While Defendants argue that the '302 patent does not disclose what they call "feedback blending" – "where the blending is ***controlled*** by a downstream analyzer" (D.I. 522 at 8) – a reasonable juror could find that the '302 patent provides a "system" that "can be modified to

Appx21

periodically sample the RVP of the **resultant blend** for quality control." '302 pat. at 7:11-14 (emphasis added).  Defendants insist this language does not show that the system "use[s] that measurement to adjust the blend ratio or control blending" (D.I. 422 at 9), but a reasonable juror, relying on the testimony of Sunoco expert Dr. Kytomaa, could reasonably find otherwise (*see* Mar. Rep. at 10).  Thus, the Court denies Defendants' motion for summary judgment.

**Dr. Ugone's Damages Opinions**

The Court will strike Dr. Ugone's damages opinions.[3]

The entire market value analysis in Dr. Ugone's supplemental report is unreliable because he does not identify reliable evidence to allow Sunoco to "meet its burden to show that the patented feature was the **sole driver** of consumer demand, i.e., that it alone motivated consumers to buy the accused the products or substantially creates the value of the component parts." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 979 (Fed. Cir. 2018) (emphasis added).  Rather, Dr. Ugone simply speculates that, for instance, Sunoco's patents led Magellan and Philips 66 to become Sunoco customers.  (*See* D.I. 476 at 13-16)  This is insufficient.  *See generally LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("[T]he patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and **such evidence must be reliable and tangible, and not conjectural or speculative**.") (internal quotation marks omitted; emphasis added).  The Court agrees with the following characterization by Defendants:

---

[3] In doing so, the Court adopts and incorporates by reference Judge Burke's analysis in his January Ugone Order.  The Court also finds persuasive the analysis in *Sunoco Partnership Marketing & Terminals L.P. v. U.S. Venture, Inc. et al.*, No. 15 C 8178 (N.D. Ill. Jan. 29, 2020), a case in which Judge Pallmeyer criticized a similar damages analysis offered by Sunoco through the same Dr. Ugone.  (*See* D.I. 482 Ex. 1 at 35-38)

> Despite conceding that the non-patented services enable Sunoco's licensees to not only operate the system at all, but to maximize blending, Dr. Ugone ascribes the ***entire value*** of the Butane Supply Agreements to only one of the many components – the royalty-free patent license. And while he opines, based on hearsay and speculation, that the patents were a factor for some customers, he fails to show that the patents ***alone*** are what motivated consumers to enter into the Butane Supply Agreements.

(D.I. 459 at 2)

The Federal Circuit has rejected Sunoco's contention that just because the non-patented features at issue here are not sold separately from the patented features it follows that the "sole driver" requirement is satisfied. *See LaserDynamics*, 694 F.3d at 68 ("It is not enough to merely show that the [patented] method is viewed as valuable, important, or even essential to the use of the [accused product]. Nor is it enough to show that [the accused product] without [the patented] method would be commercially unviable . . . ."). Sunoco's evidence of an established licensing program, and insistence that all of the non-patented features of its services have no value outside of the patented invention, do not render Dr. Ugone's analysis consistent with governing law. *See id.* ("[P]roof that consumers would not want a laptop computer without such features is not tantamount to proof that any one of those features alone drives the market for laptop computers."). The purported lack of evidence that any entity took a license from Sunoco due even in part to the non-patented features (*see* Tr. at 15-16)[4] does not (even if true) help Sunoco satisfy ***its*** burden.

Nor has Sunoco adduced evidence to meet its burden to demonstrate that the patented features "substantially create[] the value of the component parts," especially given the

---

[4] *See also generally* D.I. 476 at 8 (Sunoco suggesting "if there was a demand for the services offered by Sunoco separate and apart from the demand for the patents-in-suit, then one would expect Sunoco to have executed some number of butane supply agreements relating to non-patented systems (e.g., manual blending systems or services a la carte").

undisputed evidence that Sunoco's services are valued for their non-patented features, such as their expertise and algorithm. (*See, e.g.*, D.I. 380 Ex. 9 (Colella Tr.) at 536-37 ("[W]e have the supply and the logistics and the know-how, to enable us to be the supplier [of butane]. And most of our blend partners recognize our expertise in this area and choose to use us as their supplier."); D.I. 380 Ex. 12 (Myers Tr.) at 140-41 (stating belief that Sunoco's proprietary blend equation had role in delivering results to customers and "the results of the blending of those algorithms, I think was the selling point")) In addition to the fact evidence showing there is value to Sunoco's non-patented features, Dr. Ugone also recognized in formulating his expert opinions that Sunoco's algorithm and software are necessary and valuable components to what Sunoco includes in its Butane Supply Agreements ("BSAs") which form the basis for his opinions. (*See, e.g.*, D.I. 459-2 Ex. 1 at ¶¶ 5(b), 32(b))

Dr. Ugone's apportionment analysis is also unreliable. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) ("[T]he patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . . .") (internal quotation marks omitted). While Sunoco emphasizes that Dr. Ugone analyzed the value of supplying butane and hedging (D.I. 476 at 18-19), he did not analyze the value of other non-patented features of the BSAs, including Sunoco's blending algorithm – a feature a Sunoco witness described (as noted above) as the "selling point" for Sunoco's products. (D.I. 459 Ex. 2 at 13-14) Sunoco attempts to justify this omission by arguing that the algorithm is "part of the patented system" (D.I. 476 at

17-18), but this is contradicted by Dr. Ugone's testimony that the algorithm is "proprietary and a Sunoco trade secret" (that is, **not** disclosed in a patent) (D.I. 459 Ex. 2 Ex. 1 at ¶ 5(b)(ii)).[5]

Finally, even assuming arguendo that Dr. Ugone is offering what Sunoco calls a "lost opportunity cost opinion," it, too, is unreliable because Dr. Ugone failed to apportion the value lost due to non-infringing manual blending (and, thus, failed to identify the value lost to infringing automated blending).  (*See* D.I. 478 at 5)  Further, for all the reasons already given, the Court is not persuaded by Sunoco's contention that Defendants' challenge to Dr. Ugone's purported explanation for why he concluded Sunoco's patents drive demand for the BSAs goes to the weight to be given to Dr. Ugone's analysis, as opposed to its admissibility under binding precedent.

The Court will not permit Sunoco to file yet another report from Dr. Ugone, attempting once again to overcome the deficiencies contained in two successive reports from Dr. Ugone. (*See, e.g.*, D.I. 459 at 14 (Defendants: "Again, despite the Court's warning in its prior order, Dr. Ugone simply did not undertake the necessary apportionment analysis."); *id.* at 15 (Defendants arguing that Sunoco's "continued refusal, without any justifiable, analytical basis, to account for the undisputed value of the non-patented features . . . shows that this strategy is not the result of inadvertence"))

Because the Court is striking Dr. Ugone's supplemental report, it is not necessary to resolve the parties' now-moot objections to the January Ugone Order.

---

[5] Further demonstrating that the algorithm is not part of the patent claims is Sunoco's counsel's refusal to agree that Sunoco would have to prove an accused infringer practices the algorithm in order to prove infringement.  (*See* Tr. at 11-12)

**Defendants' Pretrial Disclosures**

Sunoco's Motion to Strike certain of Defendants' pretrial disclosures is denied.  Instead, the parties are directed to meet and confer, particularly in light of today's rulings, and thereafter Defendants shall provide Sunoco with a reduced set of deposition designations, after which Sunoco shall identify its deposition counter-designations.  In the joint status report the parties are being ordered to provide they shall (among other things) provide the Court with their proposed deadlines for the exchange of these updated disclosures.

**Defendants' Motion to Stay**

Defendants' Motion to Stay is based on the Patent Trial and Appeals Board's ("PTAB") Final Written Decision finding that the asserted claims of Sunoco's '948 and '548 patents are invalid.  Defendants seek to stay all further proceedings with respect to the '948 and '548 patents until after completion of Sunoco's anticipated appeal of the PTAB's decision (such further proceedings being necessary only if the Court of Appeals at least partially modifies or reverses the PTAB).  Defendants' Motion to Stay is denied.

In determining whether to stay litigation, courts typically consider (1) whether a stay will simplify the issues and trial of the case, (2) whether discovery is complete and a trial date has been set, and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party.  *See St. Clair Intellectual Prop. v. Sony Corp.*, 2003 WL 25283239, at *1 (D. Del. Jan. 30, 2003).

The Court is not persuaded that a stay will simplify the litigation, particularly given the overlapping issues between the claims with respect to which Defendants do not seek a stay and those of the '948 and '548 patents (issues of infringement and invalidity, for instance).  (*See* Tr. at 58, 62-63)  Other purported simplifications are now moot (because the Court has resolved all

of the parties' claim construction and summary judgment disputes, including those that may have been avoided had the requested stay been granted). The Court's strong desire to avoid a second trial is a related consideration, as the risk of a second trial is reduced by trying all patents-in-suit at the forthcoming trial.

The status of the litigation weighs heavily against the requested stay, as fact and expert discovery were completed months ago, all motions have been resolved, and trial is scheduled to begin in approximately six weeks.

Finally, Sunoco would suffer undue prejudice from a stay, which might eliminate Sunoco's opportunity to seek injunctive relief with respect to the '948 and '548 patents (which expire in February 2022). (D.I. 534 at 13-14) Additionally, Sunoco and Defendants appear to compete to some extent. (*See id*. at 15-16)

**Moving Forward**

A jury trial in this matter is currently scheduled to begin on July 20. Due to the coronavirus pandemic, no jury trial has been held in this District since March 19 and no new jury has been selected since March 9. Jury trials here are currently suspended through at least June 30. The District may yet make a decision to suspend jury trials for some or all of July or even later; of course, it also may decide not to do so.

As of today, the jury trial in this matter remains on the Court's calendar, and it remains the Court's hope that it may proceed as scheduled. But the Court will only move forward with a jury trial on July 20 if it can be done in a manner that protects the health and safety of all involved, including the jury, the larger community, and Court personnel, as well as the parties, their witnesses, and their attorneys.

The Court requires further input from the parties to determine how to proceed.

Therefore, the parties shall meet and confer and, no later than **June 11**, submit a joint status report, advising the Court of their views on, among other things: (i) whether they believe trial can and should proceed on July 20; (ii) whether they believe they have a right to a jury trial and, if so, whether they are willing to waive that right in favor of a bench trial; and (iii) whether, if the trial proceeds on July 20, any witnesses might request to appear by video or other remote technology rather than travel to the courtroom.

The Court will hold a status teleconference on **June 12 at 11:30 a.m.** Participants (and any observers) shall dial in to 877-336-1829 and use the access code 1408971.

June 9, 2020
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE

17

Appx28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUNOCO PARTNERS MARKETING & TERMINALS L.P. | | |
| Plaintiff, | | |
| v. | | C.A. No. 17-1390 (LPS-CJB) |
| POWDER SPRINGS LOGISTICS, LLC and MAGELLAN MIDSTREAM PARTNERS, L.P. | | |
| Defendants. | | |

**JOINT PROPOSED FINAL JURY INSTRUCTIONS**

**DAMAGES PHASE**

1.     **GENERAL INSTRUCTIONS**

Members of the jury, you have completed the liability phase of this case, where you found that Defendants infringe one or more valid claims of the patents-in-suit.  Sunoco contends that it is entitled to damages in an amount to compensate Sunoco for Defendants' infringement of these claims.  Defendants dispute the amount of damages that Sunoco is entitled to recover.  Therefore, you must decide what amount of monetary damages Sunoco has proven by a preponderance of the evidence that it is entitled to recover.

During the liability phase of this case, I previously explained your duties and the general rules that apply in every civil case, some rules that you must use in evaluating particular testimony and evidence, and the rules that you must follow during your deliberations in the jury room.  Those instructions apply equally to this damages phase.

I will now instruct you about the law that you must follow in determining the amount of damages that Sunoco is entitled to recover for Defendants' infringement.  Each of you has been provided a copy of these instructions.  You may read along as I deliver them if you prefer.

Please listen very carefully to everything I say.

You will have your written copy of these instructions with you in the jury room for your reference during your deliberations.  You will also have a verdict form, which will list the questions that you must answer to decide the damages phase of this case.

1

2.    **DAMAGES**

Sunoco must prove each element of its damages—including the amount of the damages—by a preponderance of the evidence, which means more likely than not.

If proven by Sunoco, damages must be in an amount adequate to compensate Sunoco for the infringement.  The purpose of a damages award is to put Sunoco in about the same financial position it would have been in if the infringement had not happened.  [**SUNOCO'S PROPOSAL:** But the damages award cannot be less than a reasonable royalty.] [**Defendants** object to this proposal as duplicative of the full instruction below.]  You may not add anything to the amount of damages to punish Defendants or to set an example.  You also may not add anything to the amount of damages for interest.[1]  [**DEFENDANTS PROPOSE**[2]**:** Sunoco has the burden to establish the amount of its damages by a preponderance of the evidence. In other words, you should award only those damages that Sunoco establishes that it more likely than not has suffered. While Sunoco is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

There are different types of damages that Sunoco may be entitled to recover. In this case, Sunoco seeks a reasonable royalty. A reasonable royalty is defined as the money amount Sunoco and Defendants would have agreed upon as a fee for use of the invention at the time just prior to when infringement began. But, regardless of the type of damages you may choose to award, you must be careful to ensure that award is no more and no less than the value of the patented invention.]

---

[1] Throughout these instructions, Sunoco has endeavored to follow the AIPLA Model Patent Jury Instructions, nearly word for word; *see* AIPLA's Model Patent Jury Instructions, 10.0 Damages – Generally.
[2] FBCA Model Patent Jury Instructions, 5.1 Damages—Introduction.

I will now give you more detailed instructions regarding damages.

3

**2.1  Date Damages Begin**

The date that Sunoco first notified Defendants of its claim for patent infringement is the date for the start of damages.  The parties do not agree on that date, and it is up to you to determine what that date is.  Sunoco must prove that it is more likely than not that the Defendants were put on notice of the claim for patent infringement as of the date alleged by Sunoco.

Sunoco can give notice to the Defendants from Sunoco giving notice to the public in general.  Sunoco can do this by including on the labeling of substantially all of its blending systems the word "patent" or the abbreviation "pat." with the number of the patent.  Sunoco also may give notice by marking substantially all of its systems with "patent" or "pat." and a freely accessible Internet address where there is a posting that connects the systems with the patent numbers.  Licensees of the patent who use the patented invention must also mark substantially of their systems that include the patented invention with the patent number.  This type of notice to the public in general starts from the date Sunoco and its licensees began to mark substantially all systems that use the invention with the patent number.  If Sunoco and its licensees did not mark substantially of those blending systems with the patent number, then Sunoco did not provide notice in this way.

If you find that Sunoco, before filing this lawsuit, did not provide effective public notice by properly marking its products, then Sunoco can only recover damages for infringement that occurred after it sued Defendants on August 2, 2018.

Appx33

[**SUNOCO PROPOSES**[3]: In this case, the date for the start of any damages calculation for the '629 patent is August 2, 2012.[4]

Sunoco contends that the dates for the start of damages for the '302 patent and '686 patent are as follows:

| Patent | Damages Start Date | Notice Type |
|--------|-------------------|-------------|
| '302 patent | August 2, 2012 | Label with '302 patent |
| '686 patent | February 2018 | Label with Internet address |

]

[**Defendants** believe the marking obligation applies to the '629 patent and that the earliest damages period that could be is when the '629 patent entered the case on August 2, 2018.][5]

───────────────────

[3] AIPLA's Model Patent Jury Instructions, 10.1 Date Damages Begin, 10.1.2 Alternate B – When the Date of the Start of the Damages Period is Disputed, except for last paragraph.

[4] "The law is clear that the notice provisions of § 287 do not apply where the patent is directed to a process or method." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316 (Fed. Cir. 2009). Further, the Federal Circuit has "held that 35 U.S.C. § 287(a) did not apply where the patentee only asserted the method claims of a patent which included both method and apparatus claims." *Id.; see also id.* at 1316-17 ("*Hanson* is factually identical to this case, and we are therefore bound by the rule of *Hanson*. . . . In this case and *Hanson*, the patentee only asserted method claims despite the fact that the patent contained both method and apparatus claims. In *American Medical*, in contrast, 'both apparatus and method claims of the '839 patent, the marking requirement of 35 U.S.C. § 287(a) does not apply.")(citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1082-83 (Fed. Cir. 1983); *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1523 (Fed. Cir. 1993). *In the Matter of Certain Elec. Digit. Media Devices and Components*, No 337-TA-796. Sunoco initially asserted method claim 31 of the '629 patent. Sunoco's First Am. Compl. (Aug. 2, 2018). On September 7, 2018, Sunoco served its amended infringement contentions asserting claims 5–7, 9, 13–33. Sunoco's Am. Infring. Cont. (Sept. 7, 2018). Defendants contend that two of those claims are apparatus claims, claims 23 and 30. Sunoco disagrees. These have always been considered as dependent claims for implementing the method, but because Defendants raised this for the first time in this case at 7:54 pm today (December 4, 2021) Sunoco has not had time to research this novel theory. However, even under Defendants' interpretation, Sunoco has asserted only method claims because Sunoco dropped those (and other) claims on May 13, 2019, continuing to assert only method claims 18, 22, 31, and 32 of the '629 patent from that point forward—throughout all expert discovery, summary judgment briefing, pre-trial proceedings, and trial. As such, only method claims have been at issue in this case. *See Contentguard Holdings, Inc. v. Amazon.com, Inc.*, 2015 WL 11089750, at *4, n.3 (E.D. Texas Aug. 10, 2015).

[5] The '629 patent contains both apparatus and method claims, thus, "to the extent that there is a tangible item to mark by which notice of the asserted method claims can be given, a party is obliged to do so if it intends to avail itself of the constructive notice provisions of section 287(a)." *Am. Med. Sys., Inc. v. Med. Engineering Corp.*, 6 F.3d 1523, 1538-39 (Fed. Cir. 1993); *Siemens Mobility Inc. v. Westinghouse Air Brake Techs.*, 2018 WL 7893901 at *4 (D. Del. Dec. 17, 2018) ("Siemens initially asserted an apparatus claim from the '850 patent, so the marking statute is applicable to that patent."). Sunoco initially asserted claims 23 and 30 of the '629 patent, which are directed to "[a] computer-readable medium having computer-executable instructions for performing the steps…" (Sunoco Am. Inf. Cont. at 5 (Sept. 7, 2018)). Claims directed to a "computer readable medium" and other computer driven processes

5

_____

are subject to the requirements of Section 287 to the extent the computer readable medium is itself a tangible object or is housed or accessed through a tangible object. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) (explaining that "computer readable medium" claims refer to disks, hard drives, or other data storage devices containing program instructions for a computer to perform a particular process); *Soverain Software LLC v. Amazon.com, Inc.*, 383 F. Supp. 2d 904, 907-909 (E.D. Tex. 2005) (reasoning that under Am. Med. Sys. "a website can be marked by submitting screens shots of websites that include patent notices" and granting summary judgment for failure to give notice of computer method claims). Thus, the marking statute applies to the '629 patent just as it does for the '302 and '686 patents.  Defendants note that Sunoco has been on notice of the dispute over whether Sunoco had an obligation to mark the '629 patent since the filing of the original Pretrial Order.  (*See* D.I. 602-4 at 13-15; D.I. 602-5 at 9-11; *see also* D.I. 709-4 at 13-15; D.I. 709-5 at 8-10.)

Appx35

### 2.2 [SUNOCO PROPOSES[6,7]: Damages – Kinds of Damages That May Be Recovered

There are several kinds of damages that are available for patent infringement.

One kind of damages is lost profits, that is, the additional profits that the patentee would have made if the defendant had not infringed. You may hear this referred to as the "but for" test—which means, "What profits would the patent owner have made 'but for' the alleged infringement?"

Another kind of patent damages is a reasonable royalty. A reasonable royalty is the amount that someone wanting to use the patented invention would have agreed to pay to the patent owner and the patent owner would have accepted. A reasonable royalty is the minimum amount of

---

[6] The parties dispute whether Sunoco can seek lost profits. No prior ruling of the Court's has precluded Sunoco from seeking lost profits. Indeed, Defendants moved for summary judgment of no damages and the motion was denied in its entirety. Dkt. 573. Expert testimony is **not** required to recover lost profits: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court. . . . The court **may** receive expert testimony as an aid to the determination of **damages or** of what **royalty** would be reasonable under the circumstances." 35 U.S.C. § 284 (emphasis added); *see also*, Dkt. Nos. 573, 574 (denying Defendants' summary judgment motion of no damages); *see also Secure Energy, Inc. v. Coal Synthetics, LLC*, 708 F. Supp. 2d 923, 933 ("[E]xpert testimony is not required for a jury to award damages, although expert testimony may be a factor in their analysis. The Court finds that the jury can determine whether there is sufficient evidence the award of a lump-sum award or other royalty."); *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 864 (5th Cir. 1981) (holding that the plaintiff presented sufficient evidence to create a jury issue as to the amount of lost profits by proffering a record of past profit and testimony regarding its accuracy, and concluding that a "non-expert's testimony regarding the past sales volume and profit margin may be used to measure damages"); *Wilson Oil Co., Inc. v. Crown Central Petroleum Co.*, No. Civ.A.02 F358 F, 2005 WL 3307158, at *2 (M.D. Ala. Dec. 6, 2005) (collecting cases allowing lay witness testimony on lost profits). Further, the Federal Circuit has stated: "In proving his damages, the patent owner's burden of proof is not an absolute one, but rather a burden of reasonable probability." *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983). The Federal Circuit went on to note that "[i]f in all reasonable probability, the Patent Owner would have made the sales, which the Infringer had made, what the Patent Owner in reasonable probability would have netted from the sales denied to him is the measure of his loss, and the Infringer is liable for that," and that lost profits causation can be inferred where the patent owner and the infringer were the only suppliers of the product. *Id.* Here, Defendant's witness Nicholas Huff admitted that he could not identify "a company other than Sunoco or Magellan that operates an automated butane blending system at its terminals." Trial Tr. 509:20-23.

[7] AIPLA's Model Patent Jury Instructions, 10.2 Damages—Kinds of Damages That May Be Recovered.

damages that a patent owner can receive for an infringement.]    [**Defendants** object to this instruction as improper under the law and/or the specific facts of the case as tried.[8]]

---

[8] Defendants disagree that Sunoco is entitled to damages both because of the Court's orders related to damages in this case and the evidence submitted during trial.  To the extent the Court finds Sunoco may seek damages, Sunoco is precluded from seeking lost profits.

Appx37

**2.3 [<u>SUNOCO PROPOSES</u>[9]: Lost Profits – "But For" Test**

Sunoco is seeking lost profits damages in this case.  To prove lost profits, Sunoco must show [*Defendants' proposal in the alternative:* a causal relationship between Magellan's infringement and Sunoco's lost profits.[10]  Sunoco must prove[11]] that, but for Magellan's infringement, Sunoco would have made additional profits from Magellan's butane blending using infringing systems or methods.  Sunoco must prove this by a preponderance of the evidence, more likely than not.  Part or your job is to determine what the Magellan would have done if the alleged infringement had not occurred.  It is important to remember that the profits I have been referring to are the profits allegedly lost by Sunoco, not the profits, if any, made by the Defendants on the infringing accused systems.]


[**Defendant Magellan** objects to this entire instruction as improper because lost profits require apportionment, and Sunoco has no expert through which it can apportion lost profits.  *In the alternative*, Defendant Magellan proposes the above language.]

---

[9] AIPLA's Model Patent Jury Instructions, 10.2.1.1 Lost Profits—"But For" Test
[10] Sunoco is seeking lost profits against Magellan's terminals Oklahoma City-Reno, Chatanooga II, West Tulsa, East Houston, Kansas City, Greensboro II, Carthage, and Dupont.  Sunoco is not seeking lost profits against Powder Springs.
[11] FCBA Model Patent Jury Instructions, 5.2 Lost Profits – "But For" Test.

### 2.3.1 [SUNOCO PROPOSES[12]: Lost Profits – the *Panduit* Factors

[*Defendants' proposal in the alternative:* With respect to Magellan's infringement,[13]] Sunoco has proven its lost profits if you find that Sunoco has proven each of the following factors by the more likely than not standard:

      1.     a demand for the patented system or method in the relevant market;

      2.     the absence of acceptable non-infringing substitutes;

      3.     that Sunoco had the manufacturing and marketing capacity to make all or a part of the infringing systems actually made [**SUNOCO PROPOSES:** by Magellan] [*Defendant Magellan's proposal in the alternative:* by Magellan for which Sunoco seeks an award of lost profits—in other words, that Sunoco is capable of satisfying the demand[14]]; and

      4.     the amount of profit that Sunoco would have made if it were not for Magellan's infringement.

      I will now explain each of these factors.

[**Defendant Magellan** objects to this entire instruction as improper because lost profits require apportionment, and Sunoco has no expert through which it can apportion lost profits. *In the alternative*, Defendant Magellan proposes as follows the above language.]

---

[12] AIPLA's Model Patent Jury Instructions, 10.2.1.1 Lost Profits—Panduit Factors.
[13] FCBA Model Patent Jury Instructions, 5.2 Lost Profits – "But For" Test.
[14] FCBA Model Patent Jury Instructions, 5.2 Lost Profits – "But For" Test.

**2.3.2 [SUNOCO PROPOSES[15]: Lost Profits – *Panduit* Factors – Demand**

The first factor asks whether there was demand for the patented system and method in the relevant market.  Sunoco can prove demand for the patented system and method by showing significant sales of Sunoco's own patented systems and methods.  Sunoco also can prove demand for the patented system and method by showing significant sales from Magellan's use of the systems and methods that are covered by one or more of the asserted claims of the patent-in-suit.  To use sales of Magellan's blending system and method as proof of this demand, however, Sunoco and Magellan's blending system and method must be sufficiently similar to compete against each other in the same market or market segment.]

[**Defendant Magellan** objects to this entire instruction as improper because lost profits require apportionment, and Sunoco has no expert through which it can apportion lost profits.  *In the alternative*, Defendant Magellan proposes the above language.]

---

[15] AIPLA's Model Patent Jury Instructions, 10.2.1.3 Lost Profits—Panduit Factors—Demand.

### 2.3.3   [SUNOCO PROPOSES[16]: Lost Profits – the *Panduit* Factors – Acceptable Non-Infringing Substitutes

The second factor asks whether non-infringing, acceptable substitutes for Sunoco's system and method competed with Magellan's infringing system and method in the marketplace and the impact of such substitutes on the marketplace absent the use of Magellan's blending system and method.  If the realities of the marketplace are that competitors other than Sunoco would likely have captured some or all of the sales made by Magellan, even despite a difference in the blending system and method, then Sunoco is not entitled to lost profits on those sales.

To be an "acceptable" substitute, the system and method must have had one or more of the advantages of the patented invention that were important to the actual users of the infringing systems, not the public in general.  The acceptable substitute also must not infringe the patents, because they did not include all the features required by the patent. The acceptable substitute may be a system or method that involved a modification of the infringing system or method to avoid infringement or the removal of at least one feature of the invention from the system or method. The acceptable substitute, in addition to being non-infringing, must have been available during the damages period.  [**SUNOCO'S PROPOSAL:** The acceptable substitute need not have actually been sold at that time. But, if the acceptable substitute was not sold during the damages period, then Magellan must show by a preponderance of the evidence that, during the damages period, a competitor or the Magellan had all the necessary equipment, materials, know-how, and experience to design and manufacture the acceptable substitute.] [**DEFENDANT MAGELLAN'S PROPOSAL[17]:** If you determine that Magellan would just as likely have used an acceptable non-

---

[16] AIPLA's Model Patent Jury Instructions, 10.2.1.4 Lost Profits—Panduit Factors—Acceptable Non-Infringing Substitutes.
[17] AIPLA Model Patent Jury Instructions, 10.2.1.4 – Lost Profits – Panduit Factors – Acceptable Non-Infringing Substitutes. *See also* NDCAL Model Patent Jury Instructions, 5.3b – Non-Infringing Substitute.

12

infringing substitute, then Sunoco has not shown it lost those sales but for Magellan's infringing use.

Even if you find that Sunoco's and Magellan's systems and methods were the only ones with the advantages of the patented invention, Sunoco is nonetheless required to prove to you that Sunoco, in fact, would have made Magellan's infringing sales.]

[**Defendant Magellan** objects to this entire instruction as improper because lost profits require apportionment, and Sunoco has no expert through which it can apportion lost profits.  *In the alternative*, Defendant Magellan proposes the above language.]

Appx42

### 2.3.4   [SUNOCO PROPOSES[18]: Lost Profits – the *Panduit* Factors – Capacity

The third factor asks whether Sunoco had the manufacturing and marketing capability to actually make the sales allegedly lost due to Defendants infringement.  Sunoco must prove that it could have [**Defendant Magellan's proposal:** blended the volumes that Magellan blended using the patented systems and methods] [**SUNOCO'S PROPOSAL:** supplied the additional systems and methods] needed to make the sales Sunoco said it lost.  Sunoco also must prove that it more likely than not had the ability to market and sell these additional systems and methods.]

[**Defendant Magellan** objects to this entire instruction as improper because lost profits require apportionment, and Sunoco has no expert through which it can apportion lost profits.  *In the alternative*, Defendant Magellan proposes the above language.]

---

[18] AIPLA's Model Patent Jury Instructions, 10.2.1.6 Lost Profits—Panduit Factors—Capacity.

14

Appx43

### 2.3.5   [SUNOCO PROPOSES[19]: Lost Profits – *Panduit* Factors – Amount of Profit

Sunoco may calculate the amount of its lost profits by calculating its lost sales and subtracting from that amount any additional costs or expenses that Sunoco would have had to pay to make the lost sales. The amount of lost profits cannot be speculative, but it need not be proven with unerring certainty.]

[**Defendant Magellan** objects to this entire instruction as improper because lost profits require apportionment, and Sunoco has no expert through which it can apportion lost profits. *In the alternative*, Magellan agrees to Plaintiff's proposal.]

---

[19] AIPLA's Model Patent Jury Instructions, 10.2.1.7 Lost Profits—Panduit Factors—Incremental Income Approach.

Appx44

### 2.4        Reasonable Royalty

If you find that Defendants have infringed any of the asserted claims of the patents-in-suit, patent law provides that the amount of damages that Defendants should pay Sunoco for infringing Sunoco's patents must be enough to compensate for the infringement, and may not be less than a reasonable royalty for the use of the patented invention.

Thus, if you find that Sunoco is not entitled to lost profits, you must award Sunoco a reasonable royalty in the amount that Sunoco has proved it could have earned on those sales.  A royalty is a payment made to a patent owner by someone else in exchange for the rights to make, use, sell, and/or import a patented system.

[**DEFENDANTS PROPOSE:** The reasonable royalty award must be based on the incremental value that the patented invention adds to systems and methods for blending butane. When the infringing systems and methods for blending butane have both patented and unpatented features, measuring this value requires a determination of the value added by the patented features. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the systems and methods for blending butane, and no more.[20]]

---

[20] AIPLA Model Patent Jury Instructions, 10.2.5.1 Reasonable Royalty—Generally.

16

**2.4.1    Reasonable Royalty – Using the "Hypothetical Negotiation" Method**

A reasonable royalty is the royalty that would have resulted from a hypothetical license negotiation between Sunoco and Defendants. Of course, we know that they did not agree to a license and royalty payment. But, to decide on the amount of reasonable royalty damages, you should assume that the parties did negotiate a license just before the infringement began. This is why it is called a "hypothetical" license negotiation. You should assume that both parties to the hypothetical negotiation understood that the patent was valid and infringed and both were willing to enter into a license just before the infringement began. You should also presume that the parties had full knowledge of the facts and circumstances surrounding the infringement at the time of the hypothetical negotiation.

In determining the amount of a reasonable royalty, you may consider evidence on any of the following factors, known as the *Georgia Pac.fic* factors, in addition to any other evidence presented by the parties on the economic value of the patent:

1.    Any royalties received by the licensor for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

2.    The rates paid by Defendants to license other patents comparable to the asserted patents.

3.    The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

4.    The licensor's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

17

Appx46

5.     The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business.

6.     The effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such collateral sales.

7.     The duration of the asserted patents and the term of the license.

8.     The established profitability of the product made under the asserted patents; its commercial success; and its current popularity.

9.     The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

10.    The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11.    The extent to which Defendants have made use of the invention; and any evidence that shows the value of that use.

12.    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.    The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

14.    The opinion testimony of qualified experts.

15.    The amount that a licensor (such as Sunoco) and a licensee (such as Defendants) would have agreed upon (at the time the infringement began) if both sides had been reasonably

18

Appx47

and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

16.     Any other economic factor that a normally prudent business person would, under similar circumstances, take into consideration in negotiating the hypothetical license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. [**DEFENDANTS PROPOSE:** You may also consider any other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people[21].]

---

[21] FBCA Model Patent Jury Instructions, 5.8 Reasonable Royalty—Relevant Factors.

### 2.4.2   Reasonable Royalty – Attribution/Apportionment

[**SUNOCO PROPOSES**[22]: The amount you find as damages must be based on the value attributable to the patented technology, as distinct from other, unpatented features of the accused systems, or other factors such as marketing or advertising, or Defendants' size or market position. In determining the appropriate royalty base and the appropriate royalty rate, the ultimate combination of both the royalty rate and the royalty base must reflect the value attributable to the patented technology. In other words, the royalty base must be closely tied to the invention. It is not sufficient to use a royalty base that is too high and then adjust the damages downward by applying a lower royalty rate. Similarly, it is not appropriate to select a royalty base that is too low and then adjust it upward by applying a higher royalty rate. Rather, you must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.]

[**DEFENDANTS PROPOSE**[23]: The amount you find as damages must be based on the value attributable to the patented technology, as distinct from other, unpatented features, goods, or services. In other words, your damages award must reflect the value you find attributable to the asserted claims. The evidence tending to separate or apportion damages between the patented features and unpatented features must be reliable and tangible, and not conjectural or speculative. You may award damages based only on a royalty that is directly attributable to the value of the patented technology. You may not award damages based on a royalty attributable to unpatented

---

[22] AIPLA's Model Patent Jury Instructions, 10.2.5.4; Sunoco would also be agreeable to the FCBA model instruction if such instruction tracked the model itself.
[23] *See, e.g.*, FCBA Model Patent Jury Instructions, 5.12 Damages – Apportionment; NDCAL Model Patent Jury Instructions, 5.7 Reasonable Royalty – Definition.

features of the Accused Products.  Sunoco bears the burden of establishing amounts directly attributable to the patented features.]

### 2.4.3 [DEFENDANTS PROPOSE[24]: Apportionment – Irrelevant Evidence

You may have heard or seen evidence in this case that should not factor into your damages analysis. Specifically, you may recall evidence relating to the following:

a.  Sunoco's assertion that the Powder Springs system leads to lost blending opportunity downstream of Powder Springs;

b.  Sunoco's Butane Supply Agreements and its profits therefrom;

c.  The amount paid by Sunoco for Texon's business in 2010;

d.  Sunoco's profit-sharing agreement with Buckeye;

e.  Sunoco, Magellan, and Powder Spring's profits.

You should not consider this evidence for purposes of arriving at your damages calculation.][25]


### [SUNOCO PROPOSES[26]:  Stipulations Related To Damages

You should consider the following stipulations when determining the appropriate amount of damages in this case:

1.  The Court has previously ruled, and the parties agree, that the full value of the Texon acquisition is not attributable solely to the patents-in-suit.

2.  The Court has previously ruled, and the parties agree, that the full value of the Buckeye license is not attributable solely to the patents-in-suit.

---

[24] *See generally* D.I.

[25] FCBA Model Patent Jury Instructions, 5.12 Damages – Apportionment ("When the accused infringing products have both patented and unpatented features, your award must be apportioned so that it is based only on the value of the patented features, and no more.")

[26] July 27, 2020 Transcript, Dkt. 603, at p. 33 ("Also, I will be precluding the plaintiff from arguing that the full value of the Texon acquisition or the full value of the Buckeye license is attributable solely to the patents-in-suit. And I am open to instructing the jury on that point as well, but I am going to preclude that as an argument of damages.") and p. 68 ("the Court has already determined that they are not permitted to attribute all the value of the BSAs to the patent or the patented features of the patent in suit. And so we'll work together on instruction to that effect.").

3. The Court has previously ruled, and the parties agree, that not all the value of the BSAs is attributable to the patents-in-suit or to patented features of the patents-in-suit.]

### 2.4.4 [SUNOCO PROPOSES[27]: Reasonable Royalty – Entire Market Value Rule

A multi-component product may have both infringing and non-infringing components. In such products, royalties should be based not on the entire product, but instead on the "smallest salable unit" that practices the patent and has close relation to the claimed invention. If the smallest salable unit is a multi-component product containing one or more non-infringing features with no relation to the patented feature(s), damages must only be based on the portion of the value of that product attributable to the patented technology. This may involve estimating the value of a feature that may not have ever been individually sold.

The entire market value rule is a narrow exception to this general rule. In order to recover damages as a percentage of revenues or profits attributable to the entire product, Sunoco must establish that it is more likely than not that the patented feature is the sole driver of customer demand for an entire multi-component product such that it creates the basis for customer demand or substantially creates the value of the product.] **[DEFENDANTS' PROPOSAL[28] in the alternative depending on the Court's resolution of the parties' disputes listed in order of preference:** *[1]* To the extent you heard any testimony that the patents were the sole driver for the Butane Supply Agreements, you must disregard it. *[2]* It is not enough to show the patented method is viewed as valuable, important, or even essential to the use of the butane supply agreements.  It is also not enough to show that the accused product, without the patented method, would be commercial unviable.  Sunoco must show that the patented feature was the sole driver of consumer demand.]

---

[27] AIPLA's Model Patent Jury Instructions, 10.2.5.5.

[28] Defendants object to this instruction as addressing improper, previously excluded theories.  *See* D.I. 547 at 11-13. In contrast, Defendants seek a limiting instruction given the evidence already in the case.

[**Defendant Magellan** objects to this entire instruction as improper based on the Court's exclusion of this damages theory.  *In the alternative*, Defendants propose the above language.]

25

**2.4.5 [SUNOCO PROPOSES[29]: Reasonable Royalty – Multiple Patents**

If you found that Defendants infringed multiple patents, even by a single infringing act, and if you award a reasonable royalty for the infringement, then you may award separate royalties to Sunoco for each patent that was infringed. You also may consider evidence of the number of patent licenses that are needed for the allegedly infringing product and the effect on the hypothetical negotiation of having to pay a royalty for each of those licenses.] [**Defendants object to this proposal.**]

---

[29] AIPLA's Model Patent Jury Instructions, 10.2.5.5.

### 2.4.6 Reasonable Royalty – Timing

Damages are not based on a hindsight evaluation of what happened, but on what the parties to the hypothetical license negotiations would have agreed upon at a time just prior to when the infringement first began. The parties agree that this negotiation would have occurred around the following dates, depending on the accused systems:

| Date | Accused Systems | Licensee |
|------|-----------------|----------|
| June 2007 | Oklahoma City-Reno, Greensboro II, and Chattanooga II | Magellan |
| Early 2011 | East Houston, West Tulsa, Carthage, and Kansas City | Magellan |
| December 2014 | Powder Springs | Powder Springs |

[**SUNOCO PROPOSES**[30]: Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation. You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.] [**Defendants** object to this instruction to the extent that Sunoco intends to argue that at the June 2007 and early 2011 hypothetical negotiations the parties would have discussed Powder Springs.]

The date of the hypothetical negotiation is different than the date from which Sunoco can obtain damages.

---

[30] AIPLA's Model Patent Jury Instructions, 10.2.5.7.

27

**2.4.7 Reasonable Royalty – Use of Comparable License Agreements**

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patents in question, or for rights to similar technologies.  A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between Sunoco (or its predecessor) and Defendants in order for you to consider it.  However, if you choose to rely upon evidence from license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between Sunoco (or its predecessor) and Defendants, in terms of the technologies, other features, goods, or services offered with the license, the parties to the license, and economic circumstances of the contracting parties, when you make your reasonable royalty determination.

[**DEFENDANTS PROPOSE:** When determining a reasonable royalty, you shall disregard all butane supply agreements.]

28

Appx57

**2.4.8 Reasonable Royalty – Availability of Non-Infringing Substitutes**

In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of acceptable non-infringing substitutes to the patented invention. An acceptable non-infringing substitute must be a system that does not infringe the patent. It must have also been, at the time of the hypothetical negotiation, both "available" and "acceptable."

**2.4.9 Reasonable Royalty – Base**

[**DEFENDANTS propose**[31]**:** You may have heard or seen evidence about the total volumes of butane blended by Defendants.   When determining a reasonable royalty, you should disregard any such evidence.]

[**DEFENDANTS propose in the alternative:** You may have heard or seen evidence in this case regarding the total volumes of butane blended using the accused systems by Magellan or Powder Springs.  In arriving at your damages calculation for the asserted claims of the '302, '629 and '686 patents, you must consider only those barrels of butane that are blended using the system or methods recited in the asserted claims of the patents-in-suit.  Accordingly, you may not consider volumes of butane that are blended using a method or system not covered by the asserted claims in this case. It is Sunoco's burden to prove the volumes for purposes of damages.]

[**SUNOCO** objects to this entire instruction as improper.]

---

[31] AIPLA Model Patent Jury Instructions 10.2.5.1. ("The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the [[product/method]], and no more."). *See also* FCBA Model Patent Jury Instructions, 5.12 Damages  - Apportionment.

**3.     DELIBERATIONS AND VERDICT**

### 3.1 Introduction

I have completed my instructions on the law related to damages.  I will end by explaining how you will conduct your deliberations in the jury room and about your possible verdicts.

When you start deliberating, do not talk to the jury officer, to me, or to anyone but each other about the case.  If you have any questions or messages, you must write them on a piece of paper, sign them and give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.  Any questions or messages normally should be sent through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages.  Never write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  Your votes should stay secret until you are finished.

### 3.1.1   Unanimous Verdict

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to your individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to re-examine your own views and change your opinions, if convinced they are erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.

Remember at all times that you are not partisans.  You are judges—judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you.  I will review it with you in a moment.  You will take the form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form.  You will then return to the Courtroom and my deputy will read aloud your verdict.  Place the completed verdict sheet in the envelope we will give you.  Do not show the completed verdict form to anyone or share it with anyone until you are in the Courtroom.

It is proper to add the caution that nothing said in these instructions, and nothing in the form of a verdict, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find.  Determining what the verdict shall be is your sole and exclusive duty and responsibility.

### 3.1.2   Duty to Deliberate

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.  Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that—your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.  Listen carefully to what the other jurors have to say, and then decide for yourself.

### 3.1.3   Social Media

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cellphone, smartphone, tablet or computer, the Internet, any Internet service, any text or instant messages service, any Internet chatroom, blog or website such as Facebook, MySpace, LinkedIn, YouTube, Twitter, or Instagram to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.

### 3.1.4   Court Has No Opinion

Let me finish by repeating something I have said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in any way.  You must decide the case yourself based on the evidence presented.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SUNOCO PARTNERS MARKETING &
TERMINALS L.P.

          Plaintiff,

      v.

POWDER SPRINGS LOGISTICS, LLC and
MAGELLAN MIDSTREAM PARTNERS,
L.P.

          Defendants.

C.A. No. 17-1390 (LPS-CJB)

## **FINAL JURY INSTRUCTIONS**

## **DAMAGES PHASE**

## **TABLE OF CONTENTS**

1. General Instructions ...................................................................................................2

2. Damages....................................................................................................................3

    2.1 Date Damages Begin.........................................................................................4

    2.2 Reasonable Royalty ...........................................................................................5

        2.2.1 Reasonable Royalty – Using the "Hypothetical Negotiation" Method .....................................................................6

        2.2.2 Reasonable Royalty – Apportionment ..........................................7

        2.2.3 Reasonable Royalty – Multiple Patents ........................................8

        2.2.4 Reasonable Royalty – Timing........................................................9

        2.2.5 Reasonable Royalty – Use of Comparable License Agreements ...................................................................................10

        2.2.6 Reasonable Royalty – Availability of Non-Infringing Substitutes................................................................................11

        2.2.7 Reasonable Royalty – Base.........................................................12

3. Deliberations and Verdict .......................................................................................13

1

1.    **GENERAL INSTRUCTIONS**

Members of the jury, you have completed the liability phase of this case, where you found that Defendants infringed the valid asserted claims of the three patents-in-suit. Now, you must decide what amount of monetary damages Sunoco has proven by a preponderance of the evidence it is entitled to recover.

The instructions I have previously given you explaining the general rules that apply in every civil case, the rules that you must use in evaluating particular testimony and evidence, and the rules that you must follow during your deliberations in the jury room, all apply equally to this damages phase.

Please listen very carefully to everything I say.

You will have your written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide the damages phase of this case.

2

2.     **DAMAGES**

If proven by Sunoco, damages must be in an amount adequate to compensate Sunoco for the infringement.  The purpose of a damages award is to put Sunoco in about the same financial position it would have been in if the infringement had not happened.  You may not add anything to the amount of damages to punish Defendants or to set an example.  You may not add anything to the amount of damages for interest.

Sunoco has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that Sunoco establishes that it more likely than not has suffered.  While Sunoco is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.  You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.  You must be careful to ensure that your damages award is no more and no less than the value of the patented invention.

**2.1 Date Damages Begin**

The date that Sunoco first notified Defendants of its claim for patent infringement is the date for the start of damages. The parties do not agree on that date, and it is up to you to determine what that date is. Sunoco must prove that it is more likely than not that Defendants were put on notice of the claim for patent infringement as of the date alleged by Sunoco.

Sunoco can give notice to Defendants by giving notice to the public in general. Sunoco can do this by including on the labeling of substantially all of its blending systems the word "patent" or the abbreviation "pat." with the number of the patent. Sunoco also may give notice by marking substantially all of its systems with "patent" or "pat." and a freely accessible Internet address where there is a posting that connects the systems with the patent numbers. Licensees of the patent who use the patented invention must also mark substantially all of their systems that include the patented invention with the patent number. This type of notice to the public in general starts from the date Sunoco and its licensees began to mark substantially all of the systems that use the invention with the patent number. If Sunoco and its licensees did not mark substantially all of those blending systems with the patent number, then Sunoco did not provide notice in this way.

If you find that Sunoco, before filing this lawsuit, did not provide effective public notice by properly marking its products, then Sunoco can only recover damages for infringement that occurred after it sued Defendants on August 2, 2018.

4

### 2.2        Reasonable Royalty

The amount of damages that Defendants should pay Sunoco for infringing Sunoco's patents must be enough to compensate for the infringement, and may not be less than a reasonable royalty for the use of the patented invention.  A royalty is a payment made to a patent owner by someone else in exchange for the rights to make, use, sell, and/or import a patented system. A reasonable royalty is the amount that someone wanting to use the patented invention would have agreed to pay to the patent owner and the patent owner would have accepted.

The reasonable royalty award must be based on the incremental value that the patented invention adds to systems and methods for blending butane. When the infringing systems and methods for blending butane have both patented and unpatented features, measuring this value requires a determination of the value added by the patented features. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the systems and methods for blending butane, and no more.

5

### 2.2.1    Reasonable Royalty – Using the "Hypothetical Negotiation" Method

A reasonable royalty is the royalty that would have resulted from a hypothetical license negotiation between Sunoco and Defendants. Of course, we know that they did not agree to a license and royalty payment. But, to decide on the amount of reasonable royalty damages, you should assume that the parties did negotiate a license just before the infringement began. This is why it is called a "hypothetical" license negotiation. You should assume that both parties to the hypothetical negotiation understood that the patent was valid and infringed and both were willing to enter into a license just before the infringement began. You should also presume that the parties had full knowledge of the facts and circumstances surrounding the infringement at the time of the hypothetical negotiation.

Some of the factors you may consider in making your determination are:

1.      The value that the claimed invention contributes to Defendants' systems and methods.

2.      The value that factors other than the claimed invention contribute to Defendants' systems and methods.

3.      Comparable license agreements, such as those covering the use of the claimed invention or similar technology.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.

6

### 2.2.2    Reasonable Royalty – Apportionment

The amount you find as damages must be based on the value attributable to the patented invention, as distinct from unpatented features of the accused system or method or other factors such as marketing or advertising, or Sunoco's size or market position.  A royalty compensating Sunoco for damages must reflect the value attributable to the infringing features of Defendants' systems and methods, and no more.  The process of separating the value of the allegedly infringing features from the value of all other features is called apportionment.  When the infringing systems and methods have both patented and unpatented features, your award must be apportioned so that it is based only on the value of the patented features, and no more.  The evidence tending to separate or apportion damages between the patented features and unpatented features must be reliable and tangible, and not conjectural or speculative.  Sunoco bears the burden of establishing amounts directly attributable to the patented features.

Keep the following in mind when conducting your apportionment analysis:

1. The full value of the Texon acquisition is not attributable solely to the patents-in-suit.

2. The full value of the Blending Patent License Agreement is not attributable solely to the patents-in-suit.

3. The full value of the Buckeye Letter Agreement is not attributable solely to the patents-in-suit.

4. The full value of the BSAs is not attributable to the patents-in-suit or to patented features of the patents-in-suit.

7

### 2.2.3 Reasonable Royalty – Multiple Patents

If you found that Defendants infringed multiple patents, even by a single infringing act, and if you award a reasonable royalty for the infringement, then you may award separate royalties to Sunoco for each patent that was infringed. You also may consider evidence of the number of patent licenses that are needed for the infringing systems and methods and the effect on the hypothetical negotiation of having to pay a royalty for each of those licenses.

### 2.2.4 Reasonable Royalty – Timing

Damages are not based on a hindsight evaluation of what happened, but on what the parties to the hypothetical license negotiations would have agreed upon at a time just prior to when the infringement first began.  The parties agree that this negotiation would have occurred around the following dates, depending on the accused systems:

| Date | Accused Systems | Licensee |
|---|---|---|
| June 2007 | Oklahoma City-Reno, Greensboro II, and Chattanooga II | Magellan |
| Early 2011 | East Houston, West Tulsa, Carthage, and Kansas City | Magellan |
| December 2014 | Powder Springs | Powder Springs |

Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation.  You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.

The date of the hypothetical negotiation is different than the date from which Sunoco can obtain damages.

9

### 2.2.5 Reasonable Royalty – Use of Comparable License Agreements

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patents in question, or for rights to similar technologies.  A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between Sunoco (or its predecessor) and Defendants in order for you to consider it.  However, if you choose to rely upon evidence from license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between Sunoco (or its predecessor) and Defendants, in terms of the technologies, other features, goods, or services offered with the license, the parties to the license, and economic circumstances of the contracting parties, when you make your reasonable royalty determination.

10

Appx76

**2.2.6 Reasonable Royalty – Availability of Non-Infringing Substitutes**

In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of acceptable non-infringing substitutes to the patented invention. An acceptable non-infringing substitute must be a system that does not infringe the patent. It must have also been, at the time of the hypothetical negotiation, both "available" and "acceptable."

11

### 2.2.7 Reasonable Royalty – Base

You may have heard or seen evidence in this case regarding the total volumes of butane blended by Magellan or Powder Springs using the accused systems.  In arriving at your damages calculation for the asserted claims, you must consider only those barrels of butane that are blended using the systems or methods recited in the asserted claims.  Accordingly, you may not consider volumes of butane that are blended using a method or system not covered by the asserted claims in this case.  It is Sunoco's burden to prove the volumes for purposes of damages.

Appx78

3.      **DELIBERATIONS AND VERDICT**

All the instructions I gave you about deliberations on Friday at pages 32-36 of the jury

instructions apply to your deliberations about damages.

PHILLIPS, McLAUGHLIN & HALL, P.A.

JOHN C. PHILLIPS, JR.
LISA C. McLAUGHLIN·
JAMES P. HALL
DAVID A. BILSON··
MEGAN C. HANEY
TODD L. GOODMAN
PAUL S. SEWARD···

ALSO MEMBER OF
·PENNSYLVANIA BAR
··NEW JERSEY BAR
···MARYLAND BAR

ATTORNEYS AT LAW
PENNSYLVANIA AVE. AND BROOM ST.
1200 N. BROOM STREET
WILMINGTON, DELAWARE 19806

(302) 655-4200
(302) 655-4210 (F)
pgmhlaw.com

January 4, 2022

**VIA CM/ECF**                                          **FILED UNDER SEAL**

The Honorable Richard G. Andrews
United States District Court for the District of Delaware
844 N. King Street
Wilmington, Delaware 19801

      Re:   *Sunoco Partners Marketing & Terminals L.P. v. Powder Springs Logistics, LLC, et al.,* C.A. No. 17-1390-RGA

Dear Judge Andrews:

     I write to docket various communications that occurred with the Court via email during trial. Enclosed please find Sunoco's objections to the final jury instructions for the damages phase as transmitted to the Court on December 5, 2021 (Ex. A). Also enclosed is additional correspondence with the Court regarding final jury instructions for the damages phase (Ex. B1, Ex. B2 & Ex. B3).

                           Respectfully submitted,

                           */s/ Megan C. Haney*

                           Megan C. Haney (No. 5016)

Encl.
cc: Counsel of Record (via email)

Appx80

# EXHIBIT A

| PI's Proposed Instr. No. | INSTRUCTION | OBJECTION(S) |
|---|---|---|
| 2.2 | Rejection of Sunoco's Proposed Instruction No. 2.1 "Date Damages Begin" | ***Absent further modification***, the Court's instruction amounts to legal error. For one, the Court's legal determination on the start of damages for the '629 patent has been made ***prior to*** hearing any evidence on this issue. The Court itself prevented this testimony from coming in during the liability phase by sustaining the Defendants objection on relevance. Sunoco has marked its blending systems since the beginning, continuing the practice of Texon before it, and that evidence will be coming in during the damages phase of the case.<br><br>Second, this issue should have been fully briefed. The Defendants raised a new, novel theory (claims 23 and 30, which were briefly asserted and dropped over two-and-a-half years ago, should be viewed as apparatus claims, not method claims, despite incorporating numerous method steps) on the eve of trial and did so ***in a footnote*** in the jury instructions. Sunoco was provided no opportunity to brief this issue, yet, the Court rendered a legal determination on that issue, potentially foreclosing a substantial amount of damages in this case. Whether or not a patentee has marked a product is a factual issue, and the Court has rendered a decision without hearing the facts. Moreover, if only methods claims area asserted, as is and has been the case for the '629 patent, no marking is required. |
| 2.3 | Rejection of Sunoco's Proposed Instruction Section: "Damages – Kinds of Damages That May Be Recovered" | Without briefing or argument, the Court precluded Sunoco from seeking lost profit damages. The Patent Statute plainly does not require expert testimony to prove lost profits. Specifically, 35 U.S.C. 284 states: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the |
| 2.3.1 | Rejection of Sunoco's Proposed Instruction Section: "Lost Profits – 'But For' Test" | |
| 2.3.2 | Rejection of Sunoco's Proposed Instruction | |

| | Section: Lost Profits – the Panduit Factors | court. . . . The court may receive expert testimony as an aid to the determination of damages or of what royalty would |
|---|---|---|
| 2.3.3 | Rejection of Sunoco's Proposed Instruction Section: Lost Profits – the Panduit Factors – Demand | be reasonable under the circumstances." 35 U.S.C. § 284 (emphasis added).  Accordingly, the Court's elimination of this instruction deprives Sunoco of an entire basis of damages and is contrary to law. |
| 2.3.4 | Rejection of Sunoco's Proposed Instruction Section: Lost Profits – the Panduit Factors – Acceptable Non-Infringing Substitutes | Further, the Federal Circuit has stated: "In proving his damages, the patent owner's burden of proof is not an absolute one, but rather a burden of reasonable probability." Lam, Inc. v. JohnsManville Corp., 718 F.2d 1056, 1065 (Fed. Cir. 1983). The Federal Circuit went on to note that "[i]f in all reasonable |
| 2.3.5 | Rejection of Sunoco's Proposed Instruction Section: Lost Profits – the Panduit Factors – Capacity | probability, the Patent Owner would have made the sales, which the Infringer had made, what the Patent Owner in reasonable probability would have netted from the sales denied to him is the measure of his loss, and the Infringer is liable for that," and that lost |
| 2.4 | Rejection of Sunoco's Proposed Instruction Section: Lost Profits – the Panduit Factors – Amount of Profit | profits causation can be inferred where the patent owner and the infringer were the only suppliers of the product. Id. Here, Defendant's witness Nicholas Huff admitted that he could not identify "a company other than Sunoco or Magellan that operates an automated butane blending system at its terminals." Trial Tr. 509:20-23. |
| 2.4.1 | Replacement of Georgia Pacific factors in "Reasonable Royalty – Using the "Hypothetical Negotiation" Method" Section with three factors | Sunoco preserves its objection to this instruction as not instructing the jury as to the complete Georgia Pacific factors. |
| 2.4.2 | Acceptance of Defendants' Proposal in ""Reasonable Royalty – Using the "Hypothetical Negotiation" Method" Section: | |
| 2.4.9 | Acceptance of Defendants' Alternative "Reasonable Royalty – Base" Instruction: | Sunoco objects to this instruction as not consistent with the facts of this case, and not legally correct instructing the jury as to the complete Georgia Pacific factors. |

# EXHIBIT B1

| | |
|---|---|
| **From:** | Richard Andrews |
| **To:** | Casey Kraning; Megan C. Haney |
| **Cc:** | Jack Phillips; rsmith@mnat.com; Nitika Fiorella |
| **Subject:** | RE: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages |
| **Date:** | Sunday, December 5, 2021 6:42:58 PM |
| **Attachments:** | Final Jury Instructions (Damages) 627.pdf |

I considered the objections and comments of both sides. Verdict form to follow. I will see you tomorrow at 8:30 a.m.

**From:** Casey Kraning <Kraning@fr.com>
**Sent:** Sunday, December 5, 2021 5:12 PM
**To:** Megan C. Haney <mch@PMHDELaw.com>; Richard Andrews <Judge_Richard_Andrews@ded.uscourts.gov>
**Cc:** Jack Phillips <JCP@PMHDELaw.com>; rsmith@mnat.com; Nitika Fiorella <fiorella@fr.com>
**Subject:** RE: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages

**CAUTION - EXTERNAL:**

Dear Judge Andrews,

Please find attached Defendants' objections to the final jury instructions on damages, which Defendants have concurrently filed. Please let us know if the Court has any questions or requires anything further.

Respectfully,
Casey Kraning

**From:** Megan C. Haney <mch@PMHDELaw.com>
**Sent:** Sunday, December 5, 2021 5:08 PM
**To:** Richard Andrews <Judge_Richard_Andrews@ded.uscourts.gov>; Casey Kraning <Kraning@fr.com>
**Cc:** Jack Phillips <JCP@PMHDELaw.com>; rsmith@mnat.com; Nitika Fiorella <fiorella@fr.com>
**Subject:** RE: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages

Dear Judge Andrews,

Pursuant to the agreed upon schedule, attached are Sunoco's objections to the final jury instructions on damages.
Please let us know if the Court requires anything further.

Respectfully,

Megan C. Haney
Phillips, McLaughlin & Hall, P.A.
1200 North Broom Street
Wilmington, DE 19806
302-655-4200

**From:** Richard Andrews <Judge_Richard_Andrews@ded.uscourts.gov>
**Sent:** Sunday, December 5, 2021 2:05 PM
**To:** Casey Kraning <Kraning@fr.com>
**Cc:** Megan C. Haney <mch@PMHDELaw.com>; Jack Phillips <JCP@PMHDELaw.com>;
rsmith@mnat.com; Nitika Fiorella <fiorella@fr.com>
**Subject:** RE: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final
Jury Instructions for Damages

Here's the jury instructions.

On page 4, I highlighted in yellow one sentence.  I think P needs to comply with the marking
requirement, and I gather that P did not.
Am I right that only Powder Springs is liable for the damages for the Powder Springs terminal?

The proposed verdict form (basically P's) is also attached.

**From:** Casey Kraning <Kraning@fr.com>
**Sent:** Saturday, December 4, 2021 11:30 PM
**To:** Richard Andrews <Judge_Richard_Andrews@ded.uscourts.gov>
**Cc:** Megan C. Haney <mch@PMHDELaw.com>; Jack Phillips <JCP@PMHDELaw.com>;
rsmith@mnat.com; Nitika Fiorella <fiorella@fr.com>
**Subject:** RE: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final
Jury Instructions for Damages

CAUTION - EXTERNAL:

Dear Judge Andrews,

Please find attached Defendants' revised proposed verdict form.

Respectfully,
Casey Kraning

**From:** Richard Andrews <Judge_Richard_Andrews@ded.uscourts.gov>

**Sent:** Saturday, December 4, 2021 9:18 PM
**To:** Casey Kraning <Kraning@fr.com>
**Subject:** Re: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages

Yes, fine, any time tonight is fine.

> On Dec 4, 2021, at 9:01 PM, Casey Kraning <Kraning@fr.com> wrote:

**CAUTION - EXTERNAL:**

Dear Judge Andrews,

Defendants also respectfully request an additional hour (until 10pm) to send the word version of Defendants' proposed verdict form.  Defendants are actively working on the verdict form and will endeavor to submit it as soon as possible.

Respectfully submitted,
Casey Kraning

**From:** Megan C. Haney <mch@PMHDELaw.com>
**Sent:** Friday, December 3, 2021 9:17 PM
**To:** judge_richard_andrews@ded.uscourts.gov
**Cc:** Casey Kraning <Kraning@fr.com>; Nitika Fiorella <fiorella@fr.com>; rsmith@mnat.com; Jack Phillips <JCP@PMHDELaw.com>
**Subject:** Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages

[This email originated outside of F&R.]

Dear Judge Andrews,

The parties have conferred and, subject to the approval of the Court, propose the below timing for the preparation of the final jury instructions for the damages phase over the weekend.  Please let us know if this is acceptable to the Court or if the Court wishes to modify the parties' proposal.

Saturday, December 4
- 4 p.m.:  Sunoco sends proposed final jury instructions to Defendants
- 6 p.m.:  Parties meet and confer to attempt to resolve any remaining disputes

- •     8 p.m.:  Parties submit final jury instructions to Court via email and filing along with word versions of the verdict forms

Sunday, December 5
- •     2 p.m.:  Court provides final jury instructions resolving any disputes
- •     5 p.m.:  Parties provide to the Court (via email) any objections they wish to preserve

The parties are available at the convenience of the Court should the Court require anything further or wish to discuss.

Respectfully,

Megan C. Haney
Phillips, McLaughlin & Hall, P.A.
1200 North Broom Street
Wilmington, DE 19806
302-655-4200

## Phillips, McLaughlin & Hall, P.A.
1200 North Broom Street
Wilmington DE, 19806
Offices: (302) 655-4200 | Fax: (302) 655-4210 | PMHDELaw.com

*This message and any attachments may contain confidential and attorney-client privileged information and are intended only for the use of the intended recipients of this message. If you are not the intended recipient of this message, or the employee or agent responsible to deliver it to the intended recipient, please notify the sender by return email, and delete this and all copies of this message and any attachments from your system. You are hereby notified that any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is strictly prohibited and may be unlawful.*

```
********************************************************************
***************************************************
This email message is for the sole use of the intended recipient(s) and
may contain confidential and privileged information. Any unauthorized use
or disclosure is prohibited. If you are not the intended recipient,
please contact the sender by reply email and destroy all copies of the
original message.
********************************************************************
***************************************************
```
**CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.**

```
**********************************************************************
*********************************************
```
This email message is for the sole use of the intended recipient(s) and may contain
confidential and privileged information. Any unauthorized use or disclosure is
prohibited. If you are not the intended recipient, please contact the sender by
reply email and destroy all copies of the original message.
```
**********************************************************************
*********************************************
```
**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

```
**********************************************************************
*********************************************
```
This email message is for the sole use of the intended recipient(s) and may contain
confidential and privileged information. Any unauthorized use or disclosure is
prohibited. If you are not the intended recipient, please contact the sender by
reply email and destroy all copies of the original message.
```
**********************************************************************
*********************************************
```
**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# EXHIBIT B2

| | |
|---|---|
| **From:** | Megan C. Haney |
| **To:** | Richard Andrews; Casey Kraning |
| **Cc:** | Jack Phillips; rsmith@mnat.com; Nitika Fiorella |
| **Subject:** | RE: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages |

Dear Judge Andrews,

I write on behalf of Sunoco in response to your questions below.  As to patent marking and your highlighted sentence on page 4 of the Final Jury Instruction No. 2.1, your Honor sustained Defendants' objections on relevance, when Mr. Legge began to testify on Sunoco's evidence of patent marking.   Trial Transcript, pages 358-359.  Your Honor informed Sunoco's counsel that Mr. Legge, a fact witness, would need to be called again in the damages phase of the case.  *Id.*  Accordingly, Sunoco will be presenting Mr. Legge tomorrow to present Sunoco's evidence on patent marking.  Given that this evidence has not yet been presented, a solution would be to remove the highlighted sentence and everything below, including the Table, and stay with the model jury instruction only.  The evidence from Mr. Legge will show that August 2, 2018 is not the correct date for the '629 patent, as the systems were marked prior to then.  Of course, we defer to Your Honor and are available for further questions.

As to your second questions, evidence came in during the liability phase such that both Defendants are jointly liable for Powder Springs' infringement.  Specifically, Magellan designed, "installed that same [feedback] system at Powder Springs," "operated" the Powder Springs system, and shares 40 percent of the net profits.  Trial Transcript, pages 498-499, 504-505.  Powder Springs owns the land and system.  Accordingly, both entities would be jointly liable for the damages at the Powder Springs terminal.

**From:** Richard Andrews <Judge_Richard_Andrews@ded.uscourts.gov>
**Sent:** Sunday, December 5, 2021 2:05 PM
**To:** Casey Kraning <Kraning@fr.com>
**Cc:** Megan C. Haney <mch@PMHDELaw.com>; Jack Phillips <JCP@PMHDELaw.com>; rsmith@mnat.com; Nitika Fiorella <fiorella@fr.com>
**Subject:** RE: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages

Here's the jury instructions.

On page 4, I highlighted in yellow one sentence.  I think P needs to comply with the marking requirement, and I gather that P did not.
Am I right that only Powder Springs is liable for the damages for the Powder Springs terminal?

The proposed verdict form (basically P's) is also attached.

**From:** Casey Kraning <Kraning@fr.com>
**Sent:** Saturday, December 4, 2021 11:30 PM

**To:** Richard Andrews <Judge_Richard_Andrews@ded.uscourts.gov>
**Cc:** Megan C. Haney <mch@PMHDELaw.com>; Jack Phillips <JCP@PMHDELaw.com>;
rsmith@mnat.com; Nitika Fiorella <fiorella@fr.com>
**Subject:** RE: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final
Jury Instructions for Damages

**CAUTION - EXTERNAL:**

Dear Judge Andrews,

Please find attached Defendants' revised proposed verdict form.

Respectfully,
Casey Kraning

**From:** Richard Andrews <Judge_Richard_Andrews@ded.uscourts.gov>
**Sent:** Saturday, December 4, 2021 9:18 PM
**To:** Casey Kraning <Kraning@fr.com>
**Subject:** Re: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final
Jury Instructions for Damages

Yes, fine, any time tonight is fine.

On Dec 4, 2021, at 9:01 PM, Casey Kraning <Kraning@fr.com> wrote:

**CAUTION - EXTERNAL:**

Dear Judge Andrews,

Defendants also respectfully request an additional hour (until 10pm) to send the word
version of Defendants' proposed verdict form.  Defendants are actively working on the
verdict form and will endeavor to submit it as soon as possible.

Respectfully submitted,
Casey Kraning

**From:** Megan C. Haney <mch@PMHDELaw.com>

**Sent:** Friday, December 3, 2021 9:17 PM
**To:** judge_richard_andrews@ded.uscourts.gov
**Cc:** Casey Kraning <Kraning@fr.com>; Nitika Fiorella <fiorella@fr.com>;
rsmith@mnat.com; Jack Phillips <JCP@PMHDELaw.com>
**Subject:** Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation
of Final Jury Instructions for Damages

[This email originated outside of F&R.]

Dear Judge Andrews,

The parties have conferred and, subject to the approval of the Court, propose the
below timing for the preparation of the final jury instructions for the damages phase
over the weekend.  Please let us know if this is acceptable to the Court or if the Court
wishes to modify the parties' proposal.

Saturday, December 4
- 4 p.m.:  Sunoco sends proposed final jury instructions to Defendants
- 6 p.m.:  Parties meet and confer to attempt to resolve any remaining disputes
- 8 p.m.:  Parties submit final jury instructions to Court via email and filing along
with word versions of the verdict forms

Sunday, December 5
- 2 p.m.:  Court provides final jury instructions resolving any disputes
- 5 p.m.:  Parties provide to the Court (via email) any objections they wish to
preserve

The parties are available at the convenience of the Court should the Court require
anything further or wish to discuss.

Respectfully,

Megan C. Haney
Phillips, McLaughlin & Hall, P.A.
1200 North Broom Street
Wilmington, DE 19806
302-655-4200


Phillips, McLaughlin & Hall, P.A.
1200 North Broom Street
Wilmington DE, 19806
Offices: (302) 655-4200 | Fax: (302) 655-4210 | PMHDELaw.com

*This message and any attachments may contain confidential and attorney-client*

*privileged information and are intended only for the use of the intended recipients of this message. If you are not the intended recipient of this message, or the employee or agent responsible to deliver it to the intended recipient, please notify the sender by return email, and delete this and all copies of this message and any attachments from your system. You are hereby notified that any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is strictly prohibited and may be unlawful.*

```
****************************************************************
*********************************************************
This email message is for the sole use of the intended recipient(s) and
may contain confidential and privileged information. Any unauthorized use
or disclosure is prohibited. If you are not the intended recipient,
please contact the sender by reply email and destroy all copies of the
original message.
****************************************************************
*********************************************************
```

**CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.**

```
****************************************************************************
*********************************************
This email message is for the sole use of the intended recipient(s) and may contain
confidential and privileged information. Any unauthorized use or disclosure is
prohibited. If you are not the intended recipient, please contact the sender by
reply email and destroy all copies of the original message.
****************************************************************************
*******************************************
```

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

1

# EXHIBIT B3

| From: | Richard Andrews |
|---|---|
| To: | Casey Kraning |
| Cc: | Megan C. Haney; Jack Phillips; rsmith@mnat.com; Nitika Fiorella |
| Subject: | RE: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages |
| Date: | Sunday, December 5, 2021 2:05:32 PM |
| Attachments: | 17-1390 Final Jury Instructions (Damages).pdf |
| | 17-1390 damages verdict form 1205.docx |

Here's the jury instructions.

On page 4, I highlighted in yellow one sentence.  I think P needs to comply with the marking requirement, and I gather that P did not.
Am I right that only Powder Springs is liable for the damages for the Powder Springs terminal?

The proposed verdict form (basically P's) is also attached.

**From:** Casey Kraning <Kraning@fr.com>
**Sent:** Saturday, December 4, 2021 11:30 PM
**To:** Richard Andrews <Judge_Richard_Andrews@ded.uscourts.gov>
**Cc:** Megan C. Haney <mch@PMHDELaw.com>; Jack Phillips <JCP@PMHDELaw.com>; rsmith@mnat.com; Nitika Fiorella <fiorella@fr.com>
**Subject:** RE: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages

**CAUTION - EXTERNAL:**

Dear Judge Andrews,

Please find attached Defendants' revised proposed verdict form.

Respectfully,
Casey Kraning

**From:** Richard Andrews <Judge_Richard_Andrews@ded.uscourts.gov>
**Sent:** Saturday, December 4, 2021 9:18 PM
**To:** Casey Kraning <Kraning@fr.com>
**Subject:** Re: Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages

Yes, fine, any time tonight is fine.

On Dec 4, 2021, at 9:01 PM, Casey Kraning <Kraning@fr.com> wrote:

**CAUTION - EXTERNAL:**

Dear Judge Andrews,

Defendants also respectfully request an additional hour (until 10pm) to send the word version of Defendants' proposed verdict form. Defendants are actively working on the verdict form and will endeavor to submit it as soon as possible.

Respectfully submitted,
Casey Kraning

---

**From:** Megan C. Haney <mch@PMHDELaw.com>
**Sent:** Friday, December 3, 2021 9:17 PM
**To:** judge_richard_andrews@ded.uscourts.gov
**Cc:** Casey Kraning <Kraning@fr.com>; Nitika Fiorella <fiorella@fr.com>; rsmith@mnat.com; Jack Phillips <JCP@PMHDELaw.com>
**Subject:** Sunoco v, PSL/Magellan, C.A. No. 17-1390, Proposed Schedule for Preparation of Final Jury Instructions for Damages

[This email originated outside of F&R.]

Dear Judge Andrews,

The parties have conferred and, subject to the approval of the Court, propose the below timing for the preparation of the final jury instructions for the damages phase over the weekend. Please let us know if this is acceptable to the Court or if the Court wishes to modify the parties' proposal.

Saturday, December 4
- 4 p.m.: Sunoco sends proposed final jury instructions to Defendants
- 6 p.m.: Parties meet and confer to attempt to resolve any remaining disputes
- 8 p.m.: Parties submit final jury instructions to Court via email and filing along with word versions of the verdict forms

Sunday, December 5
- 2 p.m.: Court provides final jury instructions resolving any disputes
- 5 p.m.: Parties provide to the Court (via email) any objections they wish to preserve

The parties are available at the convenience of the Court should the Court require anything further or wish to discuss.

Respectfully,

Megan C. Haney
Phillips, McLaughlin & Hall, P.A.
1200 North Broom Street
Wilmington, DE 19806
302-655-4200

Phillips, McLaughlin & Hall, P.A.
1200 North Broom Street
Wilmington DE, 19806
Offices: (302) 655-4200 | Fax: (302) 655-4210 | PMHDELaw.com

*This message and any attachments may contain confidential and attorney-client privileged information and are intended only for the use of the intended recipients of this message. If you are not the intended recipient of this message, or the employee or agent responsible to deliver it to the intended recipient, please notify the sender by return email, and delete this and all copies of this message and any attachments from your system. You are hereby notified that any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is strictly prohibited and may be unlawful.*

*****************************************************************
****************************************************
This email message is for the sole use of the intended recipient(s) and
may contain confidential and privileged information. Any unauthorized use
or disclosure is prohibited. If you are not the intended recipient,
please contact the sender by reply email and destroy all copies of the
original message.
*****************************************************************
****************************************************
**CAUTION - EXTERNAL EMAIL: This email originated outside the
Judiciary. Exercise caution when opening attachments or clicking on links.**

*****************************************************************
*******************************************
This email message is for the sole use of the intended recipient(s) and may contain
confidential and privileged information. Any unauthorized use or disclosure is
prohibited. If you are not the intended recipient, please contact the sender by
reply email and destroy all copies of the original message.
*****************************************************************
*******************************************
**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution
when opening attachments or clicking on links.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUNOCO PARTNERS MARKETING & TERMINALS L.P. | |
| Plaintiff, | |
| v. | C.A. No. 17-1390 (LPS-CJB) |
| POWDER SPRINGS LOGISTICS, LLC and MAGELLAN MIDSTREAM PARTNERS, L.P. | |
| Defendants. | |

**<u>FINAL JURY INSTRUCTIONS</u>**

**DAMAGES PHASE**

# TABLE OF CONTENTS

1.    General Instructions ...................................................................................2

2.    Damages ......................................................................................................3

    2.1    Date Damages Begin..........................................................................4

    2.2    Reasonable Royalty ...........................................................................6

        2.2.1    Reasonable Royalty – Using the "Hypothetical Negotiation" Method ...............................................................7

        2.2.2    Reasonable Royalty – Apportionment ...........................................8

        2.2.3    Reasonable Royalty – Multiple Patents .........................................9

        2.2.4    Reasonable Royalty – Timing.......................................................10

        2.2.5    Reasonable Royalty – Use of Comparable License Agreements .............................................................................11

        2.2.6    Reasonable Royalty – Availability of Non-Infringing Substitutes ...............................................................................12

        2.2.7    Reasonable Royalty – Base............................................................13

3.    Deliberations and Verdict .......................................................................14

1

1.     **GENERAL INSTRUCTIONS**

Members of the jury, you have completed the liability phase of this case, where you found that Defendants infringed the valid asserted claims of the three patents-in-suit.  Now, you must decide what amount of monetary damages Sunoco has proven by a preponderance of the evidence it is entitled to recover.

The instructions I have previously given you explaining the general rules that apply in every civil case, the rules that you must use in evaluating particular testimony and evidence, and the rules that you must follow during your deliberations in the jury room, all apply equally to this damages phase.

Please listen very carefully to everything I say.

You will have your written copy of these instructions with you in the jury room for your reference during your deliberations.  You will also have a verdict form, which will list the questions that you must answer to decide the damages phase of this case.

2

2.    **DAMAGES**

If proven by Sunoco, damages must be in an amount adequate to compensate Sunoco for the infringement.  The purpose of a damages award is to put Sunoco in about the same financial position it would have been in if the infringement had not happened.  You may not add anything to the amount of damages to punish Defendants or to set an example.  You may not add anything to the amount of damages for interest.

Sunoco has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that Sunoco establishes that it more likely than not has suffered.  While Sunoco is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.  You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.  You must be careful to ensure that your damages award is no more and no less than the value of the patented invention.

3

**2.1 Date Damages Begin**

The date that Sunoco first notified Defendants of its claim for patent infringement is the date for the start of damages. The parties do not agree on that date, and it is up to you to determine what that date is. Sunoco must prove that it is more likely than not that Defendants were put on notice of the claim for patent infringement as of the date alleged by Sunoco.

Sunoco can give notice to Defendants by giving notice to the public in general. Sunoco can do this by including on the labeling of substantially all of its blending systems the word "patent" or the abbreviation "pat." with the number of the patent. Sunoco also may give notice by marking substantially all of its systems with "patent" or "pat." and a freely accessible Internet address where there is a posting that connects the systems with the patent numbers. Licensees of the patent who use the patented invention must also mark substantially all of their systems that include the patented invention with the patent number. This type of notice to the public in general starts from the date Sunoco and its licensees began to mark substantially all of the systems that use the invention with the patent number. If Sunoco and its licensees did not mark substantially all of those blending systems with the patent number, then Sunoco did not provide notice in this way.

If you find that Sunoco, before filing this lawsuit, did not provide effective public notice by properly marking its products, then Sunoco can only recover damages for infringement that occurred after it sued Defendants on August 2, 2018.

==In this case, the date for the start of any damages calculation for the '629 patent is August 2, 2018.==

Sunoco contends that the dates for the start of damages for the '302 patent and '686 patent are as follows:

| Patent | Damages Start Date | Notice Type |
|---|---|---|
| '302 patent | August 2, 2012 | Label with '302 patent |

4

| '686 patent | February 2018 | Label with Internet address |
|---|---|---|

5

## 2.2     Reasonable Royalty

The amount of damages that Defendants should pay Sunoco for infringing Sunoco's patents must be enough to compensate for the infringement, and may not be less than a reasonable royalty for the use of the patented invention.  A royalty is a payment made to a patent owner by someone else in exchange for the rights to make, use, sell, and/or import a patented system. A reasonable royalty is the amount that someone wanting to use the patented invention would have agreed to pay to the patent owner and the patent owner would have accepted.

The reasonable royalty award must be based on the incremental value that the patented invention adds to systems and methods for blending butane. When the infringing systems and methods for blending butane have both patented and unpatented features, measuring this value requires a determination of the value added by the patented features. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the systems and methods for blending butane, and no more.

6

### 2.2.1    Reasonable Royalty – Using the "Hypothetical Negotiation" Method

A reasonable royalty is the royalty that would have resulted from a hypothetical license negotiation between Sunoco and Defendants. Of course, we know that they did not agree to a license and royalty payment. But, to decide on the amount of reasonable royalty damages, you should assume that the parties did negotiate a license just before the infringement began. This is why it is called a "hypothetical" license negotiation. You should assume that both parties to the hypothetical negotiation understood that the patent was valid and infringed and both were willing to enter into a license just before the infringement began. You should also presume that the parties had full knowledge of the facts and circumstances surrounding the infringement at the time of the hypothetical negotiation.

Some of the factors you may consider in making your determination are:

1.      The value that the claimed invention contributes to Defendants' systems and methods.

2.      The value that factors other than the claimed invention contribute to Defendants' systems and methods.

3.      Comparable license agreements, such as those covering the use of the claimed invention or similar technology.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.

### 2.2.2   Reasonable Royalty – Apportionment

The amount you find as damages must be based on the value attributable to the patented invention, as distinct from unpatented features of the accused system or method or other factors such as marketing or advertising, or Sunoco's size or market position.  A royalty compensating Sunoco for damages must reflect the value attributable to the infringing features of Defendants' systems and methods, and no more.  The process of separating the value of the allegedly infringing features from the value of all other features is called apportionment.  When the infringing systems and methods have both patented and unpatented features, your award must be apportioned so that it is based only on the value of the patented features, and no more.  The evidence tending to separate or apportion damages between the patented features and unpatented features must be reliable and tangible, and not conjectural or speculative.  Sunoco bears the burden of establishing amounts directly attributable to the patented features.

Keep the following in mind when conducting your apportionment analysis:

1.  The full value of the Texon acquisition is not attributable solely to the patents-in-suit.

2.   The full value of the Buckeye license is not attributable solely to the patents-in-suit.

3.  Not all the value of the BSAs is attributable to the patents-in-suit or to patented features of the patents-in-suit.

8

### 2.2.3 Reasonable Royalty – Multiple Patents

If you found that Defendants infringed multiple patents, even by a single infringing act, and if you award a reasonable royalty for the infringement, then you may award separate royalties to Sunoco for each patent that was infringed. You also may consider evidence of the number of patent licenses that are needed for the infringing systems and methods and the effect on the hypothetical negotiation of having to pay a royalty for each of those licenses.

9

### 2.2.4 Reasonable Royalty – Timing

Damages are not based on a hindsight evaluation of what happened, but on what the parties to the hypothetical license negotiations would have agreed upon at a time just prior to when the infringement first began. The parties agree that this negotiation would have occurred around the following dates, depending on the accused systems:

| Date | Accused Systems | Licensee |
|------|----------------|----------|
| June 2007 | Oklahoma City-Reno, Greensboro II, and Chattanooga II | Magellan |
| Early 2011 | East Houston, West Tulsa, Carthage, and Kansas City | Magellan |
| December 2014 | Powder Springs | Powder Springs |

Nevertheless, evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation. You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation, which may under certain circumstances include evidence of usage after infringement started, license agreements entered into by the parties shortly after the date of the hypothetical negotiation, profits earned by the infringer, and non-infringing alternatives.

The date of the hypothetical negotiation is different than the date from which Sunoco can obtain damages.

10

**2.2.5 Reasonable Royalty – Use of Comparable License Agreements**

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patents in question, or for rights to similar technologies.  A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between Sunoco (or its predecessor) and Defendants in order for you to consider it.  However, if you choose to rely upon evidence from license agreements, you must account for any differences between those licenses and the hypothetically negotiated license between Sunoco (or its predecessor) and Defendants, in terms of the technologies, other features, goods, or services offered with the license, the parties to the license, and economic circumstances of the contracting parties, when you make your reasonable royalty determination.

11

**2.2.6 Reasonable Royalty – Availability of Non-Infringing Substitutes**

In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of acceptable non-infringing substitutes to the patented invention. An acceptable non-infringing substitute must be a system that does not infringe the patent. It must have also been, at the time of the hypothetical negotiation, both "available" and "acceptable."

12

**2.2.7 Reasonable Royalty – Base**

You may have heard or seen evidence in this case regarding the total volumes of butane blended by Magellan or Powder Springs using the accused systems.  In arriving at your damages calculation for the asserted claims, you must consider only those barrels of butane that are blended using the systems or methods recited in the asserted claims.  Accordingly, you may not consider volumes of butane that are blended using a method or system not covered by the asserted claims in this case.  It is Sunoco's burden to prove the volumes for purposes of damages.

13

**3.     DELIBERATIONS AND VERDICT**

All the instructions I gave you about deliberations on Friday at pages 32-36 of the jury instructions apply to your deliberations about damages.

14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUNOCO PARTNERS MARKETING & TERMINALS L.P.<br><br>Plaintiff,<br><br>v.<br><br>POWDER SPRINGS LOGISTICS, LLC and MAGELLAN MIDSTREAM PARTNERS, L.P.<br><br>Defendants. | C.A. No. 17-1390 (LPS-CJB) |

**<u>VERDICT FORM</u>**

**DAMAGES PHASE**

1

**I.     DAMAGES**

**A.     Defendant Magellan**

**1.**     What sum of money do you find Plaintiff Sunoco has proven by a preponderance of the evidence would fairly and reasonably compensate it for Defendant Magellan's infringement?

$ _____

**B.     Defendant Powder Springs**

**2.**     What sum of money do you find Plaintiff Sunoco has proven by a preponderance of the evidence would fairly and reasonably compensate it for Defendant Powder Springs' infringement?

$ _____

2

**II.     CONCLUSION**

You have reached the end of the verdict form.  Please review the entire form to ensure that it is complete and that the answers accurately reflect your unanimous determinations.  All jurors should then sign the verdict form in the space below and notify the Court Security Officer that you have reached a verdict.  The Foreperson should retain possession of the verdict form and bring it to the courtroom with the jury.


Date: _____                    _____
                                          Foreperson

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SUNOCO PARTNERS MARKETING &
TERMINALS L.P.,

        Plaintiff,

   v.                             Civil Action No. 17-1390-RGA

POWDER SPRINGS LOGISTICS, LLC, and
MAGELLAN MIDSTREAM PARTNERS,
L.P.,

        Defendants.

MEMORANDUM OPINION

John C. Phillips, Jr., Megan C. Haney, PHILLIPS, MCLAUGHLIN & HALL, P.A., Wilmington, DE; John Keville, Michelle Replogle (argued), Michael Krill, SHEPPARD MULLIN RICHTER & HAMPTON, Houston, TX; Richard McCarty, WINSTON & STRAWN LLP, Houston, TX,

      Attorneys for Plaintiff.

Roger D. Smith II, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; David S. Moreland, John W. Harbin, MEUNIER CARLIN & CURFMAN LLC, Atlanta, GA,

      Attorneys for Defendant Powder Springs Logistics, LLC.

Douglas E. McCann (argued), Martina Tyreus Hufnal, Nitika Gupta Fiorella, FISH & RICHARDSON P.C., Wilmington, DE; Joseph A. Herriges, FISH & RICHARDSON P.C., Minneapolis, MN,

      Attorneys for Defendant Magellan Midstream Partners, L.P.

August 31, 2022

Appx134

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is Defendants' Renewed Motion for Judgment as a Matter of Law of No

Infringement of Certain Asserted Claims and No Willful Infringement.    (D.I. 795).   I have

reviewed the parties' briefing (D.I. 796, 810, 825), and I heard oral argument on August 3, 2022

(D.I. 849).

## I.    BACKGROUND

After a five-day liability trial (D.I. 817–821),[1] the jury found that Defendants literally

infringed all asserted claims: claims 3, 16, and 17 of U.S. Patent No. 6,679,302 ("the '302

patent"); claims 18, 22, 31, and 32 of U.S. Patent No. 7,032,629 ("the '629 patent"); and claim 3

of U.S. Patent No. 9,207,686 ("the '686 patent").[2]   (D.I. 743).   The jury further found that

Defendants willfully infringed all three patents and that Defendants failed to prove invalidity.

(*Id.*).   Defendants moved for judgment as a matter of law ("JMOL") pursuant to Federal Rule of

Civil Procedure 50(a) and now renew the motion under Rule 50(b).   (Trial Tr. at 672:16–673:15,

1138:13–1140:1; D.I. 795).   Defendants seek JMOL of non-infringement for seven of the eight

asserted claims, that is, all but claim 3 of the '302 patent; and JMOL of no willful infringement.

(D.I. 796 at 2–3).

## II.    LEGAL STANDARD

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would

not have a legally sufficient evidentiary basis to find for [a] party" on an issue.   FED. R. CIV. P.

50(a)(1).   "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, 'granted only

---

[1] I cite to the trial transcript as "Trial Tr."    The trial transcript is consecutively numbered.
[2] Defendant Powder Springs was only accused of—and only found liable for—infringing claim
3 of the '686 patent.    (*See* D.I. 743).

1

if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citation omitted).

"To prevail on a renewed motion for JMOL following a jury trial, a party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied by the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (cleaned up). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The Court "must not determine credibility of witnesses, and must not substitute its choice for that of the jury between conflicting elements in the evidence." *Perkin-Elmer*, 732 F.2d at 893. Rather, the Court must determine whether the evidence supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party.").

2

## III.    DISCUSSION

### A.    Butane Vapor Pressure Limitations

Defendants argue that no reasonable juror could find that Defendants infringe the "butane vapor pressure limitations" of claims 16 and 17 of the '302 patent; claims 18 and 22 of the '629 patent; and claim 3 of the '686 patent.   (D.I. 796 at 6–14).

These claims all require some knowledge of the vapor pressure of the butane.   Claim 17 of the '629 patent (from which claims 18 and 22 depend), for example, recites:

> 17. A computer-implemented method for blending a butane stream with a gasoline stream comprising the steps of:
>
> receiving a first measurement indicating a vapor pressure of the gasoline stream;
>
> ***receiving a second measurement indicating a vapor pressure of the butane stream***;
>
> calculating a blend rate at which the butane stream can be blended with a gasoline stream; and
>
> transmitting an instruction to a programmable logic controller for adjusting the butane stream to the calculated blend rate for blending with the gasoline stream and distributing at a rack.

(PTX 2, claim 17 (emphasis added)).

Claims 16 and 17 of the '302 patent similarly require "transmitting . . . the butane vapor pressure to the processing unit."   (PTX 1, claim 16).   Claim 1 of the '686 patent (from which claim 3 depends) requires "providing a stream of said agent [i.e., butane] that comprises an agent vapor pressure" and "calculating a blend ratio based upon said agent vapor pressure."   (PTX 3, claim 1).

The Magistrate Judge construed the "vapor pressure" terms to have their plain and ordinary meaning, which "would seem to allow for a known or inherent value to be used . . . instead of requiring that a value be taken as a result of an active sampling and measurement of

3

the respective streams." (D.I. 331 at 13–15). This Court adopted the Magistrate Judge's recommendation and held that practicing the "feedforward claims"—i.e., the claims at issue here—"requires knowing (whether it be through, for example, actual measurement, through looking it up in a table or other resource, or through knowledge of an inherent characteristic) the vapor pressure of the gasoline or butane 'to be blended.'" (D.I. 539 at 7). After briefing on the current motion was complete, the Federal Circuit held that the phrase "vapor pressure of the butane stream" in claim 17 of the '302 patent covers an assumed vapor pressure value. *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1175–76 (Fed. Cir. 2022).

Defendants argue that the undisputed evidence shows that Defendants do not know the vapor pressure (i.e., the "Reid Vapor Pressure," or "RVP") of the butane stream to be blended, so JMOL of non-infringement is appropriate. (D.I. 796 at 6).

It is undisputed that Defendants' systems do not measure the vapor pressure of the butane stream to be blended. (D.I. 796 at 8; Trial Tr. at 692:25–693:19, 701:20–22 (Hitz); Trial Tr. at 887:18–889:4 (Howerton); Trial Tr. at 945:15–20 (Hill)). Sunoco instead argued to the jury that Defendants' systems use an inherent butane RVP of 52 psi.

All of the accused systems blend butane using the blending equation set forth in U.S. Patent No. 9,080,111 ("the Huff patent"). (Trial Tr. at 439:18–21 (Huff)). The Huff patent specification provides, "[T]he blend ratio will preferably be calculated according to the following formula: $\Delta$ Blending % = (VP$_{target}$ – VP$_{actual}$)*(2/100)." (PTX 115 at 13:40–51). The Huff patent provides, "This procedure effectively assumes a vapor pressure of the butane rather than having to monitor and use an actual value." (*Id.* at 13:57–58). Using "well-known thermodynamic rules" (i.e., Raoult's law), Sunoco's expert Dr. Kytomaa showed that the 2/100 constant in Defendants' blending equation is derived using butane's known RVP of 52 psi.

4

(Trial Tr. at 565:9–566:10 (Kytomaa)).    He also performed the same calculations to show that

the appropriate constant would change if the systems instead blended other hydrocarbons (e.g.,

pentane and propane) with gasoline.    (Trial Tr. at 563:18–564:17 (Kytomaa)).    Based on this,

Dr. Kytomaa opined that an assumed butane vapor pressure of 52 psi was "baked in" to the

Defendants' blending equation.    (Trial Tr. at 565:9–566:10 (Kytomaa)).

  Sunoco also presented some Magellan documents to show knowledge of an inherent

butane vapor pressure.    Magellan's 2009 Authorization for Expenditure stated that "the current

system" uses "an equation that assumes 50RVP butane."    (PTX 114 at 2).    Mr. Roles' notes

indicated that butane has "52 RVP."    (PTX 372 at 1; Trial Tr. at 750:11–17 (Roles); *see also*

Trial Tr. at 644:21–645:8 (Kytomaa) (stating that "whether it's 50, or 52, is largely immaterial"

as "there's some variation associated with the vapor pressure of butane")).

  Defendants argue that Sunoco has failed to show "knowledge of an inherent

characteristic" of the butane stream because the evidence showed that the butane used by

Defendants does not have a constant RVP of 52 psi.    (D.I. 796 at 12; D.I. 849 at 21:4–11).    This

argument, however, is inconsistent with the Federal Circuit's recent holding that the claims

encompass an assumed vapor pressure of butane.    *See Sunoco Partners*, 32 F.4th at 1175–76.

The fact that the blending equation assumes a butane vapor pressure is enough to satisfy the

claim limitations, even if the actual vapor pressure of the butane varies.

  Further, Dr. Kytomaa reviewed "thousands of entries of butane RVP" measurements

taken by Magellan and concluded that the "vast majority" were between 50 and 55 psi.    (Trial

Tr. at 565:2–8, 645:1–8, 646:23–648:11, 649:17–650:11, 665:23–666:12 (Kytomaa); PTX 899;

*see also* Trial Tr. at 669:2–670:3 (Kytomaa) (stating that he excluded outliers based on "a

scientifically widely used and generally accepted methodology in statistics")).    Dr. Kytomaa

testified that the RVP of the butane used by Defendants was "consistent with the number 52 that

[he] utilized." (Trial Tr. at 668:2–12 (Kytomaa)). The jury was entitled to accept Dr.

Kytomaa's testimony.

Thus, I find that there was substantial evidence supporting the jury's finding that

Defendants had knowledge of an inherent or assumed butane vapor pressure.

Defendants argue that no reasonable juror could have found that Defendants' use of the

constant satisfied the limitations which require "receiving a . . . measurement indicating a vapor

pressure of the butane stream" (claims 18 and 22 of the '629 patent) or "transmitting . . . the

butane vapor pressure to the processing unit" (claims 16 and 17 of the '302 patent). (D.I. 796 at

9–10). Defendants contend that the blending equation, which is hard-coded into Defendants'

PLC, does not satisfy the active steps of "receiving" and "transmitting." (*Id.*).[3]

Dr. Kytomaa's testimony on these limitations was limited. Dr. Kytomaa testified that

Defendants' systems perform the "receiving" step "by virtue of programming in or inputting into

the equation the vapor pressure of the butane"—i.e., "the use of 52 PSI, and the number of 2 in

100 that has the butane vapor pressure baked into it." (Trial Tr. at 579:19–580:5 (Kytomaa)).

He testified that Defendants' systems perform the "transmitting" step because "the equation

utilizes the butane vapor pressure." (Trial Tr. at 591:24–592:5 (Kytomaa)). Dr. Kytomaa's

conclusory testimony on these limitations does not constitute substantial evidence.

---

[3] After oral argument, Sunoco filed a letter arguing that Defendants' argument seeks an
improper post hoc claim construction. (D.I. 837; *see also* D.I. 838, 842, 846). I do not think
that is the case. Defendants are simply arguing that there is not substantial evidence supporting
the jury's finding that Defendants' systems receive and transmit the butane vapor pressure.
Neither party requested a construction of the "receiving" and "transmitting" terms, so the jury
was instructed to apply the plain and ordinary meaning of these terms. (Trial Tr. at 1184:16–
19). I believe Defendants' arguments are consistent with this plain and ordinary meaning.

6

*MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015).   I agree with

Defendants that no reasonable juror could find that Defendants' use of a constant satisfies the

"receiving" and "transmitting" limitations.

As for infringement under the doctrine of equivalents, Dr. Kytomaa did not present any

testimony relating to these limitations.   (*See* D.I. 849 at 24:2–8).   The only DOE testimony

related to whether Defendants' use of the 2/100 constant was equivalent to using a known or

inherent value of 52 psi.   (*See* Trial Tr. at 566:11–567:14 (Kytomaa)).   Thus, although the jury

did not reach a verdict on DOE, I find that no reasonable juror could have found infringement of

the "receiving" and "transmitting" limitations under the doctrine of equivalents.   *Tex.*

*Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) ("[A]

patentee must . . . provide particularized testimony and linking argument as to the

'insubstantiality of the differences' between the claimed invention and the accused device or

process . . . to support a finding of infringement under the doctrine of equivalents. Such evidence

must be presented on a limitation-by-limitation basis.").

I therefore grant JMOL of no infringement with respect to claims 18 and 22 of the '629

patent and claims 16 and 17 of the '302 patent.

Claim 3 of the '686 patent does not include any limitation requiring "receiving" or

"transmitting" the butane vapor pressure.   Thus, because Sunoco presented substantial evidence

to support the jury's finding that Defendants had knowledge of an inherent or assumed butane

vapor pressure, I deny Defendants' motion for JMOL of no infringement with respect to claim 3

of the '686 patent.

7

B.    **Gasoline Vapor Pressure Limitations**

Defendants argue that no reasonable juror could find that Defendants infringe the "gasoline vapor pressure limitations" of claims 16 and 17 of the '302 patent; claims 18, 22, 31, and 32 of the '629 patent; and claim 3 of the '686 patent.    (D.I. 796 at 14).

Claims 16 and 17 of the '302 patent recite "transmitting the gasoline vapor pressure . . . to the processing unit" and "calculating the blend ratio from the gasoline vapor pressure."    (PTX 1, claim 16).    Claim 17 of the '629 patent (from which claims 18 and 22 depend) requires "receiving a first measurement indicating a vapor pressure of the gasoline stream."    (PTX 2, claim 17).    Claims 31 and 32 of the '629 patent require "receiving a first measurement indicating a vapor pressure of the gasoline stream."    (*Id.*, claim 31).    Claim 1 of the '686 patent (from which claim 3 depends) requires "periodically determining said gasoline vapor pressure" and "calculating a blend ratio based upon . . . said gasoline vapor pressure."    (PTX 3, claim 1). Just like the butane vapor pressure limitations, the gasoline vapor pressure limitations require "knowing . . . the vapor pressure of the gasoline . . . 'to be blended.'"    (D.I. 539 at 7).

Defendants argue that the jury's verdict of infringement is not supported by substantial evidence because Defendants' systems do not have knowledge of the vapor pressure of the gasoline to be blended, as required by this Court's construction.    (D.I. 796 at 14).

Sunoco first responds that Defendants never moved for JMOL on this ground at trial and thus cannot file a renewed motion for JMOL on this basis.    (D.I. 810 at 12).    Defendants moved for JMOL of non-infringement of all asserted claims, but only raised the "rack" and "butane vapor pressure" limitations.    (Trial Tr. at 672:16–673:15, 1138:13–1139:19).    Defendants argue that they sufficiently preserved their argument by moving for JMOL of non-infringement of all asserted claims.    (D.I. 825 at 7).    I do note that a prior case in this district found the Rule

8

50(a)(2) specificity requirement to be met where the defendant simply listed the claims that were not directly and indirectly infringed. *CIF Licensing, LLC v. Agere Sys. Inc.*, 727 F. Supp. 2d 337, 354 (D. Del. 2010). Nonetheless, I do not need to decide the non-preservation issue because Defendants' renewed motion for JMOL can be denied on the merits.

The evidence at trial showed that Defendants' systems only have analyzers downstream of the blending point. (Trial Tr. at 630:7–20 (Kytomaa)). The claims, however, do not require measurement upstream of the blending point. Sunoco presented evidence that Defendants measure the vapor pressure of the unblended gasoline prior to butane injection and calculate a blend ratio based on the measurement. (Trial Tr. at 549:15–552:16, 558:18–559:21, 570:12–18, 590:9–24 (Kytomaa)). This is substantial evidence supporting the jury's verdict. I therefore deny Defendants' motion for JMOL on these grounds.

### C.    Willful Infringement

#### 1.    The '302 and '629 Patents

Defendants argue that no reasonable juror could find that Defendants willfully infringed the '302 and '629 patents. (D.I. 796 at 15–18).

A determination of willfulness requires a finding of "deliberate or intentional" infringement. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (quoting *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020)), *cert. denied*, 142 S. Ct. 2732 (2022). A finding of "subjective willfulness," proof that the accused infringer acted in the face of a risk of infringement that was "either known or so obvious that it should have been known to the accused infringer," can satisfy this standard. *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016) (quoting

9

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 101 (2016)), *rev'd on other grounds*, 138 S.

Ct. 2129 (2018).

I find that there is substantial evidence supporting the jury's verdict of willfulness for the

'302 and '629 patents.   For instance, Sunoco presented evidence of meetings between Texon

(the company from whom Sunoco acquired the asserted patents) and Magellan regarding

Texon's offer to license its butane blending systems to Magellan.   In May 2003, Texon

presented its "Patent Pending Automated Butane Blending System" to Magellan.   (PTX 82 at 2).

Texon's presentation provided the '302 patent application number and stated that the systems

blend "as the gasoline is being delivered into trucks or pipelines." (*Id.* at 2, 8).   In March 2004,

Texon presented Magellan with its "Patented Automated Butane Blending System," which had

"[p]roven results . . . in high volume terminals at the truck loading rack or online pipeline

blending." (PTX 83 at 1, 3).   In October 2006, Texon presented Magellan with its "Patent

Proven Design" for "blending on pipelines and as product moves from tanks to a terminal's truck

loading rack." (DTX 1085 at 3, 6).

After this presentation, Mark Roles, Magellan's commercial project manager at the time,

sent an internal email asking whether there was "more value for Magellan keeping everything

internal." (DTX 246 at 1).   He stated, "I don't think it's ethical for us to drag [Texon] down the

road and leach information, and then decide to go with Moyer's group in the end." (*Id.*).

Mr. Roles then requested more information regarding Texon's systems.   (PTX 373; *see*

PTX 312 (Texon email copying Mr. Roles: "Mark specifically wants data from a truck rack

blending system and not one of our pipeline systems where we have both an upstream and

downstream Grabner")).   Defendants argue, however, that there is no evidence that Magellan

received any technical information on Texon's systems.   (D.I. 796 at 16).   They contend that

10

the evidence shows that Magellan only attempted to get "data showing that Texon's systems could reliably and consistently blend." (*Id.* at 17; *see* DTX 184; DTX 185). Mr. Roles testified that Texon was only able to provide three samples, not the requested blend data. (Tr. at 738:12–739:19 (Roles); DTX 185; DTX 219).

Sunoco responds that there was sufficient evidence for a jury to infer that Magellan did get detailed technical information about Texon's blending systems. (D.I. 810 at 14). Mr. Roles sent an email to his boss, Rhonda Staggs, stating that he would "get feedback from Engineering on Texon's system." (PTX 91 at 2). Ms. Staggs asked if "Engineering [could] do the same project for less cost," and Mr. Roles' handwritten notes indicated that they could not because "Engineering would take 6–12 months to develop." (*Id.* at 1; Trial Tr. at 755:20–757:3 (Roles)). Further, Mr. Roles' notes on "Texon – Engineering Feedback" indicated that the "[p]rogram to run the system would be difficult to build" and would take "[a] lot of man hours [i.e., about one year] developing." (PTX 402 at 3). Based on this evidence, a reasonable juror could have found that Magellan gained enough information about Texon's patents and systems so that, even if it did not know, the risk of infringement was so obvious it should have known.

Sunoco also presented evidence that Magellan filed a patent application in November 2010 for Mr. Huff's feedback system, citing Sunoco's '302, '629, and '671 patents (which is a continuation-in-part of the '629 patent, which is a continuation of the '302 patent). (PTX 115; Trial Tr. at 432:6–24 (Huff)). In September 2014, Magellan's patent application was rejected as anticipated by Sunoco's '671 patent. (Trial Tr. at 482:9–485:13 (Huff); PTX 411 at 278–90). Mr. Huff testified that Magellan did not change their physical systems after this initial rejection. (Trial Tr. at 491:1–5, 496:2–16 (Huff)). Yet, Defendants argue that this evidence does not support the jury's finding of willfulness because "Magellan was able to convince the examiner

11

that Magellan's systems were different, such that the examiner granted Magellan a patent over Texon's patents." (D.I. 796 at 17). But Magellan's patent issued after Magellan included additional limitations in the claims, so this issuance was not simply based on Magellan's arguments to the examiner. (Trial Tr. at 485:21–487:9 (Huff); PTX 411 at 317–26, 337–44).

The jury also heard testimony from Mr. Huff that Magellan knew there was a risk of infringement in 2012. (Trial Tr. at 495:9–496:1 (Huff)). Further, there was evidence that Magellan became a licensee of Sunoco's patents in May 2015 after it acquired the Perimeter terminal. (Trial Tr. at 215:16–217:15 (Colella); PTX 546); *see Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1245 (Fed. Cir. 2017) (finding that the jury's willfulness verdict was supported by "evidence of the parties' prior business dealings from which the jury could have inferred that [the infringer] believed that it needed to . . . license [the patents] to avoid infringement").

Based on this evidence, a reasonable jury could have found that Defendants acted despite a risk of infringement that was either known or so obvious it should have been known.

Defendants also argue that no reasonable jury could have found that Defendants had the specific intent to infringe because there was evidence that they had a reasonable basis to believe that their systems did not infringe. (D.I. 796 at 18–20). First, Defendants contend that Magellan believed its systems were different because they blended inline to a tank, while Texon's systems blended to a rack. (*Id.* at 18–19). But Sunoco presented substantial evidence allowing the jury to conclude otherwise. For example, Sunoco presented evidence showing that Texon offered Magellan its patented pipeline systems, not just rack systems. (*See* PTX 82 at 2, 8; PTX 83 at 1, 3; DTX 1085 at 3, 6). In a 2009 email, Melanie Little, Magellan's Senior VP of Operations, noted, "Texon indicates in the CIM [i.e., confidential information memorandum] that

12

they have a patent not only for rack blending butane system, but also for inline pipeline butane

blending." (Trial Tr. at 279:2–14 (Little)).

Second, Defendants contend that the jury heard evidence that Magellan had a "subjective

belief that its way of blending (feedback) was different and superior to Texon's way

(feedforward)," and switched its systems from feedforward to feedback in 2010. (D.I. 796 at

19). But Defendants' belief that their systems were "superior" does not show that they believed

their systems did not infringe. Further, the jury heard evidence showing that Magellan did not

subjectively believe Sunoco's patents or systems were this limited. (D.I. 810 at 16). For

example, Magellan knew that Texon had pipeline systems with downstream analyzers in 2006.

(PTX 312; Trial Tr. at 754:21–755:12 (Roles)). Further, the examiner initially rejected the

patent application for Magellan's feedback systems as anticipated by the feedforward systems in

the '671 patent. (Trial Tr. at 482:9–485:13 (Huff); PTX 411 at 278–90).

Therefore, I find that a reasonable juror could have concluded that Defendants had no

reasonable basis to believe that their systems did not infringe.

Drawing all logical inferences in favor of Sunoco as the non-moving party, I find that

there was substantial evidence in the record supporting the jury's determination that Defendants

willfully infringed the '302 and '629 patents. Thus, I will deny the motion for JMOL of no

willful infringement for the '302 and '629 patents.[4]

---

[4] Defendants also argue (in a footnote) that Sunoco's willful infringement theories are untimely because they were raised for the first time during opening statements. (D.I. 796 at 18 n.9). Defendants, however, did not object to these statements at trial. (*See* Trial Tr. at 117:23–121:24). As far as I am concerned, this argument is waived. *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("[I]t is clear that a party who fails to object to errors at trial waives the right to complain about them following trial.").

13

2.     **The '686 Patent**

Defendants also move for JMOL of no willful infringement of the '686 patent.

Defendants reason that all of Sunoco's evidence in support of its willfulness case pre-dated the

issuance of the '686 patent in December 2015.   (D.I. 796 at 18).

The Federal Circuit has noted, however, "[P]re-patent conduct may also be used to

support a finding of willfulness."   *Minn. Mining & Mfg. Co. v. Johnson & Johnson*

*Orthopaedics, Inc.*, 976 F.2d 1559, 1581 (Fed. Cir. 1992).   Accordingly, I find that there is

substantial evidence supporting the jury's finding that Defendants knew of the '686 patent when

it issued in December 2015 and knew (or it was so obvious they should have known) they were

infringing it thereafter.[5]

Magellan's 2010 patent application cited Sunoco's '302, '629, and '671 patents.   (PTX

115; Trial Tr. at 432:6–24 (Huff)).   The '686 patent is a continuation of the '671 patent and was

published in August 2012.   (PTX 3; Trial Tr. at 536:8–17 (Kytomaa)).   Further, when Magellan

acquired the Perimeter terminal in May 2015, it assumed a 2012 license agreement requiring it to

pay license fees to Sunoco.   (PTX 546; Trial Tr. at 217:5–15 (Colella)).   The agreement

licensed the '302 patent and "all U.S. patents and patent applications claiming priority thereto."

(PTX 476 at 8; Trial Tr. at 217:16–218:2 (Colella)).   The agreement specifically listed the '629

and '671 patents, and the '951 publication (of which the '686 patent is a continuation).   (PTX

476 at 8).   Although the '686 patent is not listed in this agreement, it was included in the license,

as the '686 patent claims priority to the '302 patent.   (*See* Trial Tr. at 242:5–246:18 (Colella)).

Additionally, the '686 patent has the same specification as and similar claims to the '671 patent,

---

[5]   "We presume the jury resolved all underlying factual disputes in favor of the verdict."   *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1040 (Fed. Cir. 2016) (en banc).

which the examiner found anticipated the original claims in Magellan's patent.    (*Compare* PTX 3, claims 1 & 3, *with* PTX 116, claims 1 & 5).

Considering the totality of the circumstances, I find that there is substantial evidence to support the jury's finding that Defendants willfully infringed the '686 patent.   *See, e.g.*, *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 970–71 (Fed. Cir. 2018) (affirming the district court's denial of JMOL of no willfulness because the patentee "provided sufficient evidence for a reasonable jury to conclude that [the infringer] *did* know of [the] patents as they issued," including that the infringer knew of related patents, knew the patentee's products were marked "patent pending," and had "a culture of copying"); *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 396 F. Supp. 3d 323, 334–35 (S.D.N.Y. 2019) (denying JMOL of no willful infringement where "there was circumstantial evidence that . . . was sufficient for the jury to reasonably infer that [the infringer] had knowledge of the [patent]," including that the infringer had knowledge of the parent patent disclosing the "same method and apparatus," the infringer's internal architecture documents bore "notable similarities" to the patent, and the infringer hired the patentee's former employee).

I therefore deny Defendants' motion for JMOL of no willful infringement for the '686 patent.

IV.    **CONCLUSION**

An appropriate order will issue.

15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SUNOCO PARTNERS MARKETING &
TERMINALS L.P.,

       Plaintiff,

  v.

POWDER SPRINGS LOGISTICS, LLC, and
MAGELLAN MIDSTREAM PARTNERS,
L.P.,

       Defendants.

Civil Action No. 17-1390-RGA

ORDER

For the reasons stated in the accompanying Memorandum Opinion, Defendants' Renewed Motion for Judgment as a Matter of Law of No Infringement of Certain Asserted Claims and No Willful Infringement (D.I. 795) is **GRANTED-IN-PART** and **DENIED-IN-PART.** The motion for JMOL of no infringement is **GRANTED** with respect to claims 18 and 22 of the '629 patent and claims 16 and 17 of the '302 patent. The motion for JMOL of no infringement is **DENIED** with respect to claims 31 and 32 of the '629 patent and claim 3 of the '686 patent. The motion for JMOL of no willful infringement is **DENIED**.

Entered this 31st day of August, 2022.

United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SUNOCO PARTNERS MARKETING &
TERMINALS L.P.,

       Plaintiff,

     v.

POWDER SPRINGS LOGISTICS, LLC, and
MAGELLAN MIDSTREAM PARTNERS,
L.P.,

       Defendants.

Civil Action No. 17-1390-RGA

## MEMORANDUM

Before me is Plaintiff's Post-Trial Motion for Enhanced Damages, Supplemental Damages, Pre-Judgment and Post-Judgment Interest, and Ongoing Royalties.   (D.I. 797).   The motion is fully briefed.   (D.I. 798, 807, 826).

After a five-day liability trial (D.I. 817–821),[1] the jury found that Defendants literally infringed all asserted claims: claims 3, 16, and 17 of U.S. Patent No. 6,679,302 ("the '302 patent"); claims 18, 22, 31, and 32 of U.S. Patent No. 7,032,629 ("the '629 patent"); and claim 3 of U.S. Patent No. 9,207,686 ("the '686 patent").[2]   (D.I. 743).   The jury further found that Defendants willfully infringed all three patents and that Defendants failed to prove invalidity. (*Id.*).

---

[1]  I cite to the trial transcript as "Trial Tr."   The trial transcript is consecutively numbered.
[2]  Defendant Powder Springs was only accused of—and only found liable for—infringing claim 3 of the '686 patent.   (*See* D.I. 743).

1

After a separate damages trial (D.I. 822), the jury awarded Sunoco $12,200,958.44 in damages: $9,364,242.32 against Magellan and $2,836,716.12 against Magellan and Powder Springs for the Powder Springs System.   (D.I. 752).   Sunoco now requests enhanced damages, supplemental damages, pre-judgment and post-judgment interest, and ongoing royalties.   (D.I. 797).

## I.   ENHANCED DAMAGES

"[T]he court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.   Enhanced damages are "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior," which is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."   *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016).   Enhanced damages are "not to be meted out in a typical infringement case."   *Id.* at 103.   A jury's finding of willful infringement is a prerequisite to the enhancement of damages but is not by itself sufficient.   *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017).

Although not required, the court may consider the non-exclusive *Read* factors as part of its analysis.   *Id.* at 1382–83 (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992)). The *Read* factors include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct.   *Read*, 970 F.2d at 827.

2

For *Read* factor one, Sunoco argues that there is direct evidence of the opportunity to copy and circumstantial evidence that Magellan did copy. (D.I. 798 at 12–13). I disagree. The fact that Mr. Roles requested more information about Texon's systems does not show that Magellan copied these systems. Rather, Magellan presented evidence showing that it already had internal automated blending systems since 2001. (*See* Trial Tr. at 827:12–23 (Moyer)). Mr. Roles testified that he requested this additional information because he was determining whether to use Texon's or Magellan's systems at its Southeastern terminals. (Trial Tr. at 730:1–741:10 (Roles)). Thus, I find that factor one weighs against enhanced damages.

For *Read* factor two, Sunoco argues that Defendants had no good-faith belief of non-infringement or invalidity. (D.I. 798 at 9–10). Defendants respond that they did have a good-faith belief that their systems did not infringe because their systems (1) blended inline to a tank (not a rack), and (2) used feedback (not feedforward) control. (D.I. 807 at 7). In ruling on Defendants' motion for JMOL of no willful infringement, I found that there was substantial evidence supporting the jury's presumed finding that Defendants had no reasonable basis of non-infringement. (*See* D.I. 852 at 12–13). Thus, I find that factor two weighs in favor of enhanced damages.

For *Read* factor three, Sunoco argues that Defendants took litigation positions that were contrary to their pre-litigation positions. (D.I. 798 at 13–14). I disagree. I believe Defendants acted reasonably and in good faith in pursuing their defenses. Thus, I find that factor three weighs against enhanced damages.

For *Read* factor four, Sunoco asserts that Powder Springs profited over $74 million and Magellan profited over $500 million from their infringement. (*Id.* at 10–11). The jury's damages award of $12 million amounts to only 2% of these profits, so Sunoco argues that

3

enhancement is proper to allow for the proper deterrence effect.   (*Id.*).   I do not think it is

particularly relevant that the jury's damages award amounts to only 2% of Defendants' profits.

But given Defendants' financial success, I do not think enhancement would jeopardize

Defendants' financial well-being.   *See Vectura Ltd. v. GlaxoSmithKline LLC*, 2019 WL

4346502, at *4 (D. Del. Sept. 12, 2019), *related appeal*, 981 F.3d 1030 (Fed. Cir. 2020).   Thus,

I find that factor four weighs in favor of enhanced damages.

      For *Read* factor five, Sunoco argues that this case was not close because the jury returned

a verdict finding all claims valid and willfully infringed within four hours.[3]   (D.I. 798 at 11).   I

believe, however, that this case was relatively close.   Defendants presented considerable

evidence in support of their assertions of non-infringement and invalidity.   *See Siemens

Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, 2019 WL 3240521, at *9 (D. Del. July

18, 2019) ("Just because the jury found for Siemens on infringement, invalidity, damages, and

willfulness with respect to the EOT patents does not mean that the evidence could not have

supported a verdict for Westinghouse on each of these questions.").   Thus, I find that factor five

weighs against enhanced damages.

      For *Read* factor six, Sunoco argues that Defendants continued to infringe after the patent

examiner initially rejected their patent application in 2014, after this case was filed in 2017, and

after the jury verdict in 2021.   (D.I. 798 at 10).   Because the infringement period was long and

included post-litigation infringement, this factor weighs in favor of enhancement.

---

[3] I do not think the length of the jury's deliberations is a meaningful metric.   *Vectura*, 2019 WL
4346502, at *4 n.3.   Nonetheless, I think four hours of deliberations in a patent infringement
case is probably pretty close to the median.   Closing arguments and the verdict usually occur on
the same day.

For *Read* factor seven, Sunoco argues that Defendants never took any remedial measures by switching to non-infringing systems. (*Id.*). But, as Mr. Huff testified, one of the reasons Magellan switched its systems from feedforward to feedback prior to this suit was to avoid infringement. (Trial Tr. at 492:9–495:5 (Huff)). Given this and the closeness of the case, I find this factor to be neutral.

For *Read* factor eight, Sunoco points to the fact that Sunoco and Magellan directly competed for the Colonial bid. (D.I. 798 at 11–12). Sunoco argues that Magellan only beat out Sunoco for this bid because it offered its infringing design. (*Id.*). The evidence, however, shows that Colonial went with Magellan because it had more experience blending on large pipelines. (Trial Tr. at 956:17–959:3 (McLean)). "[O]rdinary competition driven by a profit motive does not constitute the motivation to harm with which this *Read* factor is concerned." *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 503 F. Supp. 3d 156, 180 (D. Del. 2020), *aff'd in part, vacated in part, rev'd in part on other grounds*, 30 F.4th 1109 (Fed. Cir. 2022). Thus, I find that factor eight weighs against enhanced damages.

For *Read* factor nine, Sunoco argues that Magellan never told Texon/Sunoco that it was using its own automated systems, despite the multiple discussions between the parties regarding Texon's patented systems. (D.I. 798 at 12). However, there is evidence that inventor Larry Mattingly knew Magellan had automated blending systems at the time he pitched the Texon systems to Magellan. (Trial Tr. at 409:16–410:21 (Mattingly)). In fact, Mattingly sent his own contractor to Magellan's terminal to examine Magellan's use of the Grabner online analyzer. (Trial Tr. at 397:25–403:14 (Mattingly)). This evidence refutes Sunoco's allegation of concealment.

5

Sunoco also argues that Magellan's request that its patent application not be published shows an attempt to conceal.  (D.I. 798 at 12).   I do not think this is persuasive evidence that Magellan was attempting to conceal its blending activities.   Thus, I find that factor nine weighs against enhanced damages.

On balance, the *Read* factors weigh against enhanced damages.   Sunoco's arguments do not persuade me that the facts of this case are egregious.   Therefore, despite the jury's finding of willful infringement, I do not think enhanced damages are warranted.

## II.    SUPPLEMENTAL DAMAGES

Sunoco asks this Court to award supplemental damages for Defendants' pre-verdict infringement from February 2019 through October 2021.   (*Id.* at 15–17).   "When the damages are not found by a jury, the court shall assess them."   35 U.S.C. § 284.   "The amount of supplemental damages following a jury verdict is a matter committed to the sound discretion of the district court."   *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1384 (Fed. Cir. 2013) (cleaned up).   "Typically, supplemental damages are calculated based on the jury's damages verdict."   *E.I. DuPont de Nemours & Co. v. Unifrax I LLC*, 2017 WL 4004419, at *7 (D. Del. Sept. 12, 2017) (citation omitted), *aff'd*, 921 F.3d 1060 (Fed. Cir. 2019).

The jury's verdict only compensated Sunoco for Defendants' infringement through January 2019.   During closing argument, Sunoco's counsel presented the jury with a total damages number of $12,200,958.44, which was calculated based on a royalty rate of $0.02/gallon multiplied by the infringing volumes in PTX 150 and PTX 152.   (Trial Tr. at 1486:9–22, 1488:20–1489:11).   Sunoco's counsel explained that the volumes in PTX 150 and PTX 152 "end in January 2019."   (*Id.*).   The jury awarded Sunoco's exact damages number.

6

(D.I. 752). Thus, I have no doubt that the jury only considered Defendants' infringement through January 2019 when assessing damages.

Yet, Defendants argue that Sunoco is not entitled to pre-verdict supplemental damages because Sunoco had Defendants' blending volumes through October 2021 before trial and failed to present these volumes to the jury. (D.I. 807 at 16–17). Sunoco argues, however, that it was unable to present these infringing volumes to the jury. (D.I. 798 at 16). Sunoco deposed Defendants' corporate witness Ms. Wheeler in May 2019, and she authenticated PTX 150 and PTX 152. (D.I. 302; Trial Tr. at 1364:8–1367:10 (Wheeler)). Sunoco received Defendants' updated blend volumes in April 2020, May 2021, and November 2021, after fact and expert discovery closed. (*See* D.I. 800, Exs. 1–7). The parties agree that there was no witness at trial or within subpoena range that Sunoco could have introduced these new volumes through. (*See* D.I. 807 at 17; D.I. 826 at 8). Defendants, however, fault Sunoco for not making any "attempts to remedy its authentication problem," such as by "ask[ing] Defendants to stipulate to the authenticity or admissibility of the updated data." (D.I. 807 at 17). But I am not sure these efforts would have been successful. (*See, e.g.*, D.I. 749 at 1–2 (Defendants objecting to the admission of PTX 150 and PTX 152)). I therefore agree with Sunoco that it had no practical means of presenting these new volumes to the jury.

Because the jury only compensated Sunoco for infringement through January 2019, I believe supplemental damages are necessary to properly compensate Sunoco for Defendants' infringement. The parties, however, dispute how these supplemental damages should be calculated. Sunoco contends that the supplemental damages should be calculated by multiplying the additional volumes by the $0.02/gallon royalty rate applied by the jury, removing 38% to account for the non-infringing volumes, as the jury did. (D.I. 798 at 17; D.I. 799, ¶¶ 3–

7

7).   The 38% figure was the average percentage of non-infringing (outbound) volumes to total volumes from 2012–2019.   (*See* Trial Tr. at 1437:23–1439:13 (Maness)).   Defendants argue that the proper base for supplemental damages should instead be the actual percentage of infringing volumes from the relevant time period.   (D.I. 807 at 18).   I agree.   Using the actual percentage of infringing volumes, rather than an average percentage of infringing volumes from an earlier time period, will properly compensate Sunoco for Defendants' actual infringement.

Thus, I will award Sunoco supplemental damages for the period from February 2019 through October 2021, based on the actual infringing volumes for that period and a $0.02/gallon royalty rate—i.e., a total of $6,479,508.   (D.I. 808, ¶¶2–8; D.I. 808-1, Exs. 1–2).

Sunoco also asks for an accounting and supplemental damages for Defendants' pre-verdict and post-verdict infringement beyond October 2021, because Defendants have not produced these updated volumes.   (D.I. 798 at 17).   Sunoco contends that the proper accounting period is from November 1, 2021 to the date of entry of final judgment for Magellan, and from November 1, 2021 to December 16, 2021 for Powder Springs.   (*Id.*).[4]   Sunoco's proposed accounting period for Magellan, however, fails to account for the fact that the asserted patents have since expired.   The '302 and '629 patents expired on February 8, 2022.   (D.I. 773 at 3–4).   The '686 patent expired on April 5, 2022.   (D.I. 764 at 3 n.3).   Thus, the proper accounting period for Magellan is from November 1, 2021 through the expiration date of the '686 patent, April 5, 2022.

Sunoco is entitled to compensation for Magellan's infringement between November 1, 2021 and April 5, 2022, and for Powder Springs' infringement between November 1, 2021 and

---

[4] Defendants do not appear to dispute this request.   (*See* D.I. 807 at 13–18).

8

December 16, 2021.[5]  *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (Fed.

Cir. 2009) ("A damages award for pre-verdict sales of the infringing product does not fully

compensate the patentee because it fails to account for post-verdict sales of repair parts."); *Metso*

*Mins., Inc. v. Powerscreen Int'l Distrib. Ltd.*, 833 F. Supp. 2d 333, 347 (E.D.N.Y. 2011)

("Courts routinely grant motions for a further accounting where the jury did not consider certain

periods of infringing activity *post*-verdict.").  Thus, I grant Sunoco's request for an accounting

and supplemental damages for this time period using the same method applied above.[6]

## III.    PRE-JUDGMENT INTEREST

Pre-judgment interest should be awarded "absent some justification for withholding such

an award." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983).  Plaintiff seeks pre-

judgment interest at the prime rate, compounded quarterly.  (D.I. 798 at 17–18; D.I. 799, ¶¶ 8–

12).  This Court has noted that the prime rate, compounded quarterly, best compensates a

patentee.  *Vectura*, 2019 WL 4346502, at *2.

Defendants argue that Sunoco should not be awarded pre-judgment interest for the

eleven-month delay it caused by requesting a continuance of the trial.  (D.I. 807 at 18–20).  The

Supreme Court has explained, "[I]t may be appropriate to limit prejudgment interest, or perhaps

even deny it altogether, where the patent owner has been responsible for undue delay in

prosecuting the lawsuit." *Gen. Motors Corp.*, 461 U.S. at 657.  On July 2, 2020, the Court

announced that, in light of the COVID-19 pandemic, all witnesses would testify remotely at the

---

[5] This is the date Defendants switched to a manual blending system at Powder Springs to avoid
further infringement.   (D.I. 782 at 1; D.I. 782-2, Ex. 2 (Hitz Decl.)).
[6] Sunoco also requests ongoing royalties for Magellan's infringing systems.  (D.I. 798 at 19–
20).   Because the asserted patents have expired, this request is now moot.   Given my award of
post-verdict supplemental damages, Sunoco will be properly compensated for all infringement.

9

jury trial scheduled to begin on August 3, 2020.   (D.I. 583).   On July 10, 2020, Sunoco

unilaterally requested a continuance until the trial could be held in person, raising "strong

concerns regarding the ability to conduct a fair jury trial."   (D.I. 590).   The Court granted the

continuance.   (D.I. 593).

      I think Sunoco's request for a continuance was perfectly reasonable given the COVID-19

pandemic and the inability to conduct an in-person jury trial.   In fact, Defendants also expressed

that they "do not believe they can receive a fair trial if all the witness examinations must be

handled remotely."   (D.I. 580 at 5).   I therefore do not think Sunoco's requested continuance is

a proper basis for denying pre-judgment interest.

      Thus, I will award pre-judgment interest at the prime rate, compounded quarterly.   (*See*

D.I. 799, ¶¶ 8–12).[7]

## IV.    POST-JUDGMENT INTEREST

      Post-judgment interest is governed by 28 U.S.C. § 1961.   Section 1961(a) provides, "Such

interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly

average 1-year constant maturity Treasury yield, as published by the Board of Governors of the

Federal Reserve System, for the calendar week preceding the date of the judgment."   The interest

is computed daily and compounded annually.   28 U.S.C. § 1961(b).

      Thus, I will award Sunoco post-judgment interest at the Treasury bill rate as defined in §

1961(a), compounded annually.   (*See* D.I. 799, Exs. 1–2).

---

[7] This amount shall include any pre-judgment interest for supplemental damages.   *See Hologic, Inc. v. Minerva Surgical, Inc.*, 957 F.3d 1256, 1274 (Fed. Cir. 2020), *vacated on other grounds*, 141 S. Ct. 2298 (2021).

## V.   CONCLUSION

An appropriate order will issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SUNOCO PARTNERS MARKETING &
TERMINALS L.P.,

       Plaintiff,

   v.

POWDER SPRINGS LOGISTICS, LLC, and
MAGELLAN MIDSTREAM PARTNERS,
L.P.,

       Defendants.

Civil Action No. 17-1390-RGA

ORDER

For the reasons stated in the accompanying Memorandum, IT IS HEREBY ORDERED that Plaintiff's Post-Trial Motion for Enhanced Damages, Supplemental Damages, Pre-Judgment and Post-Judgment Interest, and Ongoing Royalties (D.I. 797) is GRANTED with respect to supplemental damages, pre-judgment interest, and post-judgment interest, and DENIED with respect to enhanced damages and ongoing royalties.

Entered this 31st day of August, 2022.

United States District Judge

Appx162



US006679302B1

(12) **United States Patent**
Mattingly et al.

(10) Patent No.: **US 6,679,302 B1**
(45) Date of Patent: **Jan. 20, 2004**

(54) **METHOD AND SYSTEM FOR BLENDING GASOLINE AND BUTANE AT THE POINT OF DISTRIBUTION**

(75) Inventors: **Larry D. Mattingly**, Sanford, FL (US); **Steven M. Vanderbur**, Houston, TX (US)

(73) Assignee: **MCE Blending, LLC**, Sanford, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/071,191**

(22) Filed: **Feb. 8, 2002**

**Related U.S. Application Data**

(60) Provisional application No. 60/267,844, filed on Feb. 9, 2001.

(51) Int. Cl.[7] ............................................... **B65B 1/04**
(52) U.S. Cl. ........................... **141/104**; 141/9; 141/83; 137/486; 137/625.41
(58) Field of Search ........................... 141/9, 100, 104, 141/94, 83, 192, 198; 222/25, 26, 71, 72; 137/486, 625.41

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,751,644 A | * | 8/1973 | Mayer ........................ 700/268 |
| 3,813,925 A | | 6/1974 | Fenske et al. |
| 3,904,508 A | | 9/1975 | Whyte et al. |
| 3,999,959 A | | 12/1976 | Bajek |
| 4,268,701 A | | 5/1981 | Dang Vu et al. |
| 5,004,850 A | | 4/1991 | Wilson |
| 5,093,533 A | | 3/1992 | Wilson |
| 5,208,402 A | | 5/1993 | Wilson |
| 5,423,607 A | | 6/1995 | Jones et al. |
| 5,823,669 A | | 10/1998 | Jones |
| 5,860,457 A | * | 1/1999 | Andersson ................. 141/59 |
| 5,975,353 A | * | 11/1999 | Finlayson ................. 222/26 |
| 5,979,705 A | * | 11/1999 | Kaehler et al. ............ 222/71 |

OTHER PUBLICATIONS

EPA Q & A Date Oct. 3, 1994; Abstract.
Grabner Instruments; About Vapor Pressure Testing; From Grabner Instruments website, (no date).
Haskell et al., Front–End Volatility of Gasoline Blends, *Industrial and Engineering Chemistry*, vol. 34, No. 2, Feb., 1942, p. 167–170.
Stewart, Warren E., Predict RVP of Blends Accurately, *Petroleum Refiner*, vol. 38 No. 6, Jun. 1959, p. 231–234.
Standard Test Method for Vapor Pressure of Petroleum Products (Reid Method)[1]; From Petrolab website, (no date).
Vazquez–Esparragoza et al., How to Estimate Reid Vapor Pressure (RVP) of Blends, Bryan Research & Engineering, Inc. website, *Encyclopedia of Chemical Processing and Design*, vol. 47, p 415–424; *Hydrocarbon Processing*, Aug. 1992, p 135–8.
Compliance Monitoring for Vapor Pressure or Vapor–Liquid Ratio Temperature, MiniVap On–line, Petrolab Company website, (no date).

\* cited by examiner

*Primary Examiner*—Steven O. Douglas
(74) *Attorney, Agent, or Firm*—Robert T. Neufeld; Clark G. Sullivan; King & Spalding LLP

(57) **ABSTRACT**

A system and method is provided for blending butane with gasoline at petroleum tank farms, immediately before distribution to tanker trucks. The invention provides a method for blending gasoline and butane at a tank farm comprising: (a) drawing a gasoline stream from a tank of gasoline; (b) drawing a butane stream from a tank of butane; (c) blending the butane and gasoline streams to form a blend; and (d) dispensing the blend. The blending process can be controlled to ensure that the vapor pressure of the blended gasoline meets vapor pressure requirements of environmental regulations. Information generated by the blending process can be used to efficiently forecast butane purchasing requirements, and to generate regulatory reports.

**41 Claims, 5 Drawing Sheets**



BLENDING ARCHITECTURE OVERVIEW



Plaintiff's Trial Exhibit
**1**
1:17-cv-01390-LPS-CJB

SUN_MAG_0000302

**PTX-1.1**



BLENDING ARCHITECTURE OVERVIEW

# FIG 1

SUN_MAG_0000303

**PTX-1.2**

Appx164



BLENDING SYSTEM COMPONENTS
265
250
PROCESSOR
125
PRODUCT TO TRANSPORT
GRABNER ONLINE ANALYZER
120
275
INJECTOR
270
M-101
12" PREMIUM
12" REGULAR
12" REGULAR
285
290
PI
0-300
PT
1/2"
4"X2"
M-102
280
P-102
M-103
1/4"
P-103
P-104
260
115
GASOLINE TANK
255
220
2" PURGE OPENING
235
TI
PSV
225
110
205
230
LT
LI
60,000 GALLON BUTANE TANK
PI
0-200
240
EXCESS FLOW 400 GPM
P-101
217
212
222
215
210
6"
4"
PCV
SET @ 150 PSIG
0-300
245
4"BYPASS

FIG 2

**BLENDING PROCESS OVERVIEW**



FIG 3

SUN_MAG_0000305

**PTX-1.4**

Appx166



FIG 4

SUN_MAG_0000306

PTX-1.5

Appx167

PROCESS FOR ASSESSING BUTANE MARKET

WITH CONSUMPTION DATA



FIG. 5

**PTX-1.6**

Appx168

US 6,679,302 B1

1

## METHOD AND SYSTEM FOR BLENDING GASOLINE AND BUTANE AT THE POINT OF DISTRIBUTION

### RELATED APPLICATION

The present application claims priority to U.S. provisional application entitled "Method and System for Blending Gasoline and Butane at the Point of Distribution," filed on Feb. 9, 2001, having Ser. No. 60/267,844.

### TECHNICAL FIELD

The present invention generally relates to blending gasoline and butane at gasoline tank farms. More specifically, it allows for simple and accurate blending of gasoline and butane at the point of distribution, based upon the volatility of the gasoline before blending, and a prescribed level of volatility after blending.

### BACKGROUND OF THE INVENTION

Gasoline distribution systems typically rely upon pipelines to deliver gasoline from refineries to tank farms. At the tank farms gasoline is stored until it is dispensed to gasoline tanker trucks. The tanker trucks deliver the gasoline to retail gasoline stations and other dispensing outlets where the gasoline is eventually delivered to an automobile, truck, or other vehicle.

A significant physical property of gasoline is its volatility, or its ability to combust. There are two principle methods for assessing the volatility of gasoline: (1) measuring the vapor-liquid ratio, and (2) measuring the vapor pressure. The Reid method is the standard test for measuring the vapor pressure of petroleum products. Reid vapor pressure (sometimes "RVP") is related to true vapor pressure, but is a more accurate assessment for petroleum products because it considers sample vaporization as well as the presence of water vapor and air in the measuring chamber. The Reid vapor pressure of gasoline affects the ease with which gasoline is combusted, and can have a significant impact on the ease with which an automobile engine is started, especially during colder seasons when the temperature of gasoline and its corresponding volatility decreases.

In order to keep cars performing at a consistent level year-round, gasoline marketers blend agents with gasoline that increase the Reid vapor pressure and volatility of the gasoline. Butane is commonly added as a RVP modifying agent during colder months because it is more volatile than gasoline. It is also added to reduce the cost of gasoline, because it is generally less expensive than gasoline bought at the wholesale level.

The United States Environmental Protection Agency (EPA) is concerned with gasoline vapor pressure because gasoline vapor emissions from automobiles are a major component of VOC's (volatile organic compounds) in the atmosphere. Gasoline vapor emissions are of particular concern during the warmer months when gasoline is more volatile. Accordingly, the EPA has promulgated a number of regulations that govern the volatility of gasoline, and how much butane can be blended with gasoline during May 1 through September 15. For each occasion that butane is blended with gasoline during this time period, the EPA requires that the mixture be certified to ensure that it is within the volatility guidelines.

Butane has historically been blended with gasoline at several points in the gasoline distribution chain. The first opportunity to blend butane with gasoline is at the refinery,

2

before pipelines transport the gasoline to tank farms. Refineries often add butane at the trunk line in response to changes in Reid vapor pressure demand. This process is imprecise, however, because the blended gasoline is subsequently mixed in the pipeline with other sources of gasoline of varying Reid vapor pressure. Moreover, because gasoline pipelines serve multiple regions that have variable RVP requirements, the refinery can only modify the gasoline to the lowest maximum RVP allowed by the EPA across the various regions served by the pipeline.

Butane is also added to gasoline while it is transported in the pipeline, after consolidation of various trunk lines from refineries. Typically, butane will be added to a certain volume of gasoline with a constant volatility. However, it is difficult to perform blending in the pipeline with any measure of precision. The rates of flow within the pipelines and the Reid vapor pressure of a certain volume of gasoline within the pipeline vary considerably. An additional difficulty is that the pipeline must be physically breached in at least two locations to sample the gasoline, and to add butane to the flow of gasoline. Breaching a high volume gasoline pipeline carries with it large risks that most pipeline operations would prefer to avoid.

The third point of blending is at the tank farm. When delivery of gasoline is made to a large storage tank, the RVP of the tank is measured, and sufficient butane is added to the tank to attain a desired RVP. Because tanks farms generally service a smaller area than an entire pipeline, blending at the tank farm can be more narrowly tailored to the RVP requirements of a particular region. Blending in tanks at the tank farm is performed with existing valves in tanks to introduce the butane, and thus does not entail risks similar to butane blending during gasoline transport through a pipeline.

However, blending butane at tank farms is not without its complications. Each time that gasoline is introduced to a tank, the RVP must again be measured, and butane must be added to the, tank to attain a desired RVP. Often, gasoline will be dispensed to several tanker trucks before the butane can be blended, thus losing the opportunity to blend butane in those shipments. Moreover, blending butane in tanks is labor intensive and imprecise. Because the RVP of gasoline varies within a tank, several measurements must be taken throughout the tank, and considerable stirring must occur to maximize homogeneity.

All of the foregoing methods suffer from a substantial degree of impression. In view of this impression, gasoline suppliers are unable to maximize the amount of butane blended with gasoline. In particular, during summer months, government regulations currently require recertifying of gasoline each time butane is blended. The cost of this additional certification vitiates gains that could be achieved with additional blending at the tank farm.

Several methods have been attempted to improve the precision of butane blending and the predictability of Reid vapor pressure in the final product. The Grabner unit is a substantial advance in this respect. The Grabner unit (manufactured by Grabner Instruments) is a measuring device capable of providing Reid vapor pressure and liquid-vapor ratio data for a gasoline sample typically within 6–11 minutes of introducing the sample to the unit. It has been employed at some refineries to consistently measure the volatility of gasoline, and to blend butane with the gasoline based upon an allowable RVP for the gasoline. There are also other commercially available instruments for assessing the volatility of gasoline.

Although the Grabner unit can provide more accurate assessments of gasoline volatility at the refinery, a need

SUN_MAG_0000308

**PTX-1.7**

US 6,679,302 B1

5

is capable of being blended according to the present invention, and is thus encompassed within the term "gasoline." The term butane includes n-butane, isobutane, and commercially available butane in the presence of like-fraction hydrocarbons.

The tanks often hold in excess of 500,000 gallons of petroleum product, and are surrounded by berms to capture any petroleum spills. Such facilities typically receive their petroleum products from petroleum pipelines that consolidate refined petroleum products from a number of refinery trunk lines, although tank farms can also be supplied only from one refinery, or from a coastal or freshwater port that receives refined petroleum products by boat. As used herein, the term "tank farm" only includes tank farms that distribute petroleum products to petroleum tanker trucks.

The dispensing unit can be any type of unit that is adapted for dispensing petroleum products to conventional receptacles mounted on petroleum tanker trucks. One typical dispensing unit is called a "rack" and is located on the tank farm. The dispensing unit can comprise several outlet ports to which different transports may be coupled. Generally, a transport driver connects the transport to the dispensing unit and selects the desired grade of gasoline. The selection of gasoline initiates the blending process. In the description that follows, gasoline can include gasoline, as well as other types of refined petroleum products such as diesel and jet fuel.

The blending unit can be any conventional apparatus that achieves blending of two or more separate streams into one. For example, the unit can be a Y-type or T-type junction that consolidates two independent streams. Alternatively, the blending unit can be an injector, which selectively injects butane into a gasoline stream.

The ratio at which the gasoline and butane streams are blended can be controlled at a variety of points along the path of travel for the gasoline and butane, using a variety of methods. In the injection method discussed above, the ratio can be controlled simply by varying the rate at which butane is injected into a gasoline stream flowing at a substantially constant rate. Alternatively, the ratio can be controlled by varying the rate at which gasoline and/or butane is supplied to the blending unit. The rate can be controlled by adjusting valves located between the tank and the blending unit, or by varying the output of pumps that control the flow of butane and/or gasoline to the blending unit.

In the description of the embodiments of the invention and the claims that follow, measuring the vapor pressure will refer generally to the volatility of the gasoline or butane. Indeed, the term vapor pressure is meant to encompass both Reid vapor pressure as measured by applicable ASTM procedures, and other measures of vapor pressure such as true vapor pressure and vapor/liquid ratio. It should be understood that vapor pressure measurements can also include a measurement of the vapor-liquid ratio at a certain temperature. In certain embodiments of the present invention measurements may be taken for both vapor pressure and vapor-liquid ratio. Furthermore, the vapor pressure measurement can include other methods for assessing the volatility of either the gasoline, or the butane, or both. A variety of instruments may be used for assessing the volatility of the gasoline and butane. The Grabner instrument is one such instrument which is discussed herein. The terms sensor and analyzer can be used to generally refer to the instrument that is measuring the volatility of the gasoline or butane.

In a preferred embodiment the gasoline and butane are blended by a variable ratio blending unit, in which the ratio

6

of gasoline and butane is controlled and/or varied by any of the foregoing mechanisms. In a particularly preferred embodiment, the gasoline and butane are blended at a ratio which is selected to attain a prescribed vapor pressure in the blended product. The prescribed vapor pressure can be based upon many considerations, including the maximum vapor pressures allowable by federal or state regulations for a particular region at a particular time of year, or to maximize automobile performance in view of the regional climate and elevation.

The variable ratio blending unit is preferably under the separate control of a process control unit, which dictates and controls the ratio at which butane and gasoline are blended based upon the prescribed vapor pressure. The process control unit receives measurements of the vapor pressure of the butane and gasoline, and from those measurements calculates the ratio at which the butane and gasoline should be blended to achieve the prescribed vapor pressure. Based upon those calculations, the process control unit emits a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit.

Thus, in one embodiment, the system comprises a process control unit, wherein the process control unit generates a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit. In still another embodiment the ratio input signal is derived from a calculation of the ratio of butane and gasoline that will yield a desired vapor pressure.

Numerous methods exist for calculating the ratio at which butane and gasoline should be mixed to attain the prescribed vapor pressure. In addition, there are a number of methods for describing the vapor pressure of a liquid. The most common way for measuring the vapor pressure of petroleum products is the Reid vapor pressure (sometimes "RVP") test. The most common test for RVP of petroleum fractions is defined by the American Society for Testing and Materials under the designation ASTM 5191. The American Petroleum Institute describes a predecessor RVP test procedure (ASTM D323-56) in detail, including suitable apparatus for such measurements, in "Measuring, Sampling, and Testing Crude Oil," Bulletin 2500, API, New York, January 1955, the disclosure from which being hereby incorporated by reference as if fully set forth herein. Other American Petroleum Institute Publications show charts relating RVP and ASTM boiling characteristics of gasolines and crude oils to true vapor pressure, a way to estimate the RVP of blends, and the relation of RVP to evaporation losses. See, e.g., American Petroleum Institute, Bulletin 2513, API, New York 1959; American Petroleum Institute Bulletin 2516, API, New York, March 1962; American Petroleum Institute Bulletin 2518, API, New York, June 1962.

Recently, ASTM D 6378 was published as a standard for measuring vapor pressure of gasoline by double injection or triple expansion. Measurements by this standardan be made by instruments manufactured by Grabner Instruments, Vienna, Australia, under the trade name Minivap, with the Minivap On-line being particularly suitable for applications of the present invention. There are also other commercially available instruments for measuring the volatility of petroleum products which could be used with this invention.

The blend ratio of butane to gasoline required to attain a prescribed vapor pressure can be determined simply by direct volumetric averaging of the RVP of the butane and gasoline. However, it has been noted in the literature that volumetric averaging can yield low estimates of resultant RVP, especially when the amount of butane added is less

SUN_MAG_0000310

**PTX-1.9**

US 6,679,302 B1

7

than 25%. Methods for determining blend ratios to attain a prescribed Reid vapor pressure, which overcome these observed limitations on volumetric averaging, are set forth more fully in "How to Estimate Reid Vapor Pressure (RVP) of Blends," J. Vazquez-Esparragoza, Hydrocarbon Processing, August 1992; and "Predict RVP of Blends Accurately," W. E. Stewart, Petroleum Refiner, June 1959; and "Front-End Volatility of Gasoline Blends," N. B. Haskell et al., Industrial and Engineering Chemistry, February 1942, the disclosure from each being hereby incorporated by reference as if fully set forth herein. Moreover, it should be noted that the system of the present invention can be modified to periodically sample the RVP of the resultant blend for quality control, when quality control is of concern.

To calculate the blend ratio one must first have knowledge of the respective vapor pressures of the gasoline and butane streams. Therefore, the vapor pressures of the gasoline and butane streams are preferably measured in order to generate the data used in the blending ratio calculation. The measurement can be carried out in a number of ways. Because of the variability in-vapor pressure of gasoline (due to the varying composition of gasoline delivered through pipelines) and butane (due to the difference in vapor pressure of n-butane and isobutane), the vapor pressure is preferably measured directly, by a unit specifically designed to make such measurements from samples of gasoline and butane. One such unit-is the Minivap Online analyzer manufactured by Grabner Instruments (Vienna, Austria).

As mentioned, the Grabner unit performs its analysis of vapor pressure based upon samples of the gasoline and/or butane. Samples of the gasoline and butane can be drawn from the system at any point upstream of the point where butane and gasoline are physically mixed. However, the samples are preferably drawn from the butane and/or gasoline stream after such butane and/or gasoline has been drawn from the storage tanks, because of the lack of product uniformity within these large tanks.

Therefore, in one embodiment the system further comprises a butane vapor pressure sensor for measuring the vapor pressure of butane upstream of the blending unit, and a gasoline vapor pressure sensor for measuring the vapor pressure of gasoline upstream of the blending unit, wherein the ratio input signal is generated from the vapor pressures of gasoline and butane measured by the sensors. In a preferred embodiment the gasoline and butane vapor pressure sensors appear almost as one unit with the blending unit, and measure the vapor pressure of gasoline and butane within the blending unit immediately before blending. In one particular embodiment,the vapor pressures of the gasoline and butane are determined by: (a) drawing a sample of gasoline from the gasoline stream; (b) measuring the vapor pressure of the sample of gasoline; (c) returning the sample of gasoline to the gasoline stream; (d) drawing a sample of butane from the butane stream; (e) measuring the vapor pressure of the sample of butane; and (f) returning the sample of butane to the gasoline stream.

As mentioned above, the vapor pressure of gasoline within a large tank can vary considerably over time. It is therefore necessary to monitor the vapor pressure of the gasoline and butane streams with some degree of frequency. The vapor pressure need not be measured continuously because the vapor pressure of the gasoline can be expected to remain substantially constant over short periods of time. To assure good uniformity in the butane/gasoline blend, it has been found desirable generally to measure a substantially continuous stream of gasoline about every 6 to 15 minutes (pumping at conventional rates for dispensing gaso-

8

line to tanker trucks). Whenever such measurements are made, the process control unit receives the measurements, recalculates the ratio at which the butane and gasoline must be blended to attain the prescribed vapor pressure, and varies the ratio of butane and gasoline blended through the applicable control mechanism.

Thus, in still another embodiment, the invention provides a process control unit that; comprises one or more information processing units capable of transforming measurements from the gasoline and butane vapor pressure sensors into the ratio input signal, and maintaining or varying the ratio of gasoline and butane blended in the blending unit. In one embodiment the step of determining the blend ratio comprises: (a) setting a predetermined value for the vapor pressure of the blend, and transmitting that value to a processing unit; (b) transmitting the gasoline and butane vapor pressures to a processing unit; (c) calculating the blend ratio from the gasoline and butane vapor pressures and the predetermined value. A signal that corresponds to the blend ratio from the processing unit is then preferably transmitted to a programmable logic control, which adjusts the ratio of butane and gasoline blended in the blending unit.

The level of information control over the butane blending process of this invention offers substantial opportunities to improve the efficiencies associated with butane purchasing decisions. The timing of butane purchases is a critical element of any butane purchasing program given the variability in spot and futures prices of butane on the commodities markets. The present invention offers the opportunity to accurately and efficiently project butane purchasing needs from the butane consumption data from a butane blending process at a tank farm. Because the consumption of butane will vary over time due to a number of factors, the projections can be made even more accurate by taking into consideration the factors that cause these consumption rates to vary.

For example, environmental regulations dictate allowable Reid vapor pressure for gasoline sold from tank farms at various times of the year, and for various regions. The allowable Reid vapor pressure is, of course, a determining factor when calculating the amount of butane that can be blended with gasoline in the blending system of this invention. By taking into account the timing of these regulatory changes, for the particular region in which a tank farm is situated, one can more accurately forecast the rate at which butane will be consumed by the tank farm and predict the market demand for butane.

In a similar manner, butane purchases can be timed to account for variability in the Reid vapor pressure of gasoline supplied to a tank farm. There is substantial variability in the gasoline received from commercial pipelines, and this variability can be taken into consideration, based upon the timing of gasoline deliveries to the tank farm, to more accurately forecast butane purchasing decisions as well.

These efficiencies can be especially realized when the butane purchasing decision for more than one tank farm are centralized in one purchaser, who has access to the butane consumption and forecasting data for all of the tank farms. For example, the purchaser of butane for multiple tank farms is able to shift butane supplies among the various tank farms based upon butane consumption rates, the timing of butane purchases, and seasonal variations in butane consumption among various regions. Moreover, because the purchaser controls butane for a number of tank farms, he can negotiate volume discounts and better rates.

Thus, in one embodiment the invention provides a method for optimizing butane purchase decisions for a petroleum

SUN_MAG_0000311

**PTX-1.10**

US 6,679,302 B1

9                                                        10

products tank farm comprising: (a) in an information processing unit, setting a value for the quantity of butane in a tank at time zero; (b) drawing a butane stream from the tank of butane; (c) blending the butane stream with gasoline for a first interval of time from time zero until time one; (d) monitoring the consumption of butane blended with the gasoline during the first interval of time, and transmitting data regarding the consumption during the first interval of time to the information processing unit; and (e) transforming the consumption data during the first interval of time, and the butane quantity at time zero, to an output of data comprising the butane consumption rate during the first interval of time, and the quantity of butane in the tank at time one.

In another embodiment, the method is performed repetitively, by (a) blending the butane stream with gasoline for a second interval of time from time one until time two; (b) monitoring the consumption of butane blended with the gasoline during the second time interval, (c) transmitting data regarding the consumption during the second time interval to the information processing unit; (d) transforming the consumption data during the second interval of time, and the butane quantity at time one, to an output of data comprising the butane consumption rate during the second interval of time, and the quantity of butane in the tank at time two; and (e) repeating steps (a) through (d) for one or more succeeding intervals of time.

Because the invention is particularly appropriate for the butane blending system of the present invention, in which the butane and gasoline are blended to attain a prescribed vapor pressure level the invention preferably further provides (a) inputting to the information processing unit a plurality of time dependent vapor pressure values; (b) blending the butane and gasoline at ratios that attain the time dependent vapor pressure values; and (c) transforming the time dependent vapor pressure values, and the consumption rate of butane over the first interval of time, to data output comprising a projected rate of butane consumption.

In still another embodiment the information gathered by the information processing unit of the present invention is manipulated to generate reports of butane consumption, gasoline consumption, and the vapor pressure of butane, gasoline, and blended gasoline sold by petroleum tank farms. These reports are typically required by regulatory officials to assure compliance with the law.

It should further be added that the systems of the present invention could be adapted to facilitate blending of gasoline with other fuels that would alter the volatility of the gasoline. Therefore, any of the embodiments and subembodiments discussed herein should be considered also to extend to any such fuel that alters the volatility of gasoline, and which can be mixed with gasoline for retail distribution and use. Such other fuels shall hereinafter be referred to as volatility modifying agents. Such volatility modifying agents preferably only include agents whose primary function is as a source of combustible fuel.

Referring to FIG. 1, this is an illustration of an overview of an exemplary butane blending system that operates at the distribution point. By blending butane at the final opportunity before distribution, at the tank farm, the amount of butane blended with the gasoline can be maximized. In FIG. 1, the main components of the blending system are a butane supply 110, a gasoline supply 115, an analyzing and blending unit 120, and a transport 125. The butane supply 110 typically consists of a large tank of butane with lines for refilling with butane and for drawing off butane vapor. The

butane tank will also generally have the appropriate safety valves, pressure gauges and temperature gauges. The butane supply 110 feeds into the analyzing and measuring unit 120 through one or more pipelines.

The gasoline supply 115 typically consists of a large tank or plurality of tanks at the tank farm that supply gasoline to the analyzing and blending unit 120 through pipelines. The gasoline supply may consist of a series of tanks, each providing different grades of gasoline to the analyzing and blending unit 120. Generally, the gasoline tanks are frequently supplying gasoline to the analyzing and blending unit 120 and receiving new supplies of gasoline from various refineries. This frequent turnover of gasoline in the tank makes it difficult to accurately assess the vapor pressure of the gasoline supply in the tank.

Although they are shown as one unit in FIG. 1, the analyzing and blending unit 120 may comprise a separate analyzer and separate blender in alternative embodiments of the invention. Typically, the analyzing and blending unit 120 is triggered when a transport 125 selects a gasoline. The transport 125 connects to a rack which dispenses different grades of gasoline and a transport operator selects a particular grade. The analyzing and blending unit 120 draws samples from the butane supply 110 and the gasoline supply 115 to determine how much butane can be blended with the gasoline. Often, butane will have been blended with the gasoline at earlier stages in the refining and distribution chain. However, the analyzing and blending unit 120 determines the maximum amount of butane that can be blended with the gasoline. The maximum amount of butane corresponds to the maximum volatility of the butane as established by engine requirements or government regulations. Once the analyzing and blending unit 120 determines how much butane to blend, the butane is injected into the gasoline flowing from the gasoline supply 115. The blended combination then flows into the transport 125.

Generally, it takes approximately eight minutes to load a transport with blended gasoline. Significantly, a typical analyzing unit requires six to eleven minutes to extract a sample and determine the vapor pressure. Therefore, taking a sample for every load of gasoline that goes into a transport 125 would be an inefficient use of time and resources. Accordingly, in the preferred embodiment of the present invention, gasoline and butane samples are not measured for every load that goes into a transport 125. Rather, vapor pressure measurements are taken periodically and those measurements are used to control the flow of butane and gasoline during that period of time.

FIG. 2 is a schematic diagram illustrating in greater detail the exemplary butane blending system described in FIG. 1. Referring to FIG. 2, the butane supply 110 comprises a butane tank 205, an inlet line 210, a vapor outlet line 215 and an outlet line 220. The butane tank 205 is filled with butane through the inlet line 210. Vapor is released from the butane tank 205 through 30 the vapor outlet line 215. The butane supply 110 may further comprise one or more pressure safety valves 225, a level indicator 230, temperature gauges 235, and pressure gauges 240.

Butane is supplied to the analyzing and blending unit 120 by the outlet line 220. The butane supply 110 may further comprise a bypass line 245 in fluid connection with the butane tank 205 and the outlet line 220. The bypass line 245 is operable for maintaining constant pressure in the outlet line 220.

The gasoline supply 115 is stored in one or more gasoline tanks 255 at the tank farm. Different tanks may contain

SUN_MAG_0000312

**PTX-1.11**

US 6,679,302 B1

11

different grades of gasoline. Gasoline is provided to the analyzing and blending unit 120 through one or more gasoline lines 260.

When a transport arrives at the tank farm, a transport operator selects a particular grade of gasoline for the transport load. Selection of a gasoline grade initiates the analyzing and blending process. A sample of butane is drawn from the outlet line 220 and supplied to the analyzer 250 where the vapor pressure of the butane is measured. Similarly, a sample of gasoline is drawn from the gasoline line 260 and supplied to the analyzer 250 where the vapor pressure of the gasoline is measured. In an alternative embodiment of the invention, the vapor-liquid ratio of the gasoline may be measured instead of, or in conjunction with the vapor pressure, to assess the volatility of the gasoline. Other embodiments of the invention may measure other physical characteristics to determine the volatility of the gasoline. A typical analyzer 250 is the Minivap Online analyzer manufactured by Grabner Instruments. Generally, one or more pumps 280 draw the butane and gasoline samples into the analyzer 250. After the analyzer 250 takes measurements, the samples are returned to the butane outlet line 220 and the gasoline line 260. The flow of the butane and gasoline samples is monitored by flow transmitters 285. Data from the flow transmitters 285 may be communicated to a processor 265 via remote logic units 290 to ensure that there is a sample flow to the analyzer 250.

Once the volatility of the samples is measured, the analyzer 250 sends measurement data for the samples to the processor 265. The processor 265 calculates the amount of butane that can be blended with the gasoline so that the maximum allowable volatility of the gasoline is not exceeded. The processor 265 is coupled to one or more programmable logic controllers 270 that control injectors 275. The injectors 275 are connected to the outlet line 220 and control the flow of butane into the gasoline line 260. The blended gasoline then flows through the gasoline line 260 to the transport 125.

The system provides for accurate and prompt assessment of the volatility of the gasoline. This accurate measurement enables the distributor to blend the maximum allowable amount of butane with the gasoline.

FIG. 3 is a flow chart diagram setting forth an overview of an exemplary blending process. In step 310, the blending process is initiated when a transport 125 connects to a distribution unit. Typically, the transport 125 connects to a mechanism for distributing several grades of gasoline called a rack. In step 315, the transport operator selectsi the desired grade of gasoline.

In step 320, the analyzing and blending unit 120 draws samples of gasoline and butane to determine the ratio of blending. It is the precision of the present invention that allows a distributor to blend more gasoline than would be possible with the prior art. In step 325, the properly blended butane and gasoline flows to the transport 125.

FIG. 4 sets forth the operations of the analyzing and blending process, step 320, in greater detail. The method of the present invention supports more accurate and efficient blending than available with prior art. In step 405, the analyzer 250 draws a sample from the butane outlet line 220. In step 410, the analyzer draws a sample from the gasoline line 260. Typically, butane is added to gasoline at other points in the distribution line before reaching the tank farm. However, the amount of butane added often varies. Furthermore, different sources of gasoline are often combined at the tank farm in one large gasoline tank. By

12

positioning the analyzer 250 at the distribution point, the present invention allows a distributor to efficiently and directly measure a sample of gasoline from the volume that will comprise the next load taken by a transport 125. In step 415, the analyzer 250 assesses the volatility of the butane sample and gasoline sample. The volatility of the samples is determined by measuring the vapor pressure of both the butane and the gasoline. The Reid vapor pressure test is generally employed when measuring the volatility of petroleum products. In step 420, the analyzer 250 measures the vapor-liquid ratio of the gasoline. The lower of the vapor-liquid ratio or the Reid vapor pressure of the gasoline will be used in calculating the amount of butane that can be safely blended. Alternative embodiments of the invention may use alternate methods of measuring the volatility of the gasoline and butane.

In step 425, the analyzer 250 transmits the vapor pressure and vapor-liquid ratio data to the processor 265. The processor 265 contains the predetermined limit for gasoline volatility. In step 430, using the analyzer data and the predetermined limit for gasoline volatility, the processor 265 calculates the amount of butane that may be blended with the current volume of gasoline. The processor may also store this data as a record of the amount of butane that is consumed in the blending process. In step 435, the processor sends a signal to the programmable logic controllers 270 coupled to the processor 265. This signal directs the programmable logic controllers to allow a certain amount of butane to be blended with the gasoline. In step 440, the programmable logic controllers 270 control the flow of the butane into the gasoline by adjusting the injectors 275. The injectors 275 typically comprise pneumatic valves and metersithat allow a certain amount of butane to pass from the butane outlet line 220 and into the gasoline line 260. In step 445, the blending process is completed with the butane flowing into the gasoline line 260.

FIG. 5 is a flow chart diagram representing exemplary steps for utilizing the butane consumption data. The butane consumption data can be used to predict future butane demand. As mentioned in step 430, the processor at the tank farm calculates the amount of butane to blend with gasoline. In step 510, the processor 265 records the amount of butane blended with each load of gasoline picked up by a transport 125. In step 515, the processor 265 compiles butane consumption records for a specified period of time. In an alternative embodiment of the present invention, a remote processor may communicate with multiple processors located. at different tank farms and collect butane consumption records for each distribution point. In step 520, butane market demand is predicted from the consumption records. The butane consumption information may have several uses in regard to the butane market.

In summary, the present invention supports the accurate determination of the volatility of gasoline such that additional butane may be blended with the mixture. The present invention presents advantages over the prior art in that there is a direct and accurate measurement of the gasoline sample that is being loaded into a transport. By measuring the gasoline's volatility at the last opportunity for blending before distribution, the distributor is able to maximize the amount of butane that is blended with the gasoline. Finally, butane consumption information can be easily recorded and examined to learn about the butane market.

Those skilled in the art will appreciate that the invention has a wide range of applications beyond merely blending gasoline and butane. For example, the invention could also be implemented to blend other additives with gasoline. The

SUN_MAG_0000313

**PTX-1.12**

US 6,679,302 B1

13

invention can also be used in conjunction with other types of fuel such as diesel and jet fuel.

It will be appreciated that the present invention fulfills the needs of the prior art described herein and meets the above-stated objects. While there has been shown and described the preferred embodiment of the invention, it will be evident to those skilled in the art that various modifications and changes may be made thereto without departing from the spirit and the scope of the invention as set forth in the appended claims and equivalence thereof.

What is claimed is:

1. A system for blending gasoline and butane at a tank farm comprising:

a) a tank of gasoline;

b) a tank of butane;

c) a blending unit, at the tank farm, downstream of and in fluid connection with the tank of gasoline and the tank of butane;

d) a dispensing unit downstream of and in fluid connection with the blending unit; and

e) a rack, wherein the dispensing unit is located at the rack and is adapted to dispense gasoline to gasoline transport vehicles.

2. The system of claim 1 further comprising a process control unit, wherein the process control unit generates a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit.

3. The system of claim 2 wherein the ratio input signal is derived from a calculation of the ratio of butane and gasoline that will yield a desired vapor pressure.

4. The system of claim 2, further comprising:

a) a gasoline vapor pressure sensor operable for measuring the vapor pressure of gasoline upstream of the blending unit;

b) a butane vapor pressure sensor operable for measuring the vapor pressure of butane upstream of the blending unit;

c) wherein the ratio input signal is generated from the vapor pressures of gasoline and butane measured by the gasoline vapor pressure sensor and the butane vapor pressure sensor.

5. The system of claim 4, wherein the gasoline and butane vapor pressure sensors measure the vapor pressure of gasoline and butane within the blending unit immediately before blending.

6. The system of claim 4, wherein the process control unit comprises one or more information processing units capable of transforming measurements from the gasoline and butane vapor pressure sensors into the ratio input signal, and maintaining or varying the ratio of gasoline and butane blended in the blending unit.

7. The system of claim 6, wherein the measurements from the gasoline and butane vapor pressure sensors are transformed into a ratio input signal through a mathematical algorithm that calculates the ratio of butane and gasoline that will yield a desired vapor pressure for the blended gasoline and butane.

8. The system of claim 1, further comprising one or more pumps for regulating the flow of gasoline and or butane into the blending unit.

9. The system of claim 1, wherein the blending unit comprises one or more valves for regulating the ratio of butane and gasoline blended by the blending unit.

10. The system of claim 1, wherein the blending unit comprises an injector in fluid connection with the tank of butane for injecting butane into the gasoline.

14

11. The system of claim 1, wherein the gasoline is reformulated gasoline.

12. A method for blending gasoline and butane at a tank farm comprising:

a) drawing a gasoline stream from a tank of gasoline;

b) drawing a butane stream from a tank of butane;

c) blending the butane and gasoline streams, at the tank farm, to form a blend; and

d) dispensing the blend to gasoline transport vehicles using a dispensing unit located at a rack.

13. The method of claim 12, further comprising:

a) determining a blend ratio of butane and gasoline in the butane and gasoline streams that will yield a desired vapor pressure, and

b) blending the gasoline and butane streams at the blend ratio.

14. The method of claim 13, wherein the blend ratio is determined from a vapor pressure of the gasoline stream and a vapor pressure of the butane stream.

15. The method of claim 12, wherein a vapor pressure of the gasoline and a vapor pressure of the butane are determined by:

a) drawing a sample of gasoline from the gasoline stream;

b) measuring the vapor pressure of the sample of gasoline;

c) returning the sample of gasoline to the gasoline stream;

d) drawing a sample of butane from the butane stream;

e) measuring the vapor pressure of the sample of butane; and

f) returning the sample of butane to the gasoline stream.

16. The method of claim 14, wherein the step of determining the blend ratio comprises:

a) setting a predetermined value for the vapor pressure of the blend;

b) transmitting the predetermined value for the vapor pressure of the blend to a processing unit;

c) transmitting the gasoline vapor pressure and the butane vapor pressure to the processing unit;

d) calculating the blend ratio from the gasoline vapor pressure, the butane vapor pressure, and the predetermined value for the vapor pressure of the blend.

17. The method of claim 16, further comprising:

a) transmitting a signal that corresponds to the vapor pressure of the blend from the processing unit to a programmable logic control; and

b) adjusting the ratio of butane and gasoline blended in the blending unit with the programmable logic control.

18. A method for optimizing butane purchase decisions for a petroleum products tank farm comprising:

a) in an information processing unit, setting a value for the quantity of butane in a tank at time zero;

b) drawing a butane stream from the tank of butane;

c) blending the butane stream with gasoline for a first interval of time from time zero until time one;

d) monitoring the consumption of butane blended with the gasoline during the first interval of time, and transmitting data regarding the consumption during the first interval of time to the information processing unit; and

e) transforming the consumption data during the first interval of time, and the butane quantity at time zero, to an output of data comprising the butane consumption rate during the first interval of time, and the quantity of butane in the tank at time one.

SUN_MAG_0000314

PTX-1.13

US 6,679,302 B1

**15**

**19**. The method of claim **18** further comprising:

a) blending the butane stream with gasoline for a second interval of time from time one until time two;

b) monitoring the consumption of butane blended with the gasoline during the second time interval, and transmitting data regarding the consumption during the second time interval to the information processing unit;

c) transforming the consumption data during the second interval of time, and the butane quantity at time one, to an output of data comprising the butane consumption rate during the second interval of time, and the quantity of butane in the tank at time two; and

d) repeating steps a) through c) for one or more succeeding intervals of time.

**20**. The method of claim **18** wherein the butane stream and the gasoline are blended at a ratio that attains a prescribed vapor pressure.

**21**. The method of claim **20** wherein the ratio varies due to variations in the vapor pressure of the gasoline and/or the butane stream.

**22**. The method of claim **18** further comprising:

a) inputting to the information processing unit a plurality of time dependent vapor pressure values;

b) blending the butane and gasoline at ratios that attain the time dependent vapor pressure values;

c) transforming the time dependent vapor pressure values, and the consumption rate of butane over the first interval of time, to data output comprising a projected rate of butane consumption.

**23**. A method for simplifying record keeping requirements for butane use at a petroleum products tank farm comprising:

a) drawing a gasoline stream from a tank of gasoline;

b) drawing a butane stream from a tank of butane;

c) blending the butane stream and the gasoline stream to form a blend;

d) monitoring the volatility of the gasoline stream and the butane stream;

e) monitoring the rate at which the butane stream is blended with the gasoline stream;

f) inputting the monitored volatilities and monitored blend rate to an information processing unit; and

g) generating a report that tabulates the monitored volatilities and monitored blend rate, or a summary thereof.

**24**. The method of claim **23** wherein the report is used for complying with regulatory requirements.

**25**. The method of claim **23** wherein the report is generated each time the butane stream and gasoline stream are blended.

**26**. The method of claim **23** wherein the report also includes data concerning weather conditions.

**27**. A method for blending butane and gasoline using a processor comprising:

a) receiving a gasoline volatility measurement at the processor;

b) receiving a butane volatility measurement at the processor;

c) receiving a target gasoline volatility value at the processor; and

d) calculating a butane blend rate from the gasoline volatility measurement, the butane volatility measurement, and the target gasoline volatility value.

**28**. The method of claim **27** wherein an analyzing instrument determines:

**16**

a) the gasoline volatility measurement and

b) the butane volatility measurement.

**29**. The method of claim **27** wherein the processor uses the butane blend rate to regulate the flow of butane.

**30**. The method of claim **27** wherein the processor uses the butane blend rate to control an injector that regulates the flow of butane.

**31**. The method of claim **27** wherein the target gasoline volatility value is input into the processor manually.

**32**. The method of claim **27** wherein the processor automatically determines the target gasoline volatility value from the date.

**33**. The method of claim **27** wherein the gasoline volatility measurement is the vapor-liquid ratio of the gasoline.

**34**. The method of claim **27** wherein the gasoline volatility measurement is the vapor pressure of the gasoline.

**35**. A computer-readable medium having computer-executable instructions for performing the steps recited in claim **27**.

**36**. A system for blending gasoline and a volatility modifying agent at a tank farm comprising:

a) a tank of gasoline;

b) a tank of a volatility modifying agent;

c) a blending unit, at the tank farm, downstream of and in fluid connection with the tank of gasoline and the tank of volatility modifying agent;

d) a dispensing unit downstream of and in fluid connection with the blending unit; and

e) a rack, wherein the dispensing unit is located at the rack and is adapted to dispense gasoline to gasoline transport vehicles.

**37**. The system of claim **36** further comprising a process control unit, wherein the process control unit generates a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit.

**38**. The system of claim **37** wherein the ratio input signal is derived from a calculation of the ratio of butane and gasoline that will yield a desired vapor pressure.

**39**. A method for blending gasoline and a volatility modifying agent at a tank farm comprising:

a) drawing a gasoline stream from a tank of gasoline;

b) drawing a volatility modifying agent stream from a tank of volatility modifying agent;

c) blending the volatility modifying agent and gasoline streams, at the tank farm, to form a blend; and

d) dispensing the blend to gasoline transport vehicles using a dispensing unit located at a rack.

**40**. The method of claim **39**, further comprising:

a) determining a blend ratio of volatility modifying agent and gasoline in the volatility modifying agent and gasoline streams that will yield a desired vapor pressure, and

b) blending the volatility modifying agent and butane streams at the blend ratio.

**41**. The method of claim **40**, wherein the blend ratio is determined from a vapor pressure of the gasoline stream and a vapor pressure of the volatility modifying agent stream.

\* \* \* \* \*

SUN_MAG_0000315

**PTX-1.14**



US007032629B1

(12) **United States Patent**
Mattingly et al.

(10) Patent No.: **US 7,032,629 B1**
(45) **Date of Patent:** *Apr. 25, 2006**

(54) **METHOD AND SYSTEM FOR BLENDING GASOLINE AND BUTANE AT THE POINT OF DISTRIBUTION**

(75) Inventors: **Larry D. Mattingly**, Sanford, FL (US); **Steven M. Vanderbur**, Houston, TX (US)

(73) Assignee: **MCE Blending, LLC**, Sanford, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/759,515**

(22) Filed: **Jan. 16, 2004**

**Related U.S. Application Data**

(63) Continuation of application No. 10/071,191, filed on Feb. 8, 2002, now Pat. No. 6,679,302.

(60) Provisional application No. 60/267,844, filed on Feb. 9, 2001.

(51) **Int. Cl.**
*B65B 1/04*        (2006.01)

(52) **U.S. Cl.** ............................ 141/9; 141/104; 141/83; 137/486; 137/625.41

(58) **Field of Classification Search** .................. 141/9, 141/100, 104, 94, 83, 192, 198; 222/25, 222/26, 71, 72; 137/486, 625.41
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,751,644 A | 8/1973 | Mayer | |
| 3,813,925 A | 6/1974 | Fenske et al. | |
| 3,904,508 A | 9/1975 | Whyte et al. | |
| 3,999,959 A | 12/1976 | Bajek | |
| 4,268,701 A | 5/1981 | Dang Vu et al. | |
| 5,004,850 A | 4/1991 | Wilson | |
| 5,093,533 A | 3/1992 | Wilson | |
| 5,208,402 A | 5/1993 | Wilson | |
| 5,423,607 A | 6/1995 | Jones et al. | |
| 5,823,669 A | 10/1998 | Jones | |
| 5,860,457 A | 1/1999 | Andersson | |
| 5,975,353 A | 11/1999 | Finlayson | |
| 5,979,705 A | 11/1999 | Kaehler et al. | |

*Primary Examiner*—Steven O. Douglas
(74) *Attorney, Agent, or Firm*—King & Spalding LLP; Clark G. Sullivan; Shaun B. Sethna

(57)            **ABSTRACT**

A system and method is provided for blending butane with gasoline at petroleum tank farms, immediately before distribution to tanker trucks. The invention provides a method for blending gasoline and butane at a tank farm comprising: (a) drawing a gasoline stream from a tank of gasoline; (b) drawing a butane stream from a tank of butane; (c) blending the butane and gasoline streams to form a blend; and (d) dispensing the blend. The blending process can be controlled to ensure that the vapor pressure of the blended gasoline meets vapor pressure requirements of environmental regulations. Information generated by the blending process can be used to efficiently forecast butane purchasing requirements, and to generate regulatory reports.

**33 Claims, 5 Drawing Sheets**

BLENDING ARCHITECTURE OVERVIEW





Plaintiff's Trial Exhibit
**2**
1:17-cv-01390-LPS-CJB

**BLENDING ARCHITECTURE OVERVIEW**



# FIG. 1

SUN_MAG_0000406

**PTX-2.2**



FIG. 2

SUN_MAG_0000407

**PTX-2.3**

Appx179

**U.S. Patent**    Apr. 25, 2006    Sheet 3 of 5    US 7,032,629 B1

**BLENDING PROCESS OVERVIEW**



**FIG. 3**

SUN_MAG_0000408

**PTX-2.4**

Appx180



320
BLENDING PROCESS
405
ANALYZER DRAWS SAMPLE FROM BUTANE SUPPLY LINE
410
ANALYZER DRAWS SAMPLE FROM SELECTED GASOLINE SUPPLY LINE
415
ANALYZER MEASURES REID VAPOR PRESSURE (RVP) OF EACH SAMPLE
420
ANALYZER MEASURES VAPOR-LIQUID RATIO (VLR) OF GASOLINE
425
ANALYZER TRANSMITS RVP AND VLR DATA TO PROCESSOR
430
PROCESSOR DETERMINES AMOUNT OF BUTANE TO BLEND WITH GASOLINE
435
PROCESSOR SENDS SIGNAL TO LOGIC CONTROLLERS
440
LOGIC CONTROLLERS ADJUST FLOW OF BUTANE WITH INJECTOR VALVES
445
BUTANE FLOWS INTO GASOLINE LINE

FIG. 4

**PROCESS FOR ASSESSING BUTANE MARKET**

**WITH CONSUMPTION DATA**



510

PROCESSOR RECORDS AMOUNT OF BUTANE BLENDED WITH EACH LOAD

515

PROCESSOR COMPILES BUTANE BLENDING RECORDS

520

PREDICT BUTANE MARKET BASED ON CONSUMPTION RECORDS

# FIG. 5

SUN_MAG_0000410

**PTX-2.6**

US 7,032,629 B1

1

**METHOD AND SYSTEM FOR BLENDING GASOLINE AND BUTANE AT THE POINT OF DISTRIBUTION**

RELATED APPLICATION

The present application claims priority to U.S. provisional application entitled "Method and System for Blending Gasoline and Butane at the Point of Distribution," filed on Feb. 9, 2001, having Ser. No. 60/267,844.

The present application is a continuation of and claims priority to U.S. application entitled Method and System for Blending Gasoline and Butane at the Point of Distribution, filed Feb. 8, 2002, having Ser. No. 10/71,191, now U.S. Pat. No. 6,679,302.

TECHNICAL FIELD

The present invention generally relates to blending gasoline and butane at gasoline tank farms. More specifically, it allows for simple and accurate blending of gasoline and butane at the point of distribution, based upon the volatility of the gasoline before blending, and a prescribed level of volatility after blending.

BACKGROUND OF THE INVENTION

Gasoline distribution systems typically rely upon pipelines to deliver gasoline from refineries to tank farms. At the tank farms gasoline is stored until it is dispensed to gasoline tanker trucks. The tanker trucks deliver the gasoline to retail gasoline stations and other dispensing outlets where the gasoline is eventually delivered to an automobile, truck, or other vehicle.

A significant physical property of gasoline is its volatility, or its ability to combust. There are two principle methods for assessing the volatility of gasoline: (1) measuring the vapor-liquid ratio, and (2) measuring the vapor pressure. The Reid method is the standard test for measuring the vapor pressure of petroleum products. Reid vapor pressure (sometimes "RVP") is related to true vapor pressure, but is a more accurate assessment of petroleum products because it considers sample vaporization as well as the presence of water vapor and air in the measuring chamber. The Reid vapor pressure of gasoline affects the ease with which gasoline is combusted, and can have a significant impact on the ease with which an automobile engine is started, especially during colder seasons when the temperature of gasoline and its corresponding volatility decreases.

In order to keep cars performing at a consistent level year-round, gasoline marketers blend agents with gasoline that increase the Reid vapor pressure and volatility of the gasoline. Butane is commonly added as a RVP modifying agent during colder months because it is more volatile than gasoline. It is also added to reduce the cost of gasoline, because it is generally less expensive than gasoline bought at the wholesale level.

The United States Environmental Protection Agency (EPA) is concerned with gasoline vapor pressure because gasoline vapor emissions from automobiles are a major component of VOC's (volatile organic compounds) in the atmosphere. Gasoline vapor emissions are of particular concern during the warmer months when gasoline is more volatile. Accordingly, the EPA has promulgated a number of regulations that govern the volatility of gasoline, and how much butane can be blended with gasoline during May 1 through September 15. For each occasion that butane is

2

blended with gasoline during this time period, the EPA requires that the mixture be certified to ensure that it is within the volatility guidelines.

Butane has historically been blended with gasoline at several points in the gasoline distribution chain. The first opportunity to blend butane with gasoline is at the refinery, before pipelines transport the gasoline to tank farms. Refineries often add butane at the trunk line in response to changes in Reid vapor pressure demand. This process is imprecise, however, because the blended gasoline is subsequently mixed in the pipeline with other sources of gasoline of varying Reid vapor pressure. Moreover, because gasoline pipelines serve multiple regions that have variable RVP requirements, the refinery can only modify the gasoline to the lowest maximum RVP allowed by the EPA across the various regions served by the pipeline.

Butane is also added to gasoline while it is transported in the pipeline, after consolidation of various trunk lines from refineries. Typically, butane is added to a certain volume of gasoline with a constant volatility. However, it is difficult to perform blending in the pipeline with any measure of precision. The rates of flow within the pipelines and the Reid vapor pressure of a certain volume of gasoline within the pipeline vary considerably. An additional difficulty is that the pipeline must be physically breached in at least two locations to sample the gasoline, and to add butane to the flow of gasoline. Breaching a high volume gasoline pipeline carries with it large risks that most pipeline operations would prefer to avoid.

The third point of blending is at the tank farm. When delivery of gasoline is made to a large storage tank, the RVP of the tank is measured, and sufficient butane is added to the tank to attain a desired RVP. Because tanks farms generally service a smaller area than an entire region, blending at the tank farm can be more narrowly tailored to the RVP requirements of a particular region. Blending in tanks at the tank farm is performed with existing valves in tanks to introduce the butane, and thus does not entail risks similar to butane blending during gasoline transport through a pipeline.

However, blending butane at tank farms is not without its complications. Each time that gasoline is introduced to a tank, the RVP must again be measured, and butane must be added to the tank to attain a desired RVP. Often, gasoline will be dispensed to several tanker trucks before the butane can be blended, thus losing the opportunity to blend butane in those shipments. Moreover, blending butane in tanks is labor intensive and imprecise. Because the RVP of gasoline varies within a tank, several measurements must be taken throughout the tank, and considerable stirring must occur to maximize homogeneity.

All of the foregoing methods suffer from a substantial degree of imprecision. In view of this imprecision, gasoline suppliers are unable to maximize the amount of butane blended with gasoline. In particular, during summer months, government regulations currently require recertifying of gasoline each time butane is blended. The cost of this additional certification vitiates gains that could be achieved with additional blending at the tank farm.

Several methods have been attempted to improve the precision of butane blending and the predictability of Reid vapor pressure in the final product. The Grabner unit is a substantial advance in this respect. The Grabner unit (manufactured by Grabner Instruments) is a measuring device capable of providing Reid vapor pressure and liquid-vapor ratio data for a gasoline sample typically within 6–11 minutes of introducing the sample to the unit. It has been employed at some refineries to consistently measure the

SUN_MAG_0000411

**PTX-2.7**

US 7,032,629 B1

3

volatility of gasoline, and to blend butane with the gasoline based upon an allowable RVP for the gasoline. There are also other commercially available instruments for assessing the volatility of gasoline.

Although the Grabner unit can provide more accurate assessments of gasoline volatility at the refinery, a need exists for precise measurements at the final distribution point, which is the tank farm. As explained above, the current method of taking several measurements from a large gasoline tank at the tank farm is labor intensive and must be done repeatedly because of new gasoline being introduced into the tank. A further need exists in that tank farm distributors must constantly adjust their butane blending throughout the year in response to changes in temperature and concomitant changes in EPA allowable RVP levels. Finally, a need exists for the ability to blend butane with reformulated gasoline more accurately.

SUMMARY OF THE INVENTION

The present invention is a system and method for blending butane with gasoline at the tank farm, immediately before the gasoline is dispensed to a tanker truck. The blending occurs downstream of the gasoline and butane storage tanks on the tank farm, after the gasoline and butane are drawn from their storage tanks for dispensing into a tanker truck, but before the gasoline is actually dispensed to the tanker truck at the rack. The apparatus for blending the butane and gasoline is any conventional Y-type or T-type juncture capable of joining two fluid flows into one. The ratio of gasoline and butane blended by the blending apparatus can be varied to achieve any desired vapor pressure or vapor/liquid ratio in the gasoline dispensed to the tanker truck.

The blending apparatus is preferably under the continuous control of a process control unit, which can vary the ratio at which gasoline and butane are blended to attain a desired vapor pressure or vapor/liquid ratio. The process control unit determines the blending ratio based upon three pieces of data: (1) the vapor pressure of gasoline entering the blending unit, (2) the vapor pressure of butane entering the blending unit, and (3) the desired vapor pressure of the blended gasoline. Alternatively, or additionally, the process control unit can determine the blending ratio based upon (1) the vapor/liquid ratio of the gasoline, (2) the vapor pressure of butane entering the blending unit, and (3) the desired vapor/liquid ratio of the gasoline. In a preferred embodiment, the process control unit determines the blending ratio from the vapor pressure and vapor/liquid ratio assessments, adopting the lowest rate of butane blending from the two methods.

By blending gasoline and butane immediately before the gasoline is dispensed to a tanker truck, and by continuously controlling the ratio of gasoline and butane blended by the blending apparatus, a number of significant advantages are attained, including the following:

1. The amount of butane blended with the gasoline can be more thoroughly controlled, yielding less RVP variability among tanker truck shipments.

2. The butane and gasoline can be blended to yield consistent optimal performance of motor vehicles that employ the blended gasoline, regardless of the time of year in which the motor vehicle is operated, or the temperature or elevation at which such motor vehicle is operated.

3. The ratio of butane and gasoline blended can be easily varied and controlled to comply with regional and/or seasonal RVP requirements imposed by EPA or state regulations upon the sale of retail gasoline.

4

4. By continuously adding butane to gasoline dispensed to tanker trucks, and by continuously blending at the maximum RVP and vapor/liquid ratio allowable by law, tank farm operators are able to maximize the amounts of butane that they blend with gasoline, and minimize their cost basis for the gasoline sold.

The data required for the process control unit to properly blend butane and gasoline to prescribed conditions, especially fluid flow rates, can also be used to generate useful operational data. For example, by monitoring the rate at which butane is drawn from a butane storage tank, one is better able to predict when butane must next be purchased, and how much butane must be purchased, thereby ensuring better informed butane purchasing decisions. Moreover, by properly manipulating the data obtained from the blending process control unit, one is able to generate reports for gasoline sold from a particular tank farm as required by federal and state laws or regulations.

These and other objects, features, and advantages of the present invention may be more clearly understood and appreciated from a review of the following detailed description of the disclosed embodiments and by reference to the appended drawings and claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a functional block diagram illustrating an overview of the architecture of an exemplary butane blending system.

FIG. 2 is a functional block diagram illustrating the architecture and components of an exemplary embodiment of a butane blending system.

FIG. 3 is a logic flow diagram illustrating an overview of an exemplary butane blending system.

FIG. 4 is a logic flow diagram illustrating operations of a butane blending system constructed in accordance with an exemplary embodiment of the present invention.

FIG. 5 is a logic flow diagram illustrating an exemplary process for collecting butane consumption data and using it to assess the butane market.

DETAILED DESCRIPTION OF THE EXEMPLARY EMBODIMENTS

In one embodiment the invention provides a system for blending gasoline and butane at a tank farm comprising: (a) a tank of gasoline; (b) a tank of butane; (c) a blending unit downstream of and in fluid connection with the tank of gasoline and the tank of butane; and (d) a dispensing unit downstream of and in fluid connection with the blending unit. In another embodiment the invention provides a method for blending gasoline and butane at a tank farm comprising: (a) drawing a gasoline stream from a tank of gasoline; (b) drawing a butane stream from a tank of butane; (c) blending the butane and gasoline streams to form a blend; and (d) dispensing the blend.

Tank farms can be readily adapted or constructed to contain the system, or to carry out the method, simply by modifying their piping systems to integrate a blending unit between an existing gasoline tank and an existing dispensing unit. Also, because most tank farms do not already contain a butane tank, one or more of such tanks will need to be added.

The term "tank farm" is meant to encompass any facility that contains a number of large storage tanks for petroleum products, from which petroleum tanker trucks are filled. Such facilities typically contain multiple storage tanks that

SUN_MAG_0000412

**PTX-2.8**

Appx184

US 7,032,629 B1

5

separately contain various types and grades of gasoline, including reformulated gasoline as that term is typically used in the gasoline business, and the various grades of reformulated gasoline. The tanks may also contain more specialized petroleum products. Each of these various types and grades of gasoline and specialized petroleum products, is capable of being blended according to the present invention, and is thus encompassed within the term "gasoline." The term butane includes n-butane, isobutane, and commercially available butane in the presence of like-fraction hydrocarbons.

The tanks often hold in excess of 500,000 gallons of petroleum product, and are surrounded by berms to capture any petroleum spills. Such facilities typically receive their petroleum products from petroleum pipelines that consolidate refined petroleum products from a number of refinery trunk lines, although tank farms can also be supplied only from one refinery, or from a coastal or freshwater port that receives refined petroleum products by boat. As used herein, the term "tank farm" only includes tank farms that distribute petroleum products to petroleum tanker trucks.

The dispensing unit can be any type of unit that is adapted for dispensing petroleum products to conventional receptacles mounted on petroleum tanker trucks. One typical dispensing unit is called a "rack" and is located on the tank farm. The dispensing unit can comprise several outlet ports to which different transports may be coupled. Generally, a transport driver connects the transport to the dispensing unit and selects the desired grade of gasoline. The selection of gasoline initiates the blending process. In the description that follows, gasoline can include gasoline, as well as other types of refined petroleum products such as diesel and jet fuel.

The blending unit can be any conventional apparatus that achieves blending of two or more separate streams into one. For example, the unit can be a Y-type or T-type junction that consolidates two independent streams. Alternatively, the blending unit can be an injector, which selectively injects butane into a gasoline stream.

The ratio at which the gasoline and butane streams are blended can be controlled at a variety of points along the path of travel for the gasoline and butane, using a variety of methods. In the injection method discussed above, the ratio can be controlled simply by varying the rate at which butane is injected into a gasoline stream flowing at a substantially constant rate. Alternatively, the ratio can be controlled by varying the rate at which gasoline and/or butane is supplied to the blending unit. The rate can be controlled by adjusting valves located between the tank and the blending unit, or by varying the output of pumps that control the flow of butane and/or gasoline to the blending unit.

In the description of the embodiments of the invention and the claims that follow, measuring the vapor pressure will refer generally to the volatility of the gasoline or butane. Indeed, the term vapor pressure is meant to encompass both Reid vapor pressure as measured by applicable ASTM procedures, and other measures of vapor pressure such as true vapor pressure and vapor/liquid ratio. It should be understood that vapor pressure measurements can also include a measurement of the vapor-liquid ratio at a certain temperature. In certain embodiments of the present invention measurements may be taken for both vapor pressure and vapor-liquid ratio. Furthermore, the vapor pressure measurement can include other methods for assessing the volatility of either the gasoline, or the butane, or both. A variety of instruments may be used for assessing the volatility of the gasoline and butane. The Grabner instrument is one such

6

instrument which is discussed herein. The terms sensor and analyzer can be used to generally refer to the instrument that is measuring the volatility of the gasoline or butane.

In a preferred embodiment the gasoline and butane are blended by a variable ratio blending unit, in which the ratio of gasoline and butane is controlled and/or varied by any of the foregoing mechanisms. In a particularly preferred embodiment, the gasoline and butane are blended at a ratio which is selected to attain a prescribed vapor pressure in the blended product. The prescribed vapor pressure can be based upon many considerations, including the maximum vapor pressures allowable by federal or state regulations for a particular region at a particular time of year, or to maximize automobile performance in view of the regional climate and elevation.

The variable ratio blending unit is preferably under the separate control of a process control unit, which dictates and controls the ratio at which butane and gasoline are blended based upon the prescribed vapor pressure. The process control unit receives measurements of the vapor pressure of the butane and gasoline, and from those measurements calculates the ratio at which the butane and gasoline should be blended to achieve the prescribed vapor pressure. Based upon those calculations, the process control unit emits a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit.

Thus, in one embodiment, the system comprises a process control unit, wherein the process control unit generates a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit. In still another embodiment the ratio input signal is derived from a calculation of the ratio of butane and gasoline that will yield a desired vapor pressure.

Numerous methods exist for calculating the ratio at which butane and gasoline should be mixed to attain the prescribed vapor pressure. In addition, there are a number of methods for describing the vapor pressure of a liquid. The most common way for measuring the vapor pressure of petroleum products is the Reid vapor pressure (sometimes "RVP") test. The most common test for RVP of petroleum fractions is defined by the American Society for Testing and Materials under the designation ASTM 5191. The American Petroleum Institute describes a predecessor RVP test procedure (ASTM D323-56) in detail, including suitable apparatus for such measurements, in "Measuring, Sampling, and Testing Crude Oil," Bulletin 2500, API, New York, January 1955, the disclosure from which being hereby incorporated by reference as if fully set forth herein. Other American Petroleum Institute Publications show charts relating RVP and ASTM boiling characteristics of gasolines and crude oils to true vapor pressure, a way to estimate the RVP of blends, and the relation of RVP to evaporation losses. See, e.g., American Petroleum Institute, Bulletin 2513, API, New York 1959; American Petroleum Institute Bulletin 2516, API, New York, March 1962; American Petroleum Institute Bulletin 2518, API, New York, June 1962.

Recently, ASTM D 6378 was published as a standard for measuring vapor pressure of gasoline by double injection or triple expansion. Measurements by this standard can be made by instruments manufactured by Grabner Instruments, Vienna, Australia, under the trade name Minivap, with the Minivap On-line being particularly suitable for applications of the present invention. There are also other commercially available instruments for measuring the volatility of petroleum products which could be used with this invention.

The blend ratio of butane to gasoline required to attain a prescribed vapor pressure can be determined simply by

SUN_MAG_0000413

**PTX-2.9**

Appx185

US 7,032,629 B1

7

direct volumetric averaging of the RVP of the butane and gasoline. However, it has been noted in the literature that volumetric averaging can yield low estimates of resultant RVP, especially when the amount of butane added is less than 25%. Methods for determining blend ratios to attain a prescribed Reid vapor pressure, which overcome these observed limitations on volumetric averaging, are set forth more fully in "How to Estimate Reid Vapor Pressure (RVP) of Blends," J. Vazquez-Esparragoza, Hydrocarbon Processing, August 1992; and "Predict RVP of Blends Accurately," W. E. Stewart, Petroleum Refiner, June 1959; and "Front-End Volatility of Gasoline Blends," N. B. Haskell et al., Industrial and Engineering Chemistry, February 1942, the disclosure from each being hereby incorporated by reference as if fully set forth herein. Moreover, it should be noted that the system of the present invention can be modified to periodically sample the RVP of the resultant blend for quality control, when quality control is of concern.

To calculate the blend ratio one must first have knowledge of the respective vapor pressures of the gasoline and butane streams. Therefore, the vapor pressures of the gasoline and butane streams are preferably measured in order to generate the data used in the blending ratio calculation. The measurement can be carried out in a number of ways. Because of the variability in vapor pressure of gasoline (due to the varying composition of gasoline delivered through pipelines) and butane (due to the difference in vapor pressure of n-butane and isobutane), vapor pressure is preferably measured directly, by a unit specifically designed to make such measurements from samples of gasoline and butane. One such unit is the Minivap Online analyzer manufactured by Grabner Instruments (Vienna, Austria).

As mentioned, the Grabner unit performs its analysis of vapor pressure based upon samples of the gasoline and/or butane. Samples of the gasoline and butane can be drawn from the system at any point upstream of the point where butane and gasoline are physically mixed. However, the samples are preferably drawn from the butane and/or gasoline stream after such butane and/or gasoline has been drawn from the storage tanks, because of the lack of product uniformity within these large tanks.

Therefore, in one embodiment the system further comprises a butane vapor pressure sensor for measuring the vapor pressure of butane upstream of the blending unit, and a gasoline vapor pressure sensor for measuring the vapor pressure of gasoline upstream of the blending unit, wherein the ratio input signal is generated from the vapor pressures of gasoline and butane measured by the sensors. In a preferred embodiment the gasoline and butane vapor pressure sensors appear almost as one unit with the blending unit, and measure the vapor pressure of gasoline and butane within the blending unit immediately before blending. In one particular embodiment, the vapor pressures of the gasoline and butane are determined by: (a) drawing a sample of gasoline from the gasoline stream; (b) measuring the vapor pressure of the sample of gasoline; (c) returning the sample of gasoline to the gasoline stream; (d) drawing a sample of butane from the butane stream; (e) measuring the vapor pressure of the sample of butane; and (f) returning the sample of butane to the gasoline stream.

As mentioned above, the vapor pressure of gasoline within a large tank can vary considerably over time. It is therefore necessary to monitor the vapor pressure of the gasoline and butane streams with some degree of frequency. The vapor pressure need not be measured continuously because the vapor pressure of the gasoline can be expected to remain substantially constant over short periods of time.

8

To assure good uniformity in the butane/gasoline blend, it has been found desirable generally to measure a substantially continuous stream of gasoline about every 6 to 15 minutes (pumping at conventional rates for dispensing gasoline to tanker trucks). Whenever such measurements are made, the process control unit receives the measurements, recalculates the ratio at which the butane and gasoline must be blended to attain the prescribed vapor pressure, and varies the ratio of butane and gasoline blended through the applicable control mechanism.

Thus, in still another embodiment, the invention provides a process control unit that comprises one or more information processing units capable of transforming measurements from the gasoline and butane vapor pressure sensors into the ratio input signal, and maintaining or varying the ratio of gasoline and butane blended in the blending unit. In one embodiment the step of determining the blend ratio comprises: (a) setting a predetermined value for the vapor pressure of the blend, and transmitting that value to a processing unit; (b) transmitting the gasoline and butane vapor pressures to a processing unit; (c) calculating the blend ratio from the gasoline and butane vapor pressures and the predetermined value. A signal that corresponds to the blend ratio from the processing unit is then preferably transmitted to a programmable logic control, which adjusts the ratio of butane and gasoline blended in the blending unit.

The level of information control over the butane blending process of this invention offers substantial opportunities to improve the efficiencies associated with butane purchasing decisions. The timing of butane purchases is a critical element of any butane purchasing program given the variability in spot and futures prices of butane on the commodities markets. The present invention offers the opportunity to accurately and efficiently project butane purchasing needs from the butane consumption data from a butane blending process at a tank farm. Because the consumption of butane will vary over time due to a number of factors, the projections can be made even more accurate by taking into consideration the factors that cause these consumption rates to vary.

For example, environmental regulations dictate allowable Reid vapor pressure for gasoline sold from tank farms at various times of the year, and for various regions. The allowable Reid vapor pressure is, of course, a determining factor when calculating the amount of butane that can be blended with gasoline in the blending system of this invention. By taking into account the timing of these regulatory changes, for the particular region in which a tank farm is situated, one can more accurately forecast the rate at which butane will be consumed by the tank farm and predict the market demand for butane.

In a similar manner, butane purchases can be timed to account for variability in the Reid vapor pressure of gasoline supplied to a tank farm. There is substantial variability in the gasoline received from commercial pipelines, and this variability can be taken into consideration, based upon the timing of gasoline deliveries to the tank farm, to more accurately forecast butane purchasing decisions as well.

These efficiencies can be especially realized when the butane purchasing decision for more than one tank farm are centralized in one purchaser, who has access to the butane consumption and forecasting data for all of the tank farms. For example, the purchaser of butane for multiple tank farms is able to shift butane supplies among the various tank farms based upon butane consumption rates, the timing of butane purchases, and seasonal variations in butane consumption among various regions. Moreover, because the purchaser

SUN_MAG_0000414

PTX-2.10

Appx186

US 7,032,629 B1

9

controls butane for a number of tank farms, he can negotiate volume discounts and better rates.

Thus, in one embodiment the invention provides a method for optimizing butane purchase decisions for a petroleum products tank farm comprising: (a) in an information processing unit, setting a value for the quantity of butane in a tank at time zero; (b) drawing a butane stream from the tank of butane; (c) blending the butane stream with gasoline for a first interval of time from time zero until time one; (d) monitoring the consumption of butane blended with the gasoline during the first interval of time, and transmitting data regarding the consumption during the first interval of time to the information processing unit; and (e) transforming the consumption data during the first interval of time, and the butane quantity at time zero, to an output of data comprising the butane consumption rate during the first interval of time, and the quantity of butane in the tank at time one.

In another embodiment, the method is performed repetitively, by (a) blending the butane stream with gasoline for a second interval of time from time one until time two; (b) monitoring the consumption of butane blended with the gasoline during the second time interval, (c) transmitting data regarding the consumption during the second time interval to the information processing unit; (d) transforming the consumption data during the second interval of time, and the butane quantity at time one, to an output of data comprising the butane consumption rate during the second interval of time, and the quantity of butane in the tank at time two; and (e) repeating steps (a) through (d) for one or more succeeding intervals of time.

Because the invention is particularly appropriate for the butane blending system of the present invention, in which the butane and gasoline are blended to attain a prescribed vapor pressure level the invention preferably further provides (a) inputting to the information processing unit a plurality of time dependent vapor pressure values; (b) blending the butane and gasoline at ratios that attain the time dependent vapor pressure values; and (c) transforming the time dependent vapor pressure values, and the consumption rate of butane over the first interval of time, to data output comprising a projected rate of butane consumption.

In still another embodiment the information gathered by the information processing unit of the present invention is manipulated to generate reports of butane consumption, gasoline consumption, and the vapor pressure of butane, gasoline, and blended gasoline sold by petroleum tank farms. These reports are typically required by regulatory officials to assure compliance with the law.

It should further be added that the systems of the present invention could be adapted to facilitate blending of gasoline with other fuels that would alter the volatility of the gasoline. Therefore, any of the embodiments and subembodiments discussed herein should be considered also to extend to any such fuel that alters the volatility of gasoline, and which can be mixed with gasoline for retail distribution and use. Such other fuels shall hereinafter be referred to as volatility modifying agents. Such volatility modifying agents preferably only include agents whose primary function is as a source of combustible fuel.

Referring to FIG. 1, this is an illustration of an overview of an exemplary butane blending system that operates at the distribution point. By blending butane at the final opportunity before distribution, at the tank farm, the amount of butane blended with the gasoline can be maximized. In FIG. 1, the main components of the blending system are a butane supply 110, a gasoline supply 115, an analyzing and blend-

10

ing unit 120, and a transport 125. The butane supply 110 typically consists of a large tank of butane with lines for refilling with butane and for drawing off butane vapor. The butane tank will also generally have the appropriate safety valves, pressure gauges and temperature gauges. The butane supply 110 feeds into the analyzing and measuring unit 120 through one or more pipelines.

The gasoline supply 115 typically consists of a large tank or plurality of tanks at the tank farm that supply gasoline to the analyzing and blending unit 120 through pipelines. The gasoline supply may consist of a series of tanks, each providing different grades of gasoline to the analyzing and blending unit 120. Generally, the gasoline tanks are frequently supplying gasoline to the analyzing and blending unit 120 and receiving new supplies of gasoline from various refineries. This frequent turnover of gasoline in the tank makes it difficult to accurately assess the vapor pressure of the gasoline supply in the tank.

Although they are shown as one unit in FIG. 1, the analyzing and blending unit 120 may comprise a separate analyzer and separate blender in alternative embodiments of the invention. Typically, the analyzing and blending unit 120 is triggered when a transport 125 selects a gasoline. The transport 125 connects to a rack which dispenses different grades of gasoline and a transport operator selects a particular grade. The analyzing and blending unit 120 draws samples from the butane supply 110 and the gasoline supply 115 to determine how much butane can be blended with the gasoline. Often, butane will have been blended with the gasoline at earlier stages in the refining and distribution chain. However, the analyzing and blending unit 120 determines the maximum amount of butane that can be blended with the gasoline. The maximum amount of butane corresponds to the maximum volatility of the butane as established by engine requirements or government regulations. Once the analyzing and blending unit 120 determines how much butane to blend, the butane is injected into the gasoline flowing from the gasoline supply 115. The blended combination then flows into the transport 125.

Generally, it takes approximately eight minutes to load a transport with blended gasoline. Significantly, a typical analyzing unit requires six to eleven minutes to extract a sample and determine the vapor pressure. Therefore, taking a sample for every load of gasoline that goes into a transport 125 would be an inefficient use of time and resources. Accordingly, in the preferred embodiment of the present invention, gasoline and butane samples are not measured for every load that goes into a transport 125. Rather, vapor pressure measurements are taken periodically and those measurements are used to control the flow of butane and gasoline during that period of time.

FIG. 2 is a schematic diagram illustrating in greater detail the exemplary butane blending system described in FIG. 1. Referring to FIG. 2, the butane supply 110 comprises a butane tank 205, an inlet line 210, a vapor outlet line 215 and an outlet line 220. The butane tank 205 is filled with butane through the inlet line 210. Vapor is released from the butane tank 205 through the vapor outlet line 215. The butane supply 110 may further comprise one or more pressure safety valves 225, a level indicator 230, temperature gauges 235, and pressure gauges 240.

Butane is supplied to the analyzing and blending unit 120 by the outlet line 220. The butane supply 110 may further comprise a bypass line 245 in fluid connection with the butane tank 205 and the outlet line 220. The bypass line 245 is operable for maintaining constant pressure in the outlet line 220.

SUN_MAG_0000415

**PTX-2.11**

Appx187

US 7,032,629 B1

11

The gasoline supply 115 is stored in one or more gasoline tanks 255 at the tank farm. Different tanks may contain different grades of gasoline. Gasoline is provided to the analyzing and blending unit 120 through one or more gasoline lines 260.

When a transport arrives at the tank farm, a transport operator selects a particular grade of gasoline for the transport load. Selection of a gasoline grade initiates the analyzing and blending process. A sample of butane is drawn from the outlet line 220 and supplied to the analyzer 250 where the vapor pressure of the butane is measured. Similarly, a sample of gasoline is drawn from the gasoline line 260 and supplied to the analyzer 250 where the vapor pressure of the gasoline is measured. In an alternative embodiment of the invention, the vapor-liquid ratio of the gasoline may be measured instead of, or in conjunction with the vapor pressure, to assess the volatility of the gasoline. Other embodiments of the invention may measure other physical characteristics to determine the volatility of the gasoline. A typical analyzer 250 is the Minivap Online analyzer manufactured by Grabner Instruments. Generally, one or more pumps 280 draw the butane and gasoline samples into the analyzer 250. After the analyzer 250 takes measurements, the samples are returned to the butane outlet line 220 and the gasoline line 260. The flow of the butane and gasoline samples is monitored by flow transmitters 285. Data from the flow transmitters 285 may be communicated to a processor 265 via remote logic units 290 to ensure that there is a sample flow to the analyzer 250.

Once the volatility of the samples is measured, the analyzer 250 sends measurement data for the samples to the processor 265. The processor 265 calculates the amount of butane that can be blended with the gasoline so that the maximum allowable volatility of the gasoline is not exceeded. The processor 265 is coupled to one or more programmable logic controllers 270 that control injectors 275. The injectors 275 are connected to the outlet line 220 and control the flow of butane into the gasoline line 260. The blended gasoline then flows through the gasoline line 260 to the transport 125.

The system provides for accurate and prompt assessment of the volatility of the gasoline. This accurate measurement enables the distributor to blend the maximum allowable amount of butane with the gasoline.

FIG. 3 is a flow chart diagram setting forth an overview of an exemplary blending process. In step 310, the blending process is initiated when a transport 125 connects to a distribution unit. Typically, the transport 125 connects to a mechanism for distributing several grades of gasoline called a rack. In step 315, the transport operator selects the desired grade of gasoline.

In step 320, the analyzing and blending unit 120 draws samples of gasoline and butane to determine the ratio of blending. It is the precision of the present invention that allows a distributor to blend more gasoline than would be possible with the prior art. In step 325, the properly blended butane and gasoline flows to the transport 125.

FIG. 4 sets forth the operations of the analyzing and blending process, step 320, in greater detail. The method of the present invention supports more accurate and efficient blending than available with prior art. In step 405, the analyzer 250 draws a sample from the butane outlet line 220. In step 410, the analyzer draws a sample from the gasoline line 260. Typically, butane is added to gasoline at other points in the distribution line before reaching the tank farm. However, the amount of butane added often varies. Furthermore, different sources of gasoline are often combined at the

12

tank farm in one large gasoline tank. By positioning the analyzer 250 at the distribution point, the present invention allows a distributor to efficiently and directly measure a sample of gasoline from the volume that will comprise the next load taken by a transport 125. In step 415, the analyzer 250 assesses the volatility of the butane sample and gasoline sample. The volatility of the samples is determined by measuring the vapor pressure of both the butane and the gasoline. The Reid vapor pressure test is generally employed when measuring the volatility of petroleum products. In step 420, the analyzer 250 measures the vapor-liquid ratio of the gasoline. The lower of the vapor-liquid ratio or the Reid vapor pressure of the gasoline will be used in calculating the amount of butane that can be safely blended. Alternative embodiments of the invention may use alternate methods of measuring the volatility of the gasoline and butane.

In step 425, the analyzer 250 transmits the vapor pressure and vapor-liquid ratio data to the processor 265. The processor 265 contains the predetermined limit for gasoline volatility. In step 430, using the analyzer data and the predetermined limit for gasoline volatility, the processor 265 calculates the amount of butane that may be blended with the current volume of gasoline. The processor may also store this data as a record of the amount of butane that is consumed in the blending process. In step 435, the processor sends a signal to the programmable logic controllers 270 coupled to the processor 265. This signal directs the programmable logic controllers to allow a certain amount of butane to be blended with the gasoline. In step 440, the programmable logic controllers 270 control the flow of the butane into the gasoline by adjusting the injectors 275. The injectors 275 typically comprise pneumatic valves and meters that allow a certain amount of butane to pass from the butane outlet line 220 and into the gasoline line 260. In step 445, the blending process is completed with the butane flowing into the gasoline line 260.

FIG. 5 is a flow chart diagram representing exemplary steps for utilizing the butane consumption data. The butane consumption data can be used to predict future butane demand. As mentioned in step 430, the processor at the tank farm calculates the amount of butane to blend with gasoline. In step 510, the processor 265 records the amount of butane blended with each load of gasoline picked up by a transport 125. In step 0.515, the processor 265 compiles butane consumption records for a specified period of time. In an alternative embodiment of the present invention, a remote processor may communicate with multiple processors located at different tank farms and collect butane consumption records for each distribution point. In step 520, butane market demand is predicted from the consumption records. The butane consumption information may have several uses in regard to the butane market.

In summary, the present invention supports the accurate determination of the volatility of gasoline such that additional butane may be blended with the mixture. The present invention presents advantages over the prior art in that there is a direct and accurate measurement of the gasoline sample that is being loaded into a transport. By measuring the gasoline's volatility at the last opportunity for blending before distribution, the distributor is able to maximize the amount of butane that is blended with the gasoline. Finally, butane consumption information can be easily recorded and examined to learn about the butane market.

Those skilled in the art will appreciate that the invention has a wide range of applications beyond blending merely gasoline and butane. For example, the invention could also be implemented to blend other additives with gasoline. The

SUN_MAG_0000416

**PTX-2.12**

Appx188

US 7,032,629 B1

13

invention can also be used in conjunction with other types of fuel such as diesel and jet fuel.

It will be appreciated that the present invention fulfills the needs of the prior art described herein and meets the above-stated objects. While there has been shown and described the preferred embodiment of the invention, it will be evident to those skilled in the art that various modifications and changes may be made thereto without departing from the spirit and the scope of the invention as set forth in the appended claims and equivalence thereof.

What is claimed is:

1. A system for blending gasoline and butane comprising:
a tank of gasoline;
a tank of butane;
a blending unit downstream of and in fluid connection with the tank of gasoline and the tank of butane; and
a rack downstream of and in fluid connection with the blending unit, wherein the rack is adapted to dispense gasoline to a gasoline transport vehicle.

2. The system of claim 1 further comprising a process control unit, wherein the process control unit generates a ratio input signal that controls the ratio of butane and gasoline blended by the blending unit.

3. The system of claim 1 further comprises
a gasoline vapor pressure sensor operable for measuring the vapor pressure of gasoline upstream of the blending unit; and
a butane vapor pressure sensor operable for measuring the vapor pressure of butane upstream of the blending unit.

4. The system of claim 3 further comprising a process control unit operable for
receiving the measured gasoline vapor pressure from the gasoline vapor pressure sensor;
receiving the measured butane vapor pressure from the butane vapor pressure sensor; and
calculating a ratio for blending the gasoline and the butane from the measured gasoline vapor pressure and the measured butane vapor pressure.

5. A method for blending gasoline and butane comprising:
drawing a gasoline stream from a tank of gasoline;
drawing a butane stream from a tank of butane;
blending the butane stream and the gasoline stream to form a blend; and
dispensing the blend to gasoline transport vehicles using a rack.

6. The method of claim 5, further comprising the steps of:
determining a blend ratio of the butane and gasoline streams that will yield a desired vapor pressure; and
blending the gasoline stream and butane stream at the blend ratio.

7. The method of claim 6, wherein the blend ratio is determined from a vapor pressure of the gasoline stream and a vapor pressure of the butane stream.

8. The method of claim 5, wherein a vapor pressure of the gasoline stream and a vapor pressure of the butane stream are determined by:
drawing a sample of gasoline from the gasoline stream;
measuring the vapor pressure of the sample of gasoline;
drawing a sample of butane from the butane stream; and
measuring the vapor pressure of the sample of butane.

9. The method of claim 5, further comprising the steps of:
measuring the vapor pressure of the blend; and
generating a report of the vapor pressure of the blend.

10. A system for blending gasoline and a volatility modifying agent comprising:
a tank of gasoline;
a tank of the volatility modifying agent;

14

a blending unit downstream of and in fluid connection with the tank of gasoline and the tank of the volatility modifying agent; and
a rack downstream of and in fluid connection with the blending unit, wherein the rack is adapted to dispense gasoline to a gasoline transport vehicle.

11. The system of claim 10 further comprising a process control unit, wherein the process control unit generates a ratio input signal that controls the ratio of the volatility modifying agent and the gasoline blended by the blending unit.

12. The system of claim 11 wherein the ratio input signal is derived from a calculation of the ratio of the volatility modifying agent and the gasoline that will yield a desired vapor pressure.

13. A method for blending gasoline and a volatility modifying agent comprising:
drawing a gasoline stream from a tank of gasoline;
drawing a volatility modifying agent stream from a tank of the volatility modifying agent;
blending the volatility modifying agent stream and the gasoline stream to form a blend; and
dispensing the blend to a gasoline transport vehicle at a rack.

14. The method of claim 13, further comprising:
determining a blend ratio of the volatility modifying agent stream and the gasoline stream that will yield a desired vapor pressure; and
blending the volatility modifying agent stream and the gasoline stream at the blend ratio.

15. The method of claim 14, wherein the blend ratio is determined from a vapor pressure of the gasoline stream and a vapor pressure of the volatility modifying agent stream.

16. The method of claim 13, further comprising the steps of:
determining the volatility of the blend; and
generating a report comprising the volatility of the blend.

17. A computer-implemented method for blending a butane stream with a gasoline stream comprising the steps of:
receiving a first measurement indicating a vapor pressure of the gasoline stream;
receiving a second measurement indicating a vapor pressure of the butane stream;
calculating a blend rate at which the butane stream can be blended with a gasoline stream; and
transmitting an instruction to a programmable logic controller for adjusting the butane stream to the calculated blend rate for blending with the gasoline stream and distributing at a rack.

18. The computer-implemented method of claim 17, wherein the blend rate is based on a predetermined vapor pressure for the blended gasoline and butane.

19. The computer-implemented method of claim 17, wherein the blend rate is associated with the rack that distributes the blended gasoline stream and butane stream.

20. The computer-implemented method of claim 17, wherein the blend rate is stored to generate a report of butane consumption.

21. The computer-implemented method of claim 17, wherein the blend rate is used to predict butane consumption over a period of time.

22. The computer-implemented method of claim 17, further comprising the steps of:
receiving a third measurement indicating a vapor pressure of the blend of the gasoline stream and the butane stream; and
generating a report comprising the third measurement.

US 7,032,629 B1

15                                                                              16

**23**. A computer-readable medium having computer-executable instructions for performing the steps recited in claim **17**.

**24**. A computer-implemented method for blending a volatility modifier stream and a gasoline stream comprising the steps of:

receiving a first measurement indicating a vapor pressure of the gasoline stream;

receiving a second measurement indicating a vapor pressure of the volatility modifier stream;

calculating a blend rate at which the volatility modifier stream can be blended with the gasoline stream; and

transmitting an instruction to a programmable logic controller for adjusting the volatility modifier stream to the calculated blend rate for blending with the gasoline stream and distributing at a rack.

**25**. The computer-implemented method of claim **24**, wherein the blend rate is based on a predetermined vapor pressure for the blended gasoline and volatility modifier.

**26**. The computer-implemented method of claim **24**, wherein the blend rate is associated with the rack that distributes the blended gasoline and volatility modifier.

**27**. The computer-implemented method of claim **24**, wherein the blend rate is stored to generate a report of volatility modifier consumption.

**28**. The computer-implemented method of claim **24**, wherein the blend rate is used to predict consumption of the volatility modifier over a period of time.

**29**. The computer-implemented method of claim **24**, further comprising the step of receiving a third measurement indicating a vapor pressure of the blend of the gasoline stream and the volatility modifier stream.

**30**. A computer-readable medium having computer-executable instructions for performing the steps recited in claim **24**.

**31**. A computer-implemented method for blending a butane stream and a gasoline stream comprising the steps of:

receiving a first measurement indicating a vapor pressure of the gasoline stream;

calculating a blend rate at which the butane stream can be blended with the gasoline stream;

transmitting an instruction to a programmable logic controller for adjusting the butane stream to the calculated blend rate for blending with the gasoline stream and distributing at a rack; and

receiving a second measurement indicating a vapor pressure of the blended gasoline stream and butane stream.

**32**. The computer-implemented method of claim **31**, further comprising the step of generating a report comprising the second measurement.

**33**. The computer-implemented method of claim **32**, wherein the report further comprises the first measurement.

\* \* \* \* \*

SUN_MAG_0000418

**PTX-2.14**



US009207686B2

(12) **United States Patent**        (10) Patent No.:    **US 9,207,686 B2**
Mattingly et al.                     (45) Date of Patent:    ***Dec. 8, 2015**

(54) **VERSATILE SYSTEMS FOR CONTINUOUS IN-LINE BLENDING OF BUTANE AND PETROLEUM**

(75) Inventors: **Larry D. Mattingly**, Sanford, FL (US);
**Steven M. Vanderbur**, Houston, TX (US)

(73) Assignee: **SUNOCO PARTNERS MARKETING & TERMINALS L.P.**, Philadelphia, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 688 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/451,715**

(22) Filed: **Apr. 20, 2012**

(65) **Prior Publication Data**

US 2012/0203038 A1    Aug. 9, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/633,431, filed on Dec. 8, 2009, now Pat. No. 8,176,951, which is a continuation of application No. 11/407,523, filed on Apr. 20, 2006, now Pat. No. 7,631,671, which is a
(Continued)

(51) **Int. Cl.**
*G05D 11/00*    (2006.01)
*G05D 11/13*    (2006.01)
*C10L 1/06*    (2006.01)

(52) **U.S. Cl.**
CPC ................ *G05D 11/133* (2013.01); *C10L 1/06* (2013.01); *G05D 11/132* (2013.01); *G05D 11/139* (2013.01); *Y10T 137/7759* (2013.01); *Y10T 137/86823* (2013.01)

(58) **Field of Classification Search**
USPC ............ 141/9, 83, 104, 105; 137/486, 625.41
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,246,875 A | 6/1941 | Carney | |
| 2,297,185 A | 9/1942 | Hollander et al. | |
| 3,179,291 A | 4/1965 | Umbach et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2435113 | 1/2005 |
| WO | WO 2007-124058 | 11/2007 |

OTHER PUBLICATIONS

Macungie Station Butane Blending Diagram, Jan. 15, 2004.*
(Continued)

*Primary Examiner* — Timothy L Maust
*Assistant Examiner* — Timothy P Kelly
(74) *Attorney, Agent, or Firm* — Clark G. Sullivan; Troutman Sanders LLP

(57)    **ABSTRACT**

A system and method are provided for in-line processes of blending butane into gasoline streams, and for blending butane into a gasoline stream at any point along a petroleum pipeline. The invention additionally provides a method for measuring the vapor pressure and vapor to liquid ratio of the gasoline, both upstream and downstream of the blending operation, as well as the sulfur content of the butane entering the blending operation. The blending operation can be controlled to ensure that the blended gasoline meets EPA requirements for vapor pressure and sulfur content of gasoline. The invention further provides a method for accessing and monitoring the operation off-site.

**17 Claims, 5 Drawing Sheets**





SUN_MAG_0001502

**PTX-3.1**

# US 9,207,686 B2
Page 2

### Related U.S. Application Data

continuation-in-part of application No. 10/759,515, filed on Jan. 16, 2004, now Pat. No. 7,032,629, which is a continuation of application No. 10/071,191, filed on Feb. 8, 2002, now Pat. No. 6,679,302.

(60) Provisional application No. 60/267,844, filed on Feb. 9, 2001.

## (56)        References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,342,199 | A | 9/1967 | McEvoy |
| 3,410,293 | A | 11/1968 | Ernyei |
| 3,484,590 | A | 12/1969 | Stanton |
| 3,751,644 | A | 8/1973 | Mayer |
| 3,813,925 | A | 6/1974 | Fenske et al. |
| 3,904,508 | A | 9/1975 | Whyte et al. |
| 3,999,959 | A | 12/1976 | Bajek |
| 4,268,701 | A | 5/1981 | Dang Vu et al. |
| 4,523,928 | A | 6/1985 | Hillman et al. |
| 4,543,819 | A | 10/1985 | Chin et al. |
| 4,876,653 | A | 10/1989 | McSpadden et al. |
| 4,882,041 | A | 11/1989 | Scott |
| 5,004,850 | A | 4/1991 | Wilson |
| 5,093,533 | A | 3/1992 | Wilson |
| 5,133,391 | A | 7/1992 | Johansson et al. |
| 5,163,586 | A | 11/1992 | Zinsmeyer |
| 5,193,594 | A | 3/1993 | Johansson et al. |
| 5,208,402 | A | 5/1993 | Wilson |
| 5,271,526 | A | 12/1993 | Williams |
| 5,344,044 | A | 9/1994 | Hayden et al. |
| 5,423,607 | A | 6/1995 | Jones et al. |
| 5,430,295 | A | 7/1995 | Le Febre et al. |
| 5,542,450 | A | 8/1996 | King et al. |
| 5,823,669 | A | 10/1998 | Jones |
| 5,860,457 | A | 1/1999 | Andersson |
| 5,975,353 | A | 11/1999 | Finlayson |
| 5,979,705 | A | 11/1999 | Kaehler et al. |
| 6,026,991 | A | 2/2000 | Matthews |
| 6,109,286 | A | 8/2000 | Johnston |
| 6,161,060 | A | 12/2000 | Collins |
| 6,163,738 | A | 12/2000 | Miller |
| 6,258,987 | B1 | 7/2001 | Schmidt et al. |
| 6,328,772 | B1 | 12/2001 | Scott et al. |
| 6,679,302 | B1 | 1/2004 | Mattingly et al. |
| 7,032,629 | B1 | 4/2006 | Mattingly et al. |
| 7,631,671 | B2 | 12/2009 | Mattingly et al. |
| 8,176,951 | B2 | 5/2012 | Mattingly et al. |
| 8,192,510 | B2 | 6/2012 | Mattingly et al. |
| 8,597,380 | B2 * | 12/2013 | Buchanan ........................ 44/452 |
| 8,748,677 | B2 | 6/2014 | Buchanan |
| 2005/0022446 | A1 | 2/2005 | Brundage et al. |
| 2005/0058016 | A1 | 3/2005 | Smith et al. |
| 2006/0278304 | A1 | 12/2006 | Mattingly et al. |
| 2007/0034550 | A1 | 2/2007 | Hedrick et al. |
| 2010/0175313 | A1 | 7/2010 | Mattingly et al. |
| 2012/0216453 | A1 | 8/2012 | Mattingly et al. |

### OTHER PUBLICATIONS

Declaration of Steven M. Vanderbur on the operation of the Macungie Station, Apr. 10, 2013, pp. 1-5.*

Grabner Instruments, "About Vapor Pressure Testing," from Grabner Instruments website, 2013.

Haskell, N. B. et al., Front-End Volatility of Gasoline Blend Industrial and Engineering Chemistry, vol. 34, No. 2, Feb. 1942, pp. 167-170.

Stewart, W.E., "Predict RVP of Blends Accurately," Petroleum Refiner, vol. 38, No. 6, Jun. 1959, pp. 231-234.

Standard Test Method for Vapor Pressure of Petroleum Products (Reid Method); from Organic website (http://organic.ulsan.ac.kr/reid.html), 2013.

Vazquez-Esparragoza, J. et el., "How to Estimate Reid Vapor Pressure (RVP) of Blends," Bryan Research & Engineering, Inc., website, Encyclopedia of Chemical Processing and Design, vol. 47, pp. 415-424; Hydrocarbon Processing, Aug. 1992, pp. 135-138.

Compliance Monitoring for Vapor Pressure or Vapor-Liquid Ratio Temperature, MiniVap On-line Petrolab Company website, 2013.

Spectro, "Sulfur Monitors and Analyzers for Fuels and Oils," from Spectro website, 2013.

Sindie, "Sindie On-line Analyzer," from Sindie website, 2013.

Environmental Protection Agency, "Gasoline Blending Regulations," 40 G.F.R. § 80.27, 80.41, 80.46, 80.65, 80.195, 80.340.

Reynolds, Robert E., "The Current Fuel Ethanol Industry Transportation, Marketing, Distribution, and Technical Considerations," Downstream Alternatives Inc., May 15, 2000.

Monder, Dayadeep S., Real-Time Optimization of Gasoline Blending with Uncertain Parameters, University of Alberta, Spring 2001. EPA Q & A Date Oct. 3, 1994, Abstract.

International Search Report and Written Opinion issued Mar. 5, 2010 in International Patent Application No. PCT/US10/20207.

International Search Report and Written Opinion, dated May 2, 2014, which issued during the prosecution of International Patent Application No. PCT/US2013/038761, which corresponds to the present application.

International Search Report and Written Opinion, dated Jun. 10, 2014, which issued during the prosecution of International Patent Application No. PCT/US2013/069447, which corresponds to the present application.

* cited by examiner

**Figure 1**



## Figure 2



SUN_MAG_0001505

**PTX-3.4**

**Figure 3**



305 — Draw sample from gasoline stream or blended stream

310 — Measure sample for vapor pressure or vapor to liquid ratio

315 — Return sample to gasoline or blended stream

SUN_MAG_0001506

## Figure 4



405 — Modulate pressure of butane stream entering blending operation

410 — Modulate area of orifice of valve through which butane enters blending operation

415 — Open on/off valve at gasoline stream

SUN_MAG_0001507

PTX-3.6

US 9,207,686 B2

1

# VERSATILE SYSTEMS FOR CONTINUOUS IN-LINE BLENDING OF BUTANE AND PETROLEUM

## RELATED APPLICATIONS

This application is a continuation of U.S. Ser. No. 12/633,431, filed Dec. 8, 2009, granted as U.S. Pat. No. 8,176,951 on May 15, 2012, which is a continuation of U.S. Ser. No. 11/407,523, filed Apr. 20, 2006, granted as U.S. Pat. No. 7,631,671 on Dec. 15, 2009, which is a continuation-in-part of U.S. Ser. No. 10/759,515, filed Jan. 16, 2004, granted as U.S. Pat. No. 7,032,629 on Apr. 25, 2006, which is a continuation of U.S. Ser. No. 10/071,191, filed Feb. 8, 2002, granted as U.S. Pat. No. 6,679,302 on Jan. 20, 2004, which claims the benefit of U.S. provisional application No. 60/267,844, filed Feb. 9, 2001, all of which are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to in-line processes for blending butane into a gasoline stream, that allow butane to be blended into a gasoline stream at any point along a petroleum pipeline.

## BACKGROUND OF THE INVENTION

Petroleum pipelines are the backbone of this nation's gasoline distribution system, delivering refined fuel products from ports and refineries to storage facilities around the country. Through an intricate network of coordinated deliveries from multiple sources, batches of varying grades and types of fuel travel through these pipelines to predetermined locations. Tank farms are used to store fuel delivered through these pipelines, and to distribute the fuel to other tank farms and ultimately to tanker trucks that deliver the fuel to end use outlets such as retail gasoline stations. Tank farms that simply store the gasoline for further distribution to other tank farms are referred to herein as "intermediate tank farms." Tank farms that dispense the gasoline to tanker trucks for delivery to the end user are referred to herein as "terminal tank farms." Petroleum products are typically dispensed to tanker trucks in what is known as a rack, which usually comprise several outlet ports to which different gasoline transports may be coupled. Some tank farms are used for terminal and intermediate functions, and those farms are referred to herein as "combined use tank farms."

A significant physical property of gasoline is its volatility, or its ability to combust. In order to keep cars performing at a consistent level year-round, gasoline marketers blend agents such as butane with gasoline to increase the Reid vapor pressure and volatility of the gasoline, especially during the colder months. These marketers also add butane to reduce the cost of the gasoline. This blending can occur in-line, so that butane is added directly to a line that is transporting the gasoline. Alternatively, blending can occur in batches, as when butane is added to a storage tank.

Because gasoline vapor emissions from automobiles are a major component of volatile organic compounds (VOC's) in the atmosphere, the United States Environmental Protection Agency (EPA) has promulgated regulations that govern the volatility of gasoline and how much butane can be blended with gasoline. These regulations generally apply from May 1 through September 15, when the gasoline is warmest and most volatile, and require that any blended gasoline be certified for compliance with the volatility guidelines. See 40

2

C.F.R. §80.27 (2005). The regulations also establish maximum volatility levels for gasoline based on the season of the year, and the region in which the gasoline will be dispensed and sold.

There are two principal methods for assessing the volatility of gasoline: (1) measuring the vapor to liquid ratio, and (2) measuring the vapor pressure. The Reid method is the standard test for measuring the vapor pressure of petroleum products. Reid vapor pressure (RVP) is related to true vapor pressure, but is a more accurate assessment for petroleum products because it considers sample vaporization as well as the presence of water vapor and air in the measuring chamber.

The EPA is also concerned with the sulfur contained in butane, and its emission into the atmosphere when blended gasoline is combusted, and has promulgated regulations that specify how much sulfur is allowed in butane that is added to gasoline, and the testing requirements for assuring that the amounts of sulfur do not exceed the specified amounts. See 40 C.F.R. §§80.195, 80.340(a)(1) (2005). The sulfur content of the butane cannot exceed 30 ppm, and the butane must be sampled at least once every 500,000 gallons of butane to assure compliance. See 40 C.F.R. §80.340(a)(1)-(2) (2005).

Butane is often blended with other gasoline components at the refinery, where it is typically added at the trunk line in response to changes in vapor pressure demand. An exemplary refinery blending process is disclosed in Mayer, U.S. Pat. No. 3,751,644. This patent, which is owned by Sun Oil Company, describes a system for automatically adjusting the amount of butane added to a gasoline stream at a petroleum refinery, based on continuous measurements of the Reid vapor pressure of the gasoline downstream from the point of blending. The described process calculates the amount of butane to be blended based on measurements taken downstream of the blending operation, and does not include measuring the Reid vapor pressure upstream of the blending operation, or calculating the blend ratio based on the Reid vapor pressure upstream from the blending operation.

Bajek's U.S. Pat. No. 3,999,959, which is owned by Universal Oil Products Company, also discloses a system for blending butane and gasoline at a petroleum refinery. The Bajek system blends butane with a low-octane gasoline stream and a high-octane gasoline stream, and then analyzes the blended gasoline to measure characteristics such as Reid vapor pressure and vapor to liquid ratio. Bajek does not disclose monitoring the gasoline upstream of the blending operation, or calculating the blend ratio based upon such upstream monitoring.

Efforts at blending butane at a terminal tank farm have also recently been undertaken. As described in our granted Patent U.S. Pat. No. 6,679,302 (to which this application claims priority), butane can be blended in-line with a gasoline stream immediately before the gasoline is dispensed to a tanker truck, and after it has been withdrawn from the storage tank. In a preferred process described in this patent, the Reid vapor pressure is measured upstream of the blending operation, and the blend ratio is calculated based on the upstream measurement.

Lastly, the inventors are aware of an unpatented system that is used to blend butane and gasoline at several terminal tank farms. These systems continuously monitor the Reid vapor pressure of gasoline that is introduced to a storage tank, and blend butane with the gasoline based upon the vapor pressure measurements. These systems do not continuously monitor the Reid vapor pressure downstream of the blending operation as an integrity check. Instead, they certify the integrity of the blending operation by periodically measuring the Reid vapor pressure of the entire storage tank.

SUN_MAG_0001509

PTX-3.8

US 9,207,686 B2

3

Several methods have been attempted to improve the precision of butane blending and the predictability of Reid vapor pressure in the final product. The Grabner unit is a substantial advance in this respect. The Grabner unit (manufactured by Grabner Instruments) is a measuring device capable of providing Reid vapor pressure and vapor to liquid ratio data for a gasoline sample typically within 6-11 minutes of introducing the sample to the unit. It has been employed at some refineries to consistently measure the volatility of gasoline, and to blend butane with the gasoline based upon an allowable Reid vapor pressure for the gasoline.

SUMMARY OF THE INVENTION

By combining the advantages of in-line vapor pressure monitoring both upstream and downstream of a butane blending operation, the inventors have developed a tightly controlled butane blending system with surprising versatility that can be used to blend butane with petroleum products at practically any point along a petroleum pipeline, regardless of variations in the flow rate of gasoline through the pipeline, the time of year in which the gasoline is delivered, or the ultimate destination to which the gasoline is delivered. For the first time, petroleum vendors and distributors are able to take optimum advantage of the many cost saving and performance benefits that butane blending offers, and to do so without regard to the location where the blending occurs along the pipeline.

Therefore, in one embodiment the invention provides a system for in-line blending of gasoline and butane comprising (a) a gasoline stream; (b) a butane stream; (c) a blending unit for blending said gasoline stream and said butane stream at an actual blend ratio and an actual blend rate to yield a blended gasoline stream; (d) an upstream vapor pressure sensor in sensory communication with said gasoline stream upstream of said blending unit; (e) a downstream vapor pressure sensor in sensory communication with said gasoline stream downstream of said blending unit; and (f) one or more information processing units (IPUs) in informational communication with said upstream vapor pressure sensors, logically programmed to calculate a calculated blend ratio based upon the vapor pressure of said gasoline stream, and for communicating said calculated blend ratio to said IPU, and adjusts the actual blend ratio to coincide with said calculated blend ratio.

In one embodiment the gasoline flow rate does not vary over time, and the blend rate can be calculated based upon a preset gasoline flow rate. Such preset flow rates may occur, for example, when gasoline is pumped at a terminal tank farm from a tank to a rack, under the influence of only one mechanical pump. However, in a particularly preferred embodiment, which takes fuller advantage of the versatility of the systems described herein, the gasoline flow rate will vary within a batch, and utilizing the invention will further comprise periodically determining the gasoline flow rate through the pipeline, and periodically recalculating the butane blend rate based upon the gasoline flow rate and the blend ratio calculated by the IPU. In a particularly preferred embodiment, the gasoline flow rate and gasoline vapor pressure will be periodically re-determined at the same frequency, so that the blend ratio and blend rate are both periodically recalculated to account for differences within and among batches in gasoline flow rate and gasoline vapor pressure. In certain embodiments, the gasoline flow rate may be continually or continuously received from the operator of the gasoline pipeline. In another embodiment the invention provides a system

4

for in-line blending of gasoline and butane comprising (a) a gasoline stream having a volumetric flow rate that varies over time; (b) a butane stream; (c) a blending unit for blending said gasoline stream and said butane stream at an actual blend ratio and an actual blend rate to yield a blended gasoline stream; (d) an upstream vapor pressure sensor in sensory communication with said gasoline stream upstream of said blending unit; and (e) one or more information processing units (IPUs) in informational communication with said upstream vapor pressure sensors, logically programmed to calculate a calculated blend ratio and calculated blend rate based upon the vapor pressure and volumetric flow rate of said gasoline stream, and for communicating said calculated blend ratio and calculated blend rate to said blending unit; wherein said blending unit periodically receives said calculated blend ratio and calculated blend rate from said one or more IPUs, and adjusts the actual blend ratio and actual blend rate to coincide with said calculated blend ratio and calculated blend rate.

In a preferred embodiment the blend ratio and blend rate calculations are based upon the time of year in which the blending occurs, the delivery location for the blended gasoline and/or the type of petroleum flowing through the pipeline, because each of these variables governs the allowable vapor pressure in the gasoline, or whether butane can be blended with the petroleum at all. In one such embodiment, the blending operation further comprises an information processing unit and an informational database on which is stored multiple allowable vapor pressures associated with date and/or destination information, and the information processing unit retrieves or receives the date and/or destination of the gasoline stream, and the information processing unit calculates the blend ratio and/or blend rate based upon the allowable vapor pressure for the retrieved date and/or destination of the gasoline stream.

In another such embodiment, the blending operation further comprises an information processing unit and an informational database on which is stored a listing of one or more petroleum products for which butane blending is impermissible, wherein the information processing unit retrieves or receives the type of petroleum flowing through the pipeline and the blend ratio and/or blend rate is calculated based upon the type of petroleum flowing through the pipeline—the rate or ratio equaling zero when a petroleum product to which butane cannot be added is flowing through the pipeline.

In yet another such embodiment, each batch of a petroleum product to flow through the pipeline will have an associated batch code based upon the destination of the batch and/or the type of petroleum product in the batch, and the blending operation further comprises an information processing unit and an informational database on which is stored allowable vapor pressures for each batch code, and the information processing unit retrieves or receives the batch code associated with the batch flowing through the pipeline, and the information processing unit calculates the blend ratio and/or blend rate based upon the allowable vapor pressure for the retrieved batch code. In exemplary embodiments, the rate or ratio equals zero when a petroleum product, such as transmix, to which butane cannot be added is flowing through the pipeline.

The invention will typically be practiced on one skid or platform, such as a square or rectangular concrete slab situated in proximity to the point at which butane is physically added to the pipeline, and it may be practiced at any point on a pipeline downstream of a refinery. For example, the invention may be practiced at an intermediate, terminal, or combination tank farm, either before gasoline is introduced to a storage tank, or after it is withdrawn from a tank.

SUN_MAG_0001510

**PTX-3.9**

US 9,207,686 B2

5 6

In another embodiment, the inventors have developed a combination monitoring system that monitors the sulfur content of butane added to a gasoline stream and the vapor pressure of gasoline to which the butane is added. The monitoring equipment for both operations is preferably located in the same area, and in one preferred embodiment the vapor pressure and sulfur monitoring equipment is located on the same platform or skid at the tank farm. The butane may be supplied to the monitoring system by one or multiple sources of butane, which are typically stored in butane bullets that are located on the premises of the tank farm. In this embodiment the invention provides a system for in-line blending of gasoline and butane comprising (a) a gasoline stream; (b) a butane stream; (c) a gasoline vapor pressure sensor, in sensory communication with said gasoline stream; (d) a butane sampling unit for periodically or continuously withdrawing butane from said gasoline stream; and (e) a blending unit for blending said gasoline stream and said butane stream at a blend ratio into a blended gasoline stream, downstream of said gasoline vapor pressure sensor and said butane sampling unit; wherein said butane sampling unit and said gasoline vapor pressure sensor are located on a platform in proximity to said petroleum pipeline. The butane measurement is preferably made on a semi-automated basis, so that at least one sample of butane is measured for sulfur content at least every 500,000 gallons of butane added to the pipeline.

The apparatus for controlling the blending of the butane and gasoline typically includes two valves—a modulating valve that controls the flow of butane toward the pipeline, and an on/off valve between the modulating valve and the gasoline stream. The amount of butane permitted to flow through the modulating valve can be varied to achieve any desired blend ratio, blend rate, or vapor pressure in the blended gasoline. In one particular embodiment, the modulating valve is under the control of a process control unit, which varies the blend ratio to attain a desired vapor pressure in the blended gasoline, based on the vapor pressure of gasoline entering the blending unit, the vapor pressure of butane entering the blending unit, and the desired vapor pressure of the blended gasoline. The blend rate is then calculated based upon the blend ratio and the rate of flow in the gasoline stream, and the modulating valve is opened or closed to allow butane addition at the rate thus calculated.

In one embodiment, the invention provides modalities for remotely controlling the butane blending operation, and for turning the blending operation on or off in its entirety. This may be accomplished, for example, by controlling the gasoline on/off valve nearest the pipeline, and may be controlled from two or more remote locations, thus giving the pipeline operator, as well as the contract butane blender, control over the process. The blending operation may be manually overridden when, for example, the terminal receives a batch of product with which butane should not be blended, such as transmix, or at certain times of the year when mixing is impermissible, or in emergency type situations.

It has also proven advantageous to coordinate the butane blending information gathered through the blending operation with data that is often gathered and generated separately by the tank farm operator, such as petroleum batch data and rate of flow. The petroleum batch data is particularly useful because, by knowing the time at which a batch began passing, and stopped passing a blending point, one can calculate precisely how much butane was blended with any given batch of petroleum flowing through the petroleum pipeline. Therefore, in still another embodiment the inventors have developed a method of recording the quantity of butane blended with a batch of petroleum in a continuous in-line butane blending operation comprising (a) providing a gasoline stream; (b) providing a butane stream; (c) recording the start time when a batch of gasoline begins to pass through said in-line butane blending operation; (d) recording the end time at which the batch finishes passing through said in-line butane blending operation; (e) recording the quantity of butane blended with said gasoline stream between said start time and end time; and (f) associating said quantity of butane with said batch in an informational database.

The information gathering and reporting methods of the systems of this invention can also be adapted to retrieve, store and generate reports with useful information such as (i) the date, (ii) batch information selected from start and stop time, total volume of gasoline per batch, total volume of butane blended per batch, petroleum type, and petroleum destination, (iii) average blend ratio, (iv) gasoline flow rate, (v) blend ratio, (vi) blend rate, (vii) vapor pressure of said gasoline upstream of the butane blending, (viii) vapor pressure of said gasoline downstream of the butane blending, (ix) vapor to liquid ratio of said gasoline upstream of the butane blending, (x) vapor to liquid ratio of said gasoline downstream of the butane blending, (xii) the amount of butane in one or more tanks of butane on the tank farm, (xiii) the content of sulfur in one or more samples of said butane, (xiv) the pressure of said butane stream at two points along the butane stream, (xv) the settings for daily calibration of a gasoline vapor pressure sensor, and (xvi) the temperature of any butane storage tanks located at the tank farm. All of this data is preferably accessible at a remote location through a suitably programmed information processing and storage unit.

In still another embodiment the systems of the present invention are programmed to automatically vary the blend ratio or blend rate based on the EPA's vapor pressure limitations based on the time of year and geographical region. Therefore, in still another embodiment the invention provides a system for in-line blending of gasoline and butane comprising (a) a gasoline stream having a volumetric flow rate; (b) a butane stream; (c) a blending unit for blending said gasoline stream and said butane stream at an actual blend ratio and an actual blend rate to yield a blended gasoline stream; (d) an upstream vapor pressure sensor in sensory communication with said gasoline stream upstream of said blending unit; (e) one or more informational databases on which is stored seasonal data that prescribes (i) allowable vapor pressures on two or more prescribed dates or ranges of dates, or (ii) whether butane blending is allowed on two or more prescribed dates or ranges of dates; and (f) one or more information processing units (IPUs) in informational communication with said upstream vapor pressure sensors and said informational databases, logically programmed to retrieve the date and to calculate a calculated blend ratio and calculated blend rate based upon the stored seasonal data and the vapor pressure and volumetric flow rate of said gasoline stream, and for communicating said calculated blend ratio and calculated blend rate to said blending unit; wherein said blending unit periodically receives said calculated blend ratio from said IPU, and adjusts the actual blend ratio to coincide with said calculated blend ratio.

These and other objects, features, and advantages of the present invention may be more clearly understood and appreciated from a review of the following detailed description of the disclosed embodiments and by reference to the appended drawings and claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a functional block diagram illustrating the architecture of an exemplary butane blending system.

SUN_MAG_0001511

PTX-3.10

Appx200

US 9,207,686 B2

7

FIG. 2 is a logic flow diagram illustrating an overview of an exemplary butane and gasoline blending method.

FIG. 3 is a logic flow diagram illustrating an overview of an analysis of the gasoline or blended gasoline streams.

FIG. 4 is a logic flow diagram illustrating operations of the two valves that control the flow of butane and gasoline into the blending unit.

FIG. 5 is a logic flow diagram illustrating an exemplary process for determining the blend ratio of butane and gasoline, monitoring the blended gasoline, and adjusting the blend ratio if necessary.

DETAILED DESCRIPTION OF THE INVENTION

Methods of Measurement

Throughout this patent application, whenever an analysis of gasoline or butane is disclosed, the analysis is to be performed in accordance with applicable EPA regulations and American Society for Testing and Materials ("ASTM") methods in force as of the date of this application. Therefore, the following ASTM methods are to be used when applicable:

1. For measuring the Reid vapor pressure of reformulated gasoline, ASTM standard method D 5191-01, entitled "Standard Test Method for Vapor Pressure of Petroleum Products (Mini Method)" must be used. The following correlation must also be used to satisfy EPA regulations:

$$RVP_{EPA} = (0.956 * RVP_{ASTM}) - 2.39 \text{ kPa}$$

2. For measuring the sulfur content of butane blended with reformulated gasoline, ASTM standard method D 3246-96 entitled "Standard Test Method for Sulfur in Petroleum Gas by Oxidative Microcoulometry" should be used. When blending with conventional gasoline, EPA regulations permit any ASTM sulfur test method to be used for quality assurance testing, so long as the test results are correlated with method D 3246-96.

Discussion

In a first embodiment, the invention provides a system for in-line blending of gasoline and butane comprising (a) a gasoline stream; (b) a butane stream; (c) a blending unit for blending said gasoline stream and said butane stream at an actual blend ratio and an actual blend rate to yield a blended gasoline stream; (d) an upstream vapor pressure sensor in sensory communication with said gasoline stream upstream of said blending unit; (e) a downstream vapor pressure sensor in sensory communication with said gasoline stream downstream of said blending unit; and (f) one or more information processing units (IPUs) in informational communication with said upstream vapor pressure sensors, logically programmed to calculate a calculated blend ratio based upon the vapor pressure of said gasoline stream, and for communicating said calculated blend ratio to said blending unit; wherein said blending unit periodically receives said calculated blend ratio from said IPU, and adjusts the actual blend ratio to coincide with said calculated blend rate.

In a second embodiment, the invention provides a system for in-line blending of gasoline and butane comprising (a) a gasoline stream having a volumetric flow rate that varies over time; (b) a butane stream; (c) a blending unit for blending said gasoline stream and said butane stream at an actual blend ratio and an actual blend rate to yield a blended gasoline stream; (d) an upstream vapor pressure sensor in sensory communication with said gasoline stream upstream of said blending unit; and (e) one or more information processing units (IPUs) in informational communication with said upstream vapor pressure sensors, logically programmed to calculate a calculated blend ratio and calculated blend rate based upon the vapor pressure

8

and volumetric flow rate of said gasoline stream, and for communicating said calculated blend ratio and calculated blend rate to said blending unit; wherein said blending unit periodically receives said calculated blend ratio and calculated blend rate from said one or more IPUs, and adjusts the actual blend ratio and actual blend rate to coincide with said calculated blend ratio and calculated blend rate.

In a third embodiment, the invention provides a system for in-line blending of gasoline and butane comprising (a) a gasoline stream; (b) a butane stream; (c) a gasoline vapor pressure sensor, in sensory communication with said gasoline stream; (d) a butane sampling unit for periodically or continuously withdrawing butane from said butane stream; and (e) a blending unit for blending said gasoline stream and said butane stream at a blend ratio into a blended gasoline stream, downstream of said gasoline vapor pressure sensor; wherein said butane sampling unit and said gasoline vapor pressure sensor are located on a platform in proximity to said petroleum pipeline.

In a fourth embodiment, the invention provides a system for in-line blending of gasoline and butane comprising (a) a gasoline stream; (b) a butane stream; and (c) a blending unit for blending said gasoline stream and said butane stream at an actual blend ratio and an actual blend rate to yield a blended gasoline stream comprising an on/off valve between said gasoline stream and said butane stream and a modulating valve that modulates the rate of flow of said butane stream toward said on/off valve. This embodiment may further comprise an upstream vapor pressure sensor in sensory communication with said gasoline stream, upstream of said blending unit.

In a fifth embodiment, the invention provides a system for in-line blending of gasoline and butane comprising (a) a gasoline stream having a volumetric flow rate; (b) a butane stream; (c) a blending unit for blending said gasoline stream and said butane stream at an actual blend ratio and an actual blend rate to yield a blended gasoline stream; (d) an upstream vapor pressure sensor in sensory communication with said gasoline stream upstream of said blending unit; (e) one or more informational databases on which is stored seasonal data that prescribes (i) allowable vapor pressures on two or more prescribed dates or ranges of dates, or (ii) whether butane blending is allowed on two or more prescribed dates or ranges of dates; and (f) one or more information processing units (IPUs) in informational communication with said upstream vapor pressure sensors and said informational databases, logically programmed to retrieve the date and to calculate a calculated blend ratio and calculated blend rate based upon the stored seasonal data, and the vapor pressure and volumetric flow rate of said gasoline stream, and for communicating said calculated blend ratio and calculated blend rate to said blending unit; wherein said blending unit periodically receives said calculated blend ratio from said IPU, and adjusts the actual blend ratio to coincide with said calculated blend ratio.

The systems of the foregoing embodiments may further comprise a gasoline vapor pressure sensor in sensory communication with said gasoline stream downstream of said blending unit, as described as part of the first embodiment. Such embodiments may further comprise one or more informational databases in informational communication with said downstream vapor pressure sensor, wherein said one or more informational databases periodically receive and store vapor pressure measurements from said downstream vapor pressure sensor. The foregoing embodiments may further

SUN_MAG_0001512

**PTX-3.11**

US 9,207,686 B2

9

include a gasoline vapor to liquid ratio sensor, and/or an automated sulfur measuring unit in sensory communication with said butane stream.

Additionally, the systems of the foregoing embodiments may further comprise a butane sampling unit for periodically or continuously withdrawing butane from said butane stream, as described as part of the third embodiment. Said butane sampling units may be under the control of one or more information processing units, wherein said one or more information processing units may cause said butane sampling unit to withdraw into a reservoir at least one sample of butane from said butane stream at least every 500,000 gallons of butane. Said reservoir may be manually withdrawn periodically from said butane sampling unit, and any butane contained in said reservoir may be tested for sulfur content.

The systems of the foregoing embodiments may further comprise (a) a butane storage unit; (b) underground piping for transmitting said butane stream from said butane storage unit to said butane blending unit; (c) a first butane pressure sensor in sensory communication with said butane stream at or near said butane storage unit; (d) a second butane pressure sensor in sensory communication with said butane stream at or near said butane blending unit; and (e) a remote information processing unit in informational communication with said first and second butane pressure sensors, for remotely monitoring and displaying butane pressures detected by said first and second butane pressure sensors. Also, the foregoing embodiments may further comprise (a) a butane storage unit; (b) a temperature gauge for measuring the temperature of butane in said butane storage unit; and (c) a remote information processing unit in informational communication with said temperature gauge, for remotely monitoring and displaying temperatures detected by said temperature gauge.

Significantly, the blending unit described in any of the foregoing embodiments may comprise two valves, as described as part of the fourth embodiment. One valve is an on/off valve located between the gasoline stream and the butane stream. This valve can prevent gasoline from entering the blending unit. The second valve is a modulating valve that controls the flow of butane towards the first valve. The second valve controls the rate of flow of butane by modulating both the pressure of the butane stream passing through the valve as well as the size of the orifice through which the butane stream flows. The modulating valve and/or the on/off valve may be under the control of a process control unit, which varies the blend ratio to attain a desired vapor pressure, based on the vapor pressure of gasoline entering the blending unit, the vapor pressure of butane entering the blending unit, and the desired vapor pressure of the blended gasoline. A butane addition rate may then be calculated based upon the blend ratio and the rate of flow in the gasoline stream, and the modulating valve may be opened or closed to allow butane addition at the rate thus calculated. The valves may also be under the control of one or more remote information processing units.

Additionally, any of the foregoing embodiments may comprise one or more informational databases and an information processing unit (IPU), as described as part of the fifth embodiment, for storing seasonal data, as well as the date, types of petroleum, vapor pressure of gasoline, and delivery location of said gasoline stream, and then blending based upon said seasonal data, date, types of petroleum, vapor pressure, and delivery location of said gasoline stream. In such embodiments, the blending operation may further comprise an information processing unit and an informational database on which is stored multiple allowable vapor pressures associated with seasonal data, date, petroleum type, and/or destination

10

information. The information processing unit then retrieves the corresponding date, petroleum type, and/or destination of the gasoline stream, and the information processing unit calculates the blend ratio and/or blend rate based upon the allowable vapor pressure for the retrieved seasonal data, date, petroleum type and/or destination for the gasoline stream. As used throughout the present application, the term "retrieve" includes both retrieving data and receiving data from another source. The blending unit described in any of the foregoing embodiments may further comprise an information processing unit and an informational database on which is stored a listing of any petroleum products for which blending with butane is impermissible. In such embodiments, the calculated blend rate and/or blend ratio may equal zero when a petroleum product to which butane cannot be added is flowing through the pipeline.

In any of the foregoing embodiments, each batch of a petroleum product to flow through the pipeline may have an associated batch code based upon the destination of the batch and/or the type of petroleum product in the batch, and the blending operation may further comprise an information processing unit and an informational database on which is stored allowable vapor pressures for each batch code. In such embodiments, the information processing unit may retrieve or receive the batch code associated with the batch flowing through the pipeline, and the information processing unit may calculate the blend ratio and/or blend rate based upon the allowable vapor pressure for the retrieved batch code. In such embodiments, the calculated blend rate or blend ratio may equal zero when a petroleum product, such as transmix, to which butane cannot be added is flowing through the pipeline.

The gasoline stream of the foregoing embodiments may have a gasoline flow rate that does not vary over time, and therefore, the blend rate can be calculated based upon a preset gasoline flow rate. As used throughout this application, the term "flow rate" refers to a volume of a fluid that flows past a given point over a given period of time. Alternatively, the gasoline stream may have a gasoline flow rate that varies within a batch of gasoline, and therefore, utilization of the invention will further comprise periodically determining the gasoline flow rate through the pipeline, and periodically recalculating the butane blend rate based upon the gasoline flow rate and a calculated blend ratio. Specifically, any of the foregoing embodiments blending gasoline with constant or variable flow rates may further comprise one or more informational processing units in informational communication with said upstream vapor pressure sensors, logically programmed to calculate a calculated blend ratio and calculated blend rate based upon the vapor pressure and volumetric flow rate of said gasoline stream, and for communicating said calculated blend ratio and calculated blend rate to said blending unit; wherein said blending unit periodically receives said calculated blend ratio and calculated blend rate from said one or more IPUs, and adjusts the actual blend ratio and actual blend rate to coincide with said calculated blend ratio and calculated blend rate.

The foregoing embodiments of the invention may further include a manual switch to shut down the system. The manual switch may operate to turn off an on/off valve that may be located between the gasoline and butane streams. The embodiments of the invention may also include an informational database for storing data accessible to an information processing unit with access to an Internet connection.

The blending units described in the foregoing embodiments of the invention may be placed on a skid or platform. The invention may be located anywhere downstream of a refinery. The invention may also be located at a gasoline tank

SUN_MAG_0001513

**PTX-3.12**

Appx202

US 9,207,686 B2

11

12

farm, either before the gasoline stream is introduced to a tank, or after the gasoline stream is withdrawn from the tank. The tank farm may be a terminal gasoline tank farm, an intermediate gasoline tank farm, or a combined use tank farm.

Referring to FIG. 1, this illustrates an overview of a preferred example of components of the foregoing embodiments. It shows a gasoline stream 110 and a butane stream 115 entering an analyzing and blending unit 120, and a blended gasoline stream 125 exiting the analyzing and blending unit 120 and entering a second analyzing unit 130. The analyzing and blending unit 120 may comprise a blending unit, a sulfur measuring unit in sensory communication with said butane stream 115 and a gasoline vapor pressure sensor and/or vapor to liquid ratio sensor in sensory communication with said gasoline stream 110. The second analyzing unit 130 may comprise a vapor pressure sensor and/or vapor to liquid ratio sensor in sensory communication with said blended gasoline stream 125.

In a sixth embodiment, the invention provides a method for in-line blending of gasoline and butane comprising (a) providing a gasoline stream; (b) providing a butane stream; (c) measuring vapor pressure of gasoline in said gasoline stream; (d) calculating a blend ratio based upon said vapor pressure; (e) blending the butane stream and gasoline stream at said blend ratio to provide blended gasoline; and (f) measuring vapor pressure of the blended gasoline stream.

In a seventh embodiment, the invention provides for a method for in-line blending of gasoline and butane comprising (a) providing a gasoline stream having a volumetric flow rate that varies over time; (b) providing a butane stream; (c) periodically measuring vapor pressure of gasoline in the gasoline stream; (d) periodically measuring volumetric flow rate of gasoline in the gasoline stream; (e) calculating a blend ratio based upon said vapor pressure and said volumetric flow rate; and (f) blending, with a blending unit, the butane stream and the gasoline stream at said blend ratio to provide a blended gasoline stream.

In an eighth embodiment, the invention provides a method for in-line blending of gasoline and comprising (a) providing a gasoline stream; (b) providing a butane stream; (c) measuring vapor pressure of gasoline in the gasoline stream; (d) calculating a blend ratio based upon said vapor pressure; (e) periodically or continuously withdrawing butane from said butane stream; (f) periodically or continuously measuring sulfur content of the butane withdrawn from said butane stream; and (g) blending the butane stream and the gasoline stream at said blend ratio to provide a blended gasoline stream.

In a ninth embodiment, the invention provides a method for in-line blending of gasoline and butane to provide a blended gasoline stream comprising (a) providing a gasoline stream; (b) providing a butane stream; (c) controlling a blend ratio of butane from said butane stream and gasoline from said gasoline stream at a blending operation; and (d) controlling whether or not gasoline pressure from said gasoline stream enters the blending operation. This method may further comprise measuring vapor pressure of the gasoline stream, measuring sulfur content of the butane stream, and/or measuring vapor pressure of the blended gasoline stream.

In a tenth embodiment, the invention provides a method for in-line blending of gasoline and butane to provide a blended gasoline stream comprising (a) providing a gasoline stream having a volumetric flow rate; (b) providing a butane stream; (c) measuring vapor pressure of gasoline in the gasoline stream; (d) storing, in one or more informational databases, seasonal data that prescribes (i) allowable vapor pressures on two or more prescribed dates or ranges of dates, or (ii) whether butane blending is allowed on two or more prescribed dates or ranges of dates; (e) calculating a blend ratio based upon current date information, said seasonal data, and said vapor pressure; and (f) blending, with a blending unit, the butane stream and the gasoline stream at said blend ratio to provide a blended gasoline stream.

In an eleventh embodiment, the invention provides a method of recording the quantity of butane blended with a batch of gasoline in a continuous in-line butane blending operation comprising (a) providing a gasoline stream; (b) providing a butane stream; (c) recording a start time when a batch of gasoline begins to pass through said in-line butane blending operation; (d) recording an end time at which the batch finishes passing through said in-line butane blending operation; (e) recording the quantity of butane blended with said gasoline stream between said start time and end time; and (f) associating said quantity of butane with said batch in an informational database.

The eleventh embodiment may further comprise measuring vapor pressure for each batch of blended gasoline. The validation may be done using the chill method. This embodiment may further comprise dividing each batch of blended gasoline into different streams of blended gasoline, and sending each stream to an off-site recipient of blended gasoline.

In an twelfth embodiment, the invention provides a method for off-site monitoring and collection of data at a gasoline and butane blending operation comprising (a) providing a gasoline stream; (b) providing a butane stream; (c) measuring vapor pressure of gasoline in the gasoline stream; (d) calculating a blend ratio based upon said vapor pressure; (e) blending said butane stream and said gasoline stream at said blend ratio to provide a blended gasoline stream; (f) recording values that represent one or more of (i) the date, (ii) batch information selected from start and stop time, total volume of gasoline per batch, total volume of butane blended per batch, petroleum type, and petroleum destination, (iii) average blend ratio, (iv) gasoline flow rate, (v) blend ratio, (vi) blend rate, (vii) vapor pressure of said gasoline upstream of the butane blending, (viii) vapor pressure of said gasoline downstream of the butane blending, (ix) vapor to liquid ratio of said gasoline upstream of the butane blending, (x) vapor to liquid ratio of said gasoline downstream of the butane blending, (xii) the amount of butane in one or more tanks of butane on the tank farm, (xiii) the content of sulfur in one or more samples of said butane, (xiv) the pressure of said butane stream at two points along the butane stream, (xv) the settings for daily calibration of a gasoline vapor pressure sensor, and (xvi) the temperature of any butane storage tanks located at the tank farm; (g) storing said values in an informational database; and (h) providing remote access to said values to an information processing unit with access to an Internet connection.

The foregoing methods may further comprise measuring vapor pressure of the blended gasoline stream, as described as part of the sixth embodiment. Any of the foregoing methods may further comprise measuring gasoline vapor-to-liquid ratio upstream and/or downstream of the blending.

Additionally, any of the foregoing methods may further comprise periodically or continuously withdrawing butane from said butane stream and periodically or continuously measuring sulfur content of the butane withdrawn from said butane stream, as described in the eighth embodiment discussion. These steps may comprise drawing an initial sample of butane from said butane stream, placing the initial sample of butane in a reservoir, repeatedly drawing subsequent samples of butane from said butane stream and placing them in the reservoir until a pre-determined amount of butane has been blended with the gasoline stream, manually withdrawing the

SUN_MAG_0001514

US 9,207,686 B2

13

reservoir, and measuring the sulfur content of the butane in the reservoir. A typical pre-determined amount of butane is about 500,000 gallons of butane. Measuring sulfur content in the butane stream in any of the foregoing methods may alternatively, or additionally, comprise connecting an automated sulfur measuring unit to the butane stream.

Any of the foregoing methods may further comprise determining the blend ratio of butane and gasoline that will yield a desired vapor pressure in the blended gasoline and blending said butane stream and said gasoline stream at said blend ratio. Said blend ratio may be determined from the vapor pressure of the gasoline in the gasoline stream and the vapor pressure of butane in the butane stream. Determining the blend ratio can be accomplished by setting a desired vapor pressure for the blended gasoline stream, transmitting the desired vapor pressure for the blended gasoline and the vapor pressure of the gasoline and butane streams to an information processing unit, and calculating a blend ratio based on the three vapor pressure values. After calculating the blend ratio, the blending process in any of the foregoing methods may further comprise measuring the vapor pressure of the blended gasoline, transmitting the value for the vapor pressure of the blended gasoline to a logic control unit, and then, using the logic control unit, adjusting the blend ratio of butane and gasoline to achieve the desired vapor pressure in the blended gasoline.

The illustration in FIG. 5 shows an exemplary process for determining the blend ratio of butane and gasoline in any of the foregoing methods. The process comprises selecting a desired vapor pressure for the blended gasoline 505, transmitting values for the desired vapor pressure, along with the vapor pressure of the gasoline and butane being blended, to an information processing unit 510, and calculating the blend ratio based on those values 515. The process shown in FIG. 5 further comprises blending gasoline and butane at the blend ratio to provide blended gasoline 520, measuring the vapor pressure of the blended gasoline 525, and adjusting the blend ratio as necessary based on the vapor pressure of the blended gasoline and the desired vapor pressure 530.

The blending procedure utilized in any of the foregoing embodiments may further comprise analyzing additional factors beyond vapor pressure, such as the time of year, delivery location, and type of petroleum. In such embodiments, the blending procedure may further comprise measuring vapor pressure of the gasoline stream and blended stream, and comparing said vapor pressures to allowable vapor pressures based on the time of year, the delivery location for the blended gasoline, and the type of petroleum flowing through the pipeline. Such embodiments may further comprise utilizing an information processing unit and an informational database on which is stored multiple allowable vapor pressures associated with date, petroleum type, and/or destination information, retrieving the corresponding date, petroleum type, and/or destination of the gasoline stream with the information processing unit, and calculating, with the information processing unit, the allowable vapor pressure for the retrieved date, petroleum type and/or destination for the gasoline stream. In such embodiments, analyzing delivery location and type of petroleum may be accomplished by analyzing a batch code that is based upon the delivery location and type of petroleum associated with each batch of petroleum product to pass through the blending operation. The blending procedure described in any of the foregoing methods may further comprise setting a blend rate and/or blend ratio to zero when a petroleum product to which butane cannot be added is flowing through the pipeline.

14

The blending procedure utilized in the foregoing methods may further comprise analyzing volumetric flow rate of the gasoline in the gasoline stream. In any of the foregoing methods, the gasoline in the gasoline stream may have a constant volumetric flow rate. Alternatively, the gasoline in the gasoline stream may have a volumetric flow rate that varies within a batch. Where the volumetric flow rate of gasoline in the gasoline stream varies within a batch, any of the foregoing methods may further comprise periodically determining the volumetric flow rate of the gasoline and periodically recalculating the blend rate based upon the gasoline flow rate and the blend ratio. The gasoline flow rate and gasoline vapor pressure may be periodically re-determined at the same frequency, so that the blend ratio and blend rate are both periodically recalculated to account for differences within and among batches in gasoline flow rate and gasoline vapor pressure.

The rate at which a fluid flows through a valve is a function of the pressure of the fluid exiting the valve, and the area of the orifice through which the fluid flows through the valve. Therefore, said butane stream and said gasoline stream may be blended at a blend ratio by steps comprising modulating pressure of the butane stream, modulating area of an orifice of a valve through which the butane stream flows toward the gasoline stream, and opening an on/off valve along the gasoline stream. FIG. 4 illustrates an exemplary process for blending butane and gasoline at a given blend ratio. The process comprises modulating the pressure of the butane stream entering the blending operation 405, modulating the size of the orifice through which butane enters the blending operation 410, and opening an on/off valve along the gasoline stream 415.

In any of the foregoing methods, the butane stream may be fed by a source of butane that comprises a consolidation of multiple butane bullets. The sulfur content of butane may be measured downstream of said consolidation of multiple butane bullets.

In any of the foregoing methods, the gasoline stream may comprise a plurality of incoming batches of gasoline, and the blending may yield a plurality of batches of blended gasoline. When the gasoline stream comprises a plurality of incoming batches of gasoline, the in-line blending of gasoline and butane and the monitoring of the vapor pressure may be performed on each batch of incoming gasoline. When the blending yields a plurality of blended batches, sulfur content and vapor pressure for each batch of blended gasoline may be validated. The validation may be done using chill method techniques. Furthermore, each batch of blended gasoline may be divided into different streams of blended gasoline, and each stream may be sent to an off-site recipient of blended gasoline.

Any of the foregoing methods may further comprise measuring vapor to liquid ratio of the gasoline in the gasoline stream and/or in the blended gasoline stream. Measuring the gasoline stream for vapor pressure and/or vapor to liquid ratio can be accomplished by drawing a sample of gasoline from the gasoline stream, measuring the vapor pressure and/or vapor to liquid ratio of the sample of gasoline, and returning the sample of gasoline to the gasoline stream. The vapor pressure and/or vapor to liquid ratio of the gasoline may be measured every seven minutes. Likewise, measuring the blended gasoline stream for vapor pressure and/or vapor to liquid ratio can be accomplished by drawing a sample of blended gasoline from the blended gasoline stream, measuring the vapor pressure and/or vapor to liquid ratio in the sample of blended gasoline; and returning the sample of blended gasoline to the blended gasoline stream. The mea-

SUN_MAG_0001515

**PTX-3.14**

Appx204

US 9,207,686 B2

15

surements of the vapor pressure and/or vapor to liquid ratio may also be done every seven minutes.

FIG. 3 illustrates an exemplary procedure for measuring the vapor pressure and/or vapor to liquid ratio in the gasoline stream or blended gasoline stream. The procedure comprises drawing a sample from the gasoline or blended stream 305, measuring the vapor pressure and/or vapor to liquid ratio of the sample 310, and returning the sample to the gasoline or blended stream 315.

Any of the foregoing methods may further comprise manually shutting down the blending operation in emergencies, during periods of time when blending is not permitted, or if a batch of transmix enters the blending operation. Manually shutting down the blending operation may be accomplished by controlling the on/off valve near the gasoline stream, and said valve may be controlled from two or more remote locations.

Additionally, any of the foregoing methods may further comprise (a) recording values that represent one or more of: (i) the date, (ii) batch information selected from start and stop time, total volume of gasoline per batch, total volume of butane blended per batch, petroleum type, and petroleum destination, (iii) average blend ratio, (iv) gasoline flow rate, (v) blend ratio, (vi) blend rate, (vii) vapor pressure of said gasoline upstream of the butane blending, (viii) vapor pressure of said gasoline downstream of the butane blending, (ix) vapor to liquid ratio of said gasoline upstream of the butane blending, (x) vapor to liquid ratio of said gasoline downstream of the butane blending, (xii) the amount of butane in one or more tanks of butane on the tank farm, (xiii) the content of sulfur in one or more samples of said butane, (xiv) the pressure of said butane stream at two points along the butane stream, (xv) the settings for daily calibration of a gasoline vapor pressure sensor, and (xvi) the temperature of any butane storage tanks located at the tank farm; (b) storing said values in an informational database; and (c) providing remote access to said values to an information processing unit with access to an Internet connection.

Referring to FIG. 2, this flow chart diagram illustrates an exemplary overview of the blending process of any of the foregoing methods. The blending process may comprise providing a gasoline stream 205, providing a butane stream 210, analyzing the gasoline stream 215, analyzing the butane stream 220, selecting a rate at which to blend the streams 225, blending the streams 230, providing blended gasoline 235, and analyzing the blended gasoline 240.

In any of the foregoing methods, the gasoline stream may comprise reformulated gasoline. Additionally, in the foregoing methods, the vapor pressure measured may be Reid vapor pressure instead of true vapor pressure.

Furthermore, in any of the foregoing methods, the blending and analyzing of butane and gasoline may be performed on one skid or platform. Additionally, any of the foregoing methods may be practiced anywhere downstream of a refinery, including at a rack with a dispensing unit. The method may also be practiced at a gasoline tank farm, either before the gasoline is introduced to a tank, or after the gasoline is withdrawn from the tank. The tank farm may be a terminal gasoline tank farm, an intermediate gasoline tank farm, or a combined use tank farm.

What is claimed is:

1. A method for in-line blending of gasoline and a volatility modifying agent comprising:
   a) providing a continuously flowing gasoline stream that comprises:
      i) a plurality of batches of different gasoline types;
      ii) a gasoline flow rate that varies over time; and

16

      iii) a plurality of gasoline vapor pressures;
   b) providing an allowable vapor pressure;
   c) providing a stream of said agent that comprises an agent vapor pressure;
   d) periodically determining said gasoline vapor pressure;
   e) periodically determining gasoline flow rate;
   f) calculating a blend ratio based upon said agent vapor pressure, said gasoline vapor pressure, and said allowable vapor pressure; and
   g) blending said agent stream and said gasoline stream at a blending unit at said blend ratio to provide a blended gasoline stream having a blended vapor pressure less than or equal to said allowable vapor pressure.

2. The method of claim 1 further comprising calculating a blend rate based upon said flow rate.

3. The method of claim 1, further comprising:
   a) providing a first information processing unit (IPU) on which said calculating is performed;
   b) providing a second IPU which generates pulses of flow rate data;
   c) transmitting said flow rate data to said first IPU; and
   d) calculating a blend rate on said first IPU based upon said flow rate data from said second IPU.

4. The method of claim 1 wherein said gasoline stream comprises a consolidation of gasoline batches from multiple sources at disparate locations.

5. The method of claim 1 further comprising:
   a) storing, in one or more informational databases, seasonal data that prescribes (i) said allowable vapor pressure on two or more prescribed dates or ranges of dates, or (ii) whether agent blending is allowed on two or more prescribed dates or ranges of dates; and
   b) calculating said blend ratio based upon current date information and said seasonal data.

6. The method of claim 1 further comprising:
   a) recording a start time when a recorded batch begins to flow past said blending unit;
   b) recording an end time when said recorded batch finishes flowing past said agent blending unit;
   c) recording a quantity of agent blended with said gasoline stream between said start time and said end time; and
   d) associating said quantity of agent with said recorded batch in an informational database.

7. A system for in-line blending of gasoline and a volatility modifying agent comprising:
   a) a continuously flowing gasoline stream that comprises:
      i) a plurality of batches of different types of gasoline;
      ii) a gasoline flow rate that varies over time; and
      iii) a plurality of gasoline vapor pressures;
   b) an agent stream that comprises an allowable agent vapor pressure;
   c) a blending unit for blending said gasoline stream and said agent stream at an actual blend ratio and an actual blend rate to yield a blended gasoline stream;
   d) an upstream vapor pressure sensor in sensory communication with said gasoline stream upstream of said blending unit; and
   e) one or more information processing units (IPUs) in informational communication with said upstream vapor pressure sensors, logically programmed to calculate a calculated blend ratio and calculated blend rate based upon vapor pressure and volumetric flow rate of said gasoline stream, and for communicating said calculated blend ratio and calculated blend rate to said blending unit;
   f) wherein said blending unit periodically accesses said calculated blend ratio and calculated blend rate from

SUN_MAG_0001516

**PTX-3.15**

Appx205

said one or more IPUs, and adjusts the actual blend ratio and actual blend rate to coincide with said calculated blend ratio and calculated blend rate.

**8**. The system of claim **7** further comprising a downstream vapor pressure sensor in sensory communication with said gasoline stream downstream of said blending unit.

**9**. The system of claim **7** further comprising one or more informational databases in informational communication with said downstream vapor pressure sensor, wherein said one or more informational databases periodically access and store vapor pressure measurements from said downstream vapor pressure sensor.

**10**. The system of claim **7** wherein said one or more IPUs are further logically programmed to calculate said calculated blend ratio based upon the date.

**11**. The system of claim **7** wherein said blending unit comprises:

a) an on/off valve between said gasoline stream and said agent stream; and

b) a modulating valve that modulates rate of flow of said agent stream toward said on/off valve.

**12**. The system of claim **7** further comprising:

a) one or more informational databases on which is stored seasonal data that prescribes (i) allowable vapor pressures on two or more prescribed dates or ranges of dates, or (ii) whether agent blending is allowed on two or more prescribed dates or ranges of dates; and

b) one or more information processing units (IPUs) in informational communication with said upstream vapor pressure sensors and said informational databases, logically programmed to retrieve the date and to calculate a calculated blend ratio and calculated blend rate based upon the stored seasonal data and vapor pressure and volumetric flow rate of said gasoline stream, and for communicating said calculated blend ratio and calculated blend rate to said blending unit;

c) wherein said blending unit periodically accesses said calculated blend ratio from said IPU, and adjusts the actual blend ratio to coincide with said calculated blend ratio.

**13**. The system of claim **7** further comprising an agent sampling unit for periodically or continuously withdrawing agent from said agent stream, wherein:

a) said agent sampling unit is under the command of one or more information processing units (IPUs), wherein said one or more IPUs command said agent sampling unit to withdraw into a reservoir at least one sample of agent from said agent stream at least every 500,000 gallons of agent; and

b) said reservoir is manually withdrawn periodically from said agent sampling unit, and any agent contained in said reservoir is tested for sulfur content.

**14**. The system of claim **13** wherein said agent sampling unit and said agent vapor pressure sensor are located on a platform in proximity to said petroleum pipeline.

**15**. The system of claim **7** wherein said blending unit comprises:

a) an on/off valve between said gasoline stream and said agent stream; and

b) a modulating valve that modulates rate of flow of said agent stream toward said on/off valve.

**16**. A method for in-line blending of petroleum and a volatility modifying agent comprising:

a) providing a petroleum stream that comprises a petroleum vapor pressure and a flow rate;

b) providing an agent stream that comprises an agent vapor pressure;

c) providing an allowable vapor pressure;

d) calculating a blend ratio based upon a blended petroleum vapor pressure, said agent vapor pressure, said flow rate and said allowable vapor pressure;

e) blending said agent stream and said petroleum stream at said blend ratio to provide a blended petroleum stream wherein the blended vapor pressure is less than or equal to said allowable petroleum vapor pressure; and

f) measuring vapor pressure of the blended petroleum stream.

**17**. The method of claim **16**, further comprising:

a) withdrawing agent from said agent stream; and

b) measuring sulfur content of said agent withdrawn from said agent stream.

* * * * *

SUN_MAG_0001517

PTX-3.16

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1218 and 2023-1274

**Short Case Caption:** Sunoco Partners Marketing & Terminals L.P. v. Powder Springs Logistics, LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,993 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 03/29/2023

Signature: John R. Keville

Name: /s/ John R. Keville